**UNITED STATES of America, et al., Plaintiffs,**

v.

**State of WASHINGTON, et al., Defendants.**

**Case No. CV 9213.**

United States District Court, W.D. Washington, at Seattle.

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS (January 1, 2008 through December 31, 2012)

900

See appellate decisions, 593 F.3d 790, 763 F.3d 1180.

904

## TABLE OF CONTENTS

*ORDER* *PAGE*

Order Granting Suquamish Tribes' Motion to Deny A & K Trust's request for
Intervenor Status (6/13/08) 905

Order Granting Suquamish Tribe's Motion for Summary Judgment (6/13/08) 908

Order Granting Suquamish tribe's Motion for Summary Judgment re A & K Trust
Tidelands ad Chico Bay (6/13/08) 910

Order on Rule 60(B) Motion to Reopen (9/2/08) 912

Joint Motion for Order to Adopt Stipulation Regarding Implementation of Shellfish
Settlement Agreement (10/10/08) 934

Order Adopting Stipulations Regarding Implementation of Shellfish Settlement
Agreement (10/21/08) 935

Order on Motion to Dismiss (11/13/08) 935

Order on Motion for Certificate of Appealability (1/5/09) 937

Order on Motion to Dismiss (6/16/09) 940

Order on Motion for Reconsideration (7/14/09) 941

Order on Motion of Makah Indian Tribe to Clarify the Status Quo (2/26/10) Minute
Order—Motion (3/5/10) 944

Order (3/10/11) 945

Order on Motion for Leave to File a Cross-request for Determination (4/12/11) 946

Order on Motions to Dismiss (9/28/11) 948

Order Regarding Dispute Resolution (10/18/11) 951

Amended Order Granting Suquamish and Tulalip joint Request for Clarification of
Section III.B.1 & B.6 of 1983 Muckleshoot Suquamish and Tulalip Settlement
Agreement (10/27/11) 958

Supplemental Order on Paragraph 25 Procedures (11/9/11) 959

Order on Motion for Reconsideration (2/13/12) 960

Order on Motion to Dismiss (2/13/12) 961

Order on Motions for Reconsideration (3/14/12) 962

Order on Motions to Modify the Status Quo (3/14/12) 963

Order on Motion for Clarification (3/16/12) 967

Minute Order (3/23/12) 968

Order on Motion for Leave to Intervene (8/9/12) 968

Order on Motion for Summary Judgment (10/11/12) 968

Order on Motion to Quash and For a Protective Order (11/20/12) 980

Order on Electronic Filing Procedures for C70–9213 (11/20/12) 982

Amended Supplemental Order on Paragraph 25 Procedures (11/20/12) 982

Order (12/5/12) 983

## COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
### (Through December 31, 2012)

## ORDER GRANTING SUQUAMISH TRIBE'S MOTION TO DENY A & K TRUST'S REQUEST FOR INTERVENOR STATUS

### Subproceeding Nos. 89–3 (Shellfish), 89–3–05

### (June 13, 2008)

RICARDO S. MARTINEZ, District Judge.

This matter is before the Court for consideration of a motion filed by the Suquamish Tribe to deny A & K Trust's Request for Intervention. Dkt. # 14565 (also docketed as Dkt. # 31 in Subproceeding 89–305). This motion was filed pursuant to the Settlement Agreement filed in Subproceeding 89–3, and procedures set forth in the subsequent Order adopting the Settlement Agreement. Dkt. ## 14476, 14482. The A & K Trust has appeared to oppose the motion. Oral argument was heard on June 11, 2008, and the matter has been fully considered. For the reasons set forth below, the Court shall grant the motion.

### DISCUSSION

On June 20, 2007, the parties filed a Settlement Agreement in this matter, setting forth an agreement by which the Tribes, the Intervenor Shellfish Growers, the State of Washington, and the United States settled a long-standing dispute regarding the Tribes' treaty right to take shellfish on tidelands owned by the State of Washington or owned or leased by private parties. The significant aspect of this agreement is that the Tribes agreed that upon the fulfillment of certain contingencies (leading to the payment of $33 million to the Tribes), "any and all shellfish on 'covered tidelands' ... are deemed as of the date of this Settlement Agreement to be 'staked and cultivated by citizens' for the purpose of implementing the Treaties ..." Settlement Agreement, ¶ 6A. The

designation of the "covered tidelands" as "staked and cultivated" thus brought these tidelands under the so-called Shellfish Proviso of the Stevens' Treaties, which reserved to the Tribes the right of taking fish in common with all citizens of the Territory, *"Provided, however,* That they shall not take shellfish from any beds staked or cultivated by citizens." *United States v. Washington,* 157 F.3d 630, 638 (9th Cir.1998). This determination as to what constitutes a "staked and cultivated bed" immune from Tribal harvest has been the focus of the on-going "Density Dispute" (Subproceeding 89–3).

The "covered tidelands" to be designated as "staked and cultivated" are those owned or leased by eight named shellfish growers who were the original Intervenors in this Subproceeding: Taylor United, Inc.; Olympia Oyster Co.; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minterbrook Oyster Co.; Charles and Willa Murray; Skookum Bay Oyster Co.; and J & G Gunstone Clams, Inc. Settlement Agreement, ¶ 2(A). Pursuant to the Settlement Agreement and a subsequent stipulation regarding its implementation, other shellfish growers who meet the conditions set forth in the Settlement Agreement could become Intervenors and be bound by the terms of the Settlement Agreement by filing a Notice and Request for Intervention on or before March 1, 2008. Such Notice must include documentation which would establish that the requirements for Intervenor status set forth in the Settlement Agreement had been met. Settlement Agreement, ¶¶ 2(B), 2(C). The Tribes would then have eight months to file objections to any such Notice. Stipulation Regarding Implementation of Settlement Agreement, Dkt. # 14481. A & K Trust ("the Trust") filed a Notice and Request for Intervention on February 29, 2008. Dkt. # 14497. To date, the Suquamish Tribe's objection to the Notice filed by the Trust is the only objection filed by the Tribes.

The criteria that a grower must meet to qualify for Intervenor status under the Settlement Agreement, and have tidelands regarded as "covered tidelands", are set forth in that Agreement. First, the person must be a member of the Puget Sound Legal Defense Fund. Second, the grower must have, on or before August 28, 1995, owned tidelands, leased them from a private party, or "otherwise had a right to commercial harvests of shellfish from tidelands" **and** either (1) had an active aquatic farm registration for commercial harvest of shellfish from tidelands on or before August 28, 1995, **and** a Washington Department of Health certification for those tidelands; or (2) on or before the date the party seeks intervention, he or she had an active aquatic farm registration for commercial shellfishing on designated tidelands, together with a health certification for those tidelands, **and** the person provides documentary evidence establishing that those tidelands were used for "sustained commercial production" of shellfish during some portion of the time between January 1, 1985, and August 28, 1995. Settlement Agreement, ¶¶ 2(B)(i), 2(B)(ii). In addition, a grower seeking to qualify under either section must provide sufficient identification of the specific tidelands to be covered, as by county and tax parcel number. A third route to qualification, not relevant here, provides for Intervenor status for growers who acquired the right to grow and harvest shellfish from someone else who already qualified, either as one of the original eight Intervenors, or through one of the routes set forth in ¶¶ 2(B)(i) and (ii).

Together with the Notice and Request for Intervention, the Trust filed over 350 pages of documents, including copies of aquatic farm registrations, deeds, tax rec-

ord, lease agreements, and licenses, all purportedly relating to various tidelands in Dyes Inlet, Washington.[1] Dkt. # 14497. In moving to deny Intervenor status to the Trust, the Suquamish Tribe asserts that none of the documentation satisfies the requirements set forth under either ¶ 2(B)(i) or (ii), and that none of it sufficiently identifies the specific tidelands to be considered as "covered tidelands.". In opposing the motion, the Trust identifies six particular tax parcels, and argues that various leases and oyster transfer permits provide sufficient documentation to meet the requirements set forth under ¶ 2(B)(ii) of demonstrating "sustained commercial production" on those tidelands at some time between January 1, 1985, and August 28, 1995. The Court finds that is not so.

The tidelands which the Trust seeks to include as "covered tidelands" in its Notice and Request for Intervention lie adjacent to Chico Bay, Phinney Bay, and Erlands Point, all within Dyes Inlet, Washington. It is undisputed that this entire area was closed to the commercial harvest of shellfish from the late 1960's until 1996—after the crucial date of August 28, 1995, due to pollution of the surrounding waters. In 1996, some areas of Dyes Inlet were opened to restricted harvest, as by relying clams from there to clean waters elsewhere for a period of purging. However, prior to August 28, 1995, even that limited harvest was not allowed.

■ The Trust thus conceded at oral argument that no "sustained commercial production" took place on these tidelands between 1985 and August 28, 1995, as required to qualify under ¶ 2(B)(ii). Instead, the Trust urged the Court to consider that under the circumstances here, where the tidelands were closed to harvest

throughout the critical period, a demonstration of "sustained commercial *activity*" should be considered sufficient to meet the requirement set forth in the Settlement Agreement. The Trust offered several documents which purported to show commercial "activity" during the relevant period, such as oyster transfer permits. Trust's Response, filed in Subproceeding 89–305 only, Dkt. # 36, Exhibits C, D. However, these unauthenticated documents are inadmissible hearsay, and further fail to provide any indicia tying them to the tidelands at issue here. More importantly, even if these documents could be considered as evidence of commercial activity on the Trust's tidelands, the Court cannot adopt the Trust's argument that commercial "activity" should be considered the functional equivalent of commercial "production" for the purposes of the Settlement Agreement.

The language of the Settlement Agreement clearly and unequivocally states that in order for tidelands to qualify as "covered tidelands" and be considered "staked and cultivated" under ¶ 2(B)(ii) of the Agreement, documentation must be provided "establishing that those tidelands were *used for sustained commercial production of shellfish during some portion of the time between January 1, 1985, and August 28, 1995.*" Settlement Agreement, ¶ 2(B)(ii). There is no exception in this carefully-crafted Agreement for tidelands that were closed to commercial production and harvest during that time. Nor can the Court make that exception. The designation of beds as "staked and cultivated" within the language of the Shellfish Proviso is in derogation of the Tribes' treaty right to harvest shellfish at their usual and accustomed places. Therefore, any provi-

---

1. The Trust failed to provide paper copies of these documents to the Court, as required under this Court's rules for electronic filing.

The Trust was reminded of this requirement by the clerk prior to the hearing, but still did not provide copies of the documents.

sion regarding that designation, including the Tribes' agreement in the Settlement Agreement, must be strictly construed. Where the language in the Agreement requires a demonstration of "sustained commercial *production*"; the Court cannot expand the language to include "sustained commercial *activity*."

As the Trust has failed to produce appropriate documentary evidence that its leased tidelands are "covered tidelands" within the provisions of the Settlement Agreement, it has not established Intervenor status in this matter. The motion of the Suquamish Tribe to deny the A & K Trust's Request for Intervention in the Shellfish Settlement Agreement (Dkt. # 14565 in Subproceeding 89-3, Dkt. # 31 in Subproceeding 89-305) is accordingly GRANTED. The Clerk shall file a copy of this Order in both Subproceeding 89-3 and in Subproceeding 89-305.

## ORDER GRANTING SUQUAMISH TRIBE'S MOTION FOR SUMMARY JUDGMENT

Subproceeding No. 89-3-05

(June 13, 2008)

This matter is before the Court for consideration of the Suquamish Tribe's Motion for Summary Judgment as to their Request for Dispute Resolution. Dkt. # 31. The Request for Dispute Resolution was filed pursuant to authority conferred by the Amended Shellfish Implementation Plan ¶ 9. 1. *United States v. Washington*, C70-9213, Subproceeding 89-3, Dkt. # 14331 (April 8, 2002).[1] The Suquamish Tribe asks that the Court adopt and enforce a plan proposed by the Suquamish for the harvest of clams on tidelands

leased by A & K Trust ("Trust") at Chico Bay in Kitsap County, Washington. The Trust has opposed the motion. The Court heard oral argument on June 11, 2008, and the matter has been fully considered. For the reasons set forth below, the motion of the Suquamish Tribe shall be GRANTED.

### DISCUSSION

This is the second time these parties have been before the Court regarding the Suquamish Tribe's treaty harvest of clams from tidelands leased by A & K Trust. *See*, Subproceeding 89-303. In the prior dispute, regarding the Trust's leased tidelands at Erlands Point, the Court found that the clam beds there did not qualify as "existing beds on property owned or leased by Growers licensed by the State of Washington", as set forth in § 6.1 of the Revised Shellfish Implementation Plan. C70-9213, Subproceeding 89-303, Dkt. # 31, p. 6 (May 28, 2004). The Suquamish Tribe was therefore entitled to exercise its treaty-based right to harvest clams from those tidelands.

Three years later, the Tribes, the State of Washington, the United States, and certain shellfish growers reached an agreement, formalized in a Settlement Agreement which was filed with the Court on June 20, 2007. C70-9213, Subproceeding 89-3, Dkt. # 14476. The significant aspect of this Agreement is that the Tribes agreed that upon the fulfillment of certain contingencies, "any and all shellfish on 'covered tidelands' ... are deemed as of the date of this Settlement Agreement to be 'staked and cultivated by citizens' for the purpose of implementing the Treaties ..." Settlement Agreement, ¶ 6A. The designation of the "covered tidelands" as "staked and cultivated" thus brought those

---

1. The undersigned judge was designated as the dispute resolution judge in 2002 when he was a United States Magistrate Judge. Since that date, he has been appointed as a United States District Judge, and no other Magistrate Judge has been designated as dispute resolution judge in the Amended Shellfish Implementation Plan.

tidelands under the so-called Shellfish Proviso of the Stevens' Treaties, which reserved to the Tribes the right of taking fish in common with all citizens of the Territory, *"Provided, however,* that they shall not take shellfish from any beds staked or cultivated by citizens." *United States v. Washington,* 157 F.3d 630, 638 (9th Cir.1998).

■ Apparently relying on the designation of "covered tidelands" as "staked and cultivated" beds in the Settlement Agreement, the Trust denied the Suquamish Tribe access to tidelands leased by the Trust at Chico Bay. The Tribe filed a Request for Dispute Resolution regarding these tidelands on June 14, 2007, and requested a preliminary injunction to enjoin any party from harvesting the clams until the matter could be resolved. The Trust and the Tribe stipulated to such an injunction, and as the additional party Clam Acres had not appeared in opposition, the injunction was entered. Dkt. ## 9, 13. The Tribe now seeks summary judgment on the issue presented in the Request for Dispute Resolution; that is, whether the designated tidelands leased by the Trust at Chico Bay are subject to treaty harvest by the Tribe, and whether the Tribe's proposal for organizing that harvest should be adopted.

In opposing the motion, the Trust first asserts that there are issues of fact as to whether it is entitled to intervene and participate in the Settlement Agreement. However, the Court has by separate Order granted the Suquamish Tribe's motion to deny the Trust's Notice and Request to Intervene in the Settlement Agreement.

The Trust's tidelands at Chico Bay therefore do not qualify as "covered tidelands" within the meaning of that Agreement. In the absence of such qualification, this matter, like the previous dispute between the Tribe and the Trust, is governed by the terms of the Amended Shellfish Implementation Plan ("the Plan").

· The Plan sets forth a specific procedure by which a shellfish grower and a Tribe with a treaty-based right to harvest naturally-occurring shellfish on tidelands owned or leased by that grower shall determine the Tribe's allocation of shellfish. Paragraph 6.1 of the Plan applies to shellfish beds on tidelands controlled by a grower who was licensed by the State of Washington as of August 28, 1995, the effective date of the original Shellfish Implementation Plan. The Court determined in the prior dispute between the Trust and the Suquamish Tribe that as of the relevant date, the Trust did not possess a grower's license for the Erlands Point tidelands. Subproceeding C89–303, Dkt. # 31, p. 6. The Trust has submitted no evidence which would change that result for the Chico Bay tidelands.[2]

Shellfish beds which were not controlled by a licensed grower as of August 28, 1995 are addressed in ¶ 6.3 of the Plan. That paragraph sets forth specific procedures for a grower to give notice to Tribes who might be affected by the grower's aquatic farming activities on tidelands subject to that Tribe's treaty harvest rights. Nowhere has the Trust submitted any evidence that it has complied with the procedures set forth in ¶ 6.3 of the Plan. Instead, the Trust has offered inadmissi-

**2.** The Trust has submitted as evidence of its shellfish farming activities a hand written memo from Paul Taylor of Taylor Shellfish Farms. The memo states in part, "We seeded 100,000 clams in 1997" and "I know you had oysters planted and at least a couple of predator nets when we first looked at the ground." The Tribe has objected to this memo as inad-

missible hearsay, and the Court agrees. Even if the memo could be considered, it does not constitute evidence of shellfish farming activity by the Trust at Chico Bay; it does not identify who "we" are nor state where the clams were seeded and predator nets placed. Further, the only date given, 1997, is post-Implementation Plan.

ble evidence purporting to demonstrate its efforts to develop some unspecified tidelands as commercial shellfish beds. Trust's Response, Dkt. # 35, Exhibits A & B. At oral argument, the Trust argued that it is entitled to reap the fruits of its labor. However, ¶ 6.3 is crafted to ensure just that benefit to a shellfish grower. The Trust has failed to comply with the requirements of ¶ 6.3 of the Plan, and is not entitled to claim the benefits thereof.

## CONCLUSION

The Trust has presented no evidence that would create a factual issue with respect to the Suquamish Tribe's treaty-based right to harvest clams at the Trust's Chico Bay tidelands. Nor has the Trust presented any evidence or argument as to why the Court should not adopt the Tribe's proposal for proceeding with that harvest. Accordingly, the Tribe's motion for summary judgment is GRANTED. The Court shall sign and file the proposed Order presented by the Tribe, setting forth a reasonable and orderly procedure by which the parties may proceed with the harvest.

ORDER GRANTING SUQUAMISH TRIBE'S MOTION FOR SUMMARY JUDGMENT RE: A & K TRUST TIDELANDS AT CHICO BAY

Subproceeding No. 89–3–05

(June 13, 2008)

This matter comes before the Court on the Suquamish Tribe's Motion for Summary Judgment Re: A & K Trust Tidelands at Chico Bay. The Court has considered the papers submitted and the arguments presented by the parties. The Court hereby GRANTS the Suquamish Tribe's Motion for Summary Judgment Re: A & K Trust Tidelands at Chico Bay. The Court hereby ORDERS as follows:

1. The Tribe and A & K Trust (the "Trust"), including Clam Acres or any other person acting on the Trust's behalf, shall harvest and manage the Chico Bay tidelands (i.e., tax parcel numbers 052401–1–075–2000 and 322501–3–036–2000) on a rotational basis until further order of the Court or agreement by the parties. Under this rotational scheme, the parties shall collectively harvest up to 33% (up to 16.5% each) of the harvestable clam biomass annually.

2. Annual allocations of manila clams ("M") and native littleneck clams ("NL") under this rotational scheme for each harvest area through the end of 2010 are as follows:

Parcel 052401–1–075–2000

(portion not subject to July 20, 2007 DOH emergency closure)

| | Suquamish Tribe | A & K Trust |
| --- | --- | --- |
| 2008 M | 15,742 pounds | 13,042 pounds |
| 2008 NL | 2,107 pounds | 2,107 pounds |
| 2009 M | 15,742 pounds | 15,742 pounds |
| 2009 NL | 2,107 pounds | 2,107 pounds |
| 2010 M | 15,742 pounds | 15,742 pounds |
| 2010 NL | 2,107 pounds | 2,107 pounds |

Parcel 052401–1–075–2000
(portion subject to July 20, 2007 DOH emergency closure)

| | Suquamish Tribe | A & K Trust |
|---|---|---|
| 2008 M | 2,154 pounds | 2,154 pounds |
| 2008 NL | 196 pounds | 196 pounds |
| 2009 M | 2,154 pounds | 2,154 pounds |
| 2009 NL | 196 pounds | 196 pounds |
| 2010 M | 2,154 pounds | 2,154 pounds |
| 2010 NL | 196 pounds | 196 pounds |

Parcel 322501–3–036–2000

| | Suquamish Tribe | A & K Trust |
|---|---|---|
| 2008 M | 496 pounds | 496 pounds |
| 2008 NL | 57 pounds | 57 pounds |
| 2009 M | 496 pounds | 496 pounds |
| 2009 NL | 57 pounds | 57 pounds |
| 2010 M | 496 pounds | 496 pounds |
| 2010 NL | 57 pounds | 57 pounds |

3. Absent some other agreement by the parties, the Tribe shall conduct a new clam population survey of the Chico Bay tidelands in the spring of 2011, and every third year thereafter, and future harvest allocations under this rotational scheme shall be calculated in accordance with such surveys.

4. The Tribe shall have the opportunity to immediately harvest its 2008 shares of the manila and native littleneck clams on the Chico Bay tidelands. The Trust, Clam Acres, and anyone acting on their behalf, shall not harvest any clams from the Chico Bay tidelands until the Tribe has completed its 2008 harvests or until five months have elapsed from the date of this Order, whichever comes first. The Tribe shall inform the Trust and WDFW of the dates that it plans to harvest as soon as practical, and shall promptly notify the Trust when it has completed the harvest of its allocation on any of the three harvest areas.

5. In future years, the parties shall schedule their harvests so as to account for spawning periods and DOH closures, and so as to accommodate the other party's full and fair opportunity to conduct its harvests. Each party shall provide notice to the other party at least three (3) business days prior to harvest, each party may have a representative present for the other party's harvests and "weigh-outs," and each party shall promptly provide to the other party a report showing the quantities of clams harvested by date.

6. At least thirty (30) days prior to any proposed commercial shellfish harvest on tidelands owned, leased, or otherwise controlled by the Trust (wherever located, including but not limited to the Trust's tidelands at Erlands Point, Phinney Bay, and elsewhere in Chico Bay), the Trust shall notify the Tribe (and any other affected treaty tribes). Prior to any such harvest, the Trust and the Tribe (and any other affected tribes) shall establish a plan that provides for the implementation of the Tribe's (or tribes') treaty right to 50% of the naturally-occurring shellfish on such tidelands. In the event the Trust provides a proper notice to the Tribe and other affected tribes under Section 6.3 of the Implementation Plan, the terms of Section 6.3 shall control.

7. The clerk is directed to enter judgment accordingly.

## ORDER ON RULE 60(B) MOTION TO REOPEN

Subproceeding No. 01–2

(September 2, 2008)

This matter is before the Court for consideration of a Rule 60(b) motion by the Samish Indian Nation [1] to reopen the judgment in *U.S. v. Washington*, C70–9213. Dkt. # 300. The earlier denial of this motion was reversed and remanded to this Court by the Ninth Circuit Court of Appeals. *U.S. v. Washington*, 394 F.3d 1152 (9th Cir.2005). The Court heard oral argument on October 10, 2007, and has thoroughly considered the arguments and memoranda of the parties, together with the lengthy record in this case. For the reasons set forth below, the Court has concluded that the motion to reopen the judgment must be denied.

## BACKGROUND

This subproceeding represents the effort by the Samish Indian Nation ("the Samish") to be recognized as a "Treaty Tribe" [2] and thus exercise treaty fishing rights alongside other such recognized tribes pursuant to *U.S. v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974). In the previous Order denying the Rule 60(b) motion, the Court set forth the following factual statement, which is re-stated here as it sets the background for the present decision:

A. Treaty Fishing Rights

In 1970, the United States, on its own behalf and as trustee for seven Indian tribes, brought suit seeking an injunction requiring the State to protect those tribes' share or runs of anadromous fish. Seven other tribes intervened as plaintiffs. In 1974, United States District Judge Boldt ruled that all fourteen tribes had treaty fishing rights under several Indian treaties, including the Treaty of Point Elliot, which entitled them to take up to fifty percent of the harvestable fish passing through their off-reservation fishing grounds. *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974) ("*Washington I*"). *Washington I* declared the treaty fishing rights of only those "14 Indian entities" that had participated as plaintiffs in that proceeding and that were defined as "Treaty Tribes" in the ruling. 384 F.Supp. at 405. *Washington I* contemplated that additional Indian entities might become parties in the case if any such entitles demonstrated that is was "entitled to exercise fishing rights under the treaties construed herein within the Western District of Washington." *Id.*

On September 20, 1974, shortly after Judge Boldt's initial decision, the Samish Tribe, as well as the Duwamish, Snohomish, Steilacoom, and Snoqualmie Tribes, moved to intervene in *United States v. Washington*, to assert their own treat[y] fishing rights. Judge Boldt referred the issue of the Samish's treaty status to Magistrate Judge Robert Cooper sitting as a Special Master. After a five-day trial, Magistrate Judge Cooper determined that the Samish was neither a treaty tribe nor a political successor to the signatory treaty tribe.

The Samish appealed this determination to Judge Boldt, who thereafter conduct-

---

1. Movant has been identified throughout these proceedings as the Samish Indian Tribe or Samish Tribe as well as the Samish Indian Nation.

2. This term refers to those tribes which have been recognized by this Court as eligible to exercise fishing rights under the Treaty of Point Elliot, as determined in *U.S. v. Washington*, 384 F.Supp. 312 (1974), *U.S. v. Washington*, 459 F.Supp. 1020 (1978) and *U.S. v. Washington*, 476 F.Supp. 1101 (1979).

ed a *de novo* evidentiary hearing. The Samish submitted additional evidence to Judge Boldt, who heard argument in January 1977. Judge Boldt issued his decision in March 1979, ruling that the Samish were not a Treaty Tribe as defined in *Washington I* and that its members were not entitled to exercise treaty rights under the Treaty of Point Elliot. *United States v. Washington*, 476 F.Supp. 1101, 1111 (W.D.Wash.1979) ("*Washington II*"). Judge Boldt found that the Samish Tribe was not a successor in interest to any treaty signatory and had not maintained an organized tribal structure. *Id.* at 1106. Judge Boldt also concluded that the Samish were not entitled to exercise treaty rights because the Tribe was not "federally recognized" by the United States Department of Interior (DOI). *Id.* at 1111.

The Samish appealed Judge Boldt's ruling to the Ninth Circuit, arguing *inter alia* that Judge Boldt improperly adopted without substantial change the proposed findings and conclusions submitted by the United States. *United States v. Washington*, 641 F.2d 1368, 1371 (9th Cir.1981). The Samish also appealed Judge Boldt's Finding of Fact No. 27, in which Judge Boldt found that the Samish had "not lived as a continuous separate, distinct and cohesive Indian cultural or political community." 476 F.Supp. at 1105. Because Judge Boldt had in fact adopted most of the United States' proposed findings of fact and conclusions of law, the Ninth Circuit applied close scrutiny to the Samish's claims. The Ninth Circuit concluded that Judge Boldt had applied an incorrect legal test in determining whether a tribe had treaty rights. Rejecting the notion that federal recognition or nonrecognition was dispositive, the Ninth Circuit instead stated that the "single

necessary and sufficient condition for the exercise of treaty rights is" whether "a group of Indian descendants ... have maintained an organized tribal structure." 641 F.2d at 1372.

Applying this test to the record, the Ninth Circuit concluded "[a]fter close scrutiny, ... that the evidence supported [Judge Boldt's] finding of fact" that the Samish had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political communit[ies]." *Id.* at 1373. As for the effect of the Samish's nonrecognition, the court stated that "[n]onrecognition of the tribe by the federal government ... may result in loss of statutory benefits, but can have no impact on vested treaty rights." *Id.* The court, therefore, affirmed Judge Boldt because "the district court correctly resolved this question despite its failure to apply the proper standard." *Id.* at 1374. The Samish appealed this decision to the United States Supreme Court, which denied certiorari. 454 U.S. 1143 [102 S.Ct. 1001, 71 L.Ed.2d 294] (1982).

By the early 1980's, therefore, the Samish Tribe had failed to persuade at least three judicial bodies—Magistrate Judge Cooper, Judge Boldt, and the Ninth Circuit—that it was entitled to be a party to this case.

B. Federal Recognition Proceeding

In 1972, after Congress began conditioning eligibility for most programs benefitting Indians upon status as a federally recognized tribe, the Samish first sought federal recognition. *See* 25 U.S.C. §§ 450–450(n). In 1978 the DOI [Department of Interior] published final regulations governing the procedure for official recognition of Indian Tribes. Apparently, the DOI took no action on the Samish's original petition until after

the 1978 regulations were promulgated, and the Samish filed a revised petition under the new regulations in October 1979. Thereafter, the Bureau of Indian Affairs (BIA) conducted an independent inquiry into the Samish's recognition petition. The recognition petition was denied first in 1982, when the Assistant Secretary for Indian Affairs first published a preliminary determination concluding that the Samish should not be recognized. Samish objected to this decision and submitted a response and additional information and, after several years of delay, the Deputy to the Assistant Secretary for Indian Affairs issued a final decision in 1987 denying federal recognition to the Samish. 52 Fed.Reg. 3709 (Feb. 5, 1987).

In 1989, the Samish filed a federal action in this district, alleging that the BIA's denial of its recognition petition violated the Tribe's due process rights and that the Samish was the successor in interest to the treaty Samish Tribe for purposes of showing entitlement to federal recognition. *Greene v. Lujan,* No 89–645Z (W.D.Wash). The Tulalip Tribe sought to intervene in this case, believing that if Samish were to gain federal recognition, then treaty fishing rights would likely follow. Judge Zilly denied Tulalip's intervenor application but permitted it to participate as *amicus curiae.* On an interlocutory appeal, the Ninth Circuit affirmed the denial of the Tulalip's intervenor application on the grounds that "the calculus for tribal treaty rights under Ninth Circuit law is separate and distinct from that for federal acknowledgment." *Greene v. United States,* 996 F.2d 973, 976–77 (9th Cir.1993). Thus, the Ninth Circuit reasoned, Tulalip's interest in the recognition proceeding did not rise to intervenor status since "[e]ven if [the Samish] obtain federal tribal status, [they] would still have to

confront the decisions in *Washington I* and *II* before they could claim fishing rights."
*Id.*

On the merits, Judge Zilly held that the Samish had been denied due process in the recognition proceedings and vacated the decision denying recognition and remanded the recognition petition to the DOI for formal adjudication under the Administrative Procedure Act (APA). February 25, 1992 Order, 1992 WL 533059. The Ninth Circuit affirmed Judge Zilly's due process ruling, requiring an APA due process hearing for the Samish. *Greene v. Babbitt,* 64 F.3d 1266 (9th Cir.1995).

On remand, Administrative Law Judge (ALJ) David Torbett of the DOI Office of Hearings and Appeals conducted an APA due process hearing on the Samish's recognition proceeding. After an eight-day hearing, on August 31, 1995 Judge Torbett issued recommended findings of fact and conclusions of law in favor of Samish recognition.

In his recommended decision, ALJ Torbett found that the Samish met all seven mandatory criteria necessary for federal recognition as an Indian tribe. *See,* 25 C.F.R. § 83.7 (1993). Reviewing ALJ Torbett's decision, the Assistant Secretary for Indian Affairs rejected some of his findings and conclusions, but ultimately ruled in favor of Samish recognition on November 8, 1995. The Samish appealed these rejections, and Judge Zilly reinstated the finding[s] of fact and conclusions of law that had been rejected and affirmed the Samish recognition decision. *Greene v. Babbitt,* 943 F.Supp. 1278, 1288–89 (W.D.Wash.1995 [1996] ). Now, having achieved federal recognition, the Samish set out again [Note 4], pursuant to Rule 60(b)(6), to reopen the judgment in this case.

[Footnote 4: An earlier, unrelated attempt to set aside the judgment in *Washington II* occurred on November 22, 1993, when three Tribes, including the Samish, moved for relief under Rule 60(b)(6) on the grounds that Judge Boldt might have been mentally incompetent at the time he signed the final findings in the case. This court, on January 23, 1995, denied the motion on three grounds: (1) that courts should avoid [disturbing the public interest in] the finality of judgments; (2) that a ruling for the Tribes would open the floodgates to future challenges to judgments on grounds of judicial incompetence; and (3) the Tribes suffered no manifest injustice since the magistrate judge and the Ninth Circuit reached the same conclusion as Judge Boldt. The Ninth Circuit affirmed this court's ruling *United States v. Washington*, 98 F.3d 1159 (9th Cir.1996).]

Dkt. # 68, pp. 2–8.

In the written opinion on the judgment which the Samish now seek to reopen, the Court set forth both specific and general findings of fact. *U.S. v. Washington*, 476 F.Supp. 1101 (W.D.Wash.1979). The general findings applied to five intervenor tribes who were at that time seeking Treaty Tribe status: the Duwamish, Samish, Snohomish, Snoqualmie, and Steilacoom tribes. As to these tribes, the Court made the following general findings:

(1) Article 2 of the Medicine Creek Treaty and Article 4 of the Point Elliott Treaty provided that the tribes and bands which were parties thereto agree to remove to and settle upon the reservations within one year after ratification of said treaties if the means were furnished them. In the years following the ratification of those treaties the United States did not enforce those provisions. A number of tribes or parts of tribes or bands which were parties to the treaties did not remove to the reservations and some Indians who did move later left the reservation, often returning to their native areas. Among the reasons for not removing to or remaining on the reservation were: (1) the reservations were too small or otherwise inadequate for the tribes and bands assigned to them; (2) the tribes or bands were not on friendly terms with others assigned to the reservation or with the people in whose territory the reservation was located; and (3) the reservation was too far from their traditional territory. The United States did not adopt or apply a policy of requiring the western Washington tribes or bands who were parties to the treaties to remove to or remain on the reservations. (PTO Part 2 P 3).

(2). A number of individual Indian people intermarried with non-Indians, did not accompany their respective tribes to the reservations but took up the habits of non-Indian life, and lived as citizens of the State of Washington in non-Indian communities. (Ex. USA–112; Tr. 10/29/75, 378–379)

(3). During the latter part of the 19th century and early part of the 20th century it was the policy of the United States Government to encourage the breaking up of Indian reservations and destruction of tribal relations and to settle Indians upon their own allotments or homesteads, acculturate and incorporate them into the national life, and deal with them not as nations or tribes or bands but as individual citizens. (PTO Part 2 P 4; Exs. USA–123 through 128; Annual Rept. Comm'r of Ind. Affairs, 1890, p. VI)

(4). This policy was officially changed in the 1930's. (Exs. USA–129 and 130) The Indian Reorganization Act of June 18, 1934, 48 Stat. 984, was directed at

implementing a policy of organizing and strengthening Indian tribal entities so as to manage their own affairs and to promote their civic and cultural freedom and opportunity and their own economic rehabilitation. By the Indian Reorganization Act, the descendants of the treaty tribes associated with most of the reservations voted to reorganize pursuant to that Act as Indian tribes and political entities under federally-approved constitutions and bylaws having express and implied governmental and proprietary powers and with original inherent sovereign tribal powers preserved to the extent not restricted by federal law. Except for a brief policy in the 1950's of encouraging termination of federal supervision and administration of Indian affairs, the policy of encouraging tribal organization and greater self-management of internal affairs has continued and increased. (PTO Part 2 P 4; Ex. USA–130 pp. 418–421; Tr. 12/6/74, 212–214)

(5). In the period around 1916–1919 the Bureau of Indian Affairs caused an enumeration and enrollment to be made of unattached Indians in western Washington arranged by families and tribes. Special Indian Agent Charles E. Roblin was assigned to make this enumeration and enrollment. He found that a large number of persons claiming enrollment and allotment as Indians were descendants of Indian women who married early non-Indian pioneers and founded families of mixed bloods. He reported that in many cases these applicants and families had never associated or affiliated with any Indian tribe for several decades or even generations. (Ex. USA–112)

(6). Neither Congress nor·the Executive Branch has prescribed any standardized definition for either the term "Indian" or "Indian tribe" in terms of the special federal relationships with Indians. (Ex. USA–110, pp. 138–139) The term "Indian" is used in several contexts including biological descent, cultural identity and legal status. (Id.) The term "tribe" is·most commonly used in two senses, an ethnological sense and a political sense although it also may be used in a social sense. (Federal Indian Law United States Department of the Interior (1958) p. 454)

(7). As a major aspect of the new federal Indian policy adopted in the 1930's Congress enacted the Indian Reorganization Act of 1934. One of its major purposes was to authorize and facilitate the reorganization and revitalization of Indian tribal political entities. (Ex. T–22; Exs. USA–129 and 130) While existing recognized tribes did not have to accept the Act, and many did not, it did provide a means by which tribes which had lost their political authority and recognition could regain it.

(8). The legislative history of the Indian Reorganization Act of 1934 shows that in determining who was to be considered an Indian for the purpose of such tribal reorganization Congress rejected the Department of the Interior's recommendation that persons who were not members of recognized tribes then under federal jurisdiction * 1104 or their on-reservation descendants could participate in such reorganization if they were of one-fourth or more Indian blood. Instead Congress required that such persons be of one-half or more Indian blood. Representative Howard, the House sponsor and floor leader for the bill, explained during debate that the definition (now 25 U.S.C. § 479) defines who shall be classed as Indians for the purposes of the Act. He said:

"In essence, it recognizes the status quo of the present reservation Indians and

further includes all other persons of one-fourth or more Indian blood. The latter provision is intended to prevent persons of less than one-fourth (later changed to one-half) Indian blood who are not already enrolled members of a tribe or descendants of such members living on a reservation from claiming the financial and other benefits of the act. Obviously the line must be drawn somewhere or the Government would take on impossible financial burdens in extending wardship over persons with a minor fraction of Indian blood." (Ex. T–22; Congressional Record, June 15, 1934, p. 12056)

(9). As used in (a) these Findings Nos. 1 to 59, inclusive, (b) in the Findings and Judgment awards of the Indian Claims Commission referred to in said Findings and in the requirements for the preparation of rolls for distribution of said Judgment awards, and (c) in the membership requirements of each of these Intervenor entities, the terms "descendant" or "persons of Indian blood" means any person whose lineage includes any ancestor who was an Indian or a member of the referenced Indian tribe, community or other group. This is also true of the term "persons of Indian blood" unless a particular minimum degree of such blood or descent is specifically prescribed.

(10). The Court of Claims has determined and held that the Indian Claims Act of 1946, 60 Stat. 1049, allows claims to be prosecuted under that Act on behalf of Indian tribes, bands or communities that have ceased to exist as such, if brought as a representative action on their behalf by a group whose members can be identified as members or descendants of members of a previously existing tribe. (*Thompson v. United States,* 122 Ct.Cl. 348 (1952)).

(11). These five Intervenor tribes are not the beneficial owners of the Judgments that have been awarded under the Indian Claims Act on the claims prosecuted by them. Such Judgment Awards of the Intervenor Duwamish, Samish, Snohomish, and Snoqualmie tribes have been or will be distributed, pursuant to Acts of Congress dealing with such judgments, on a per capita basis to persons determined by the Secretary of the Interior to be descendants of members of the treaty-time tribes. (80 Stat. 910, 85 Stat. 83, 87 Stat. 466, 41 F.R. 5241). Distribution of the Steilacoom award has yet to be determined. (87 Stat. 466; Ex. USA–107, p. 4)

(12). None of the five Intervenor entities whose status is considered in these Findings is at this time a political continuation of or political successor in interest to any of the tribes or bands of Indians with whom the United States treated in the treaties of Medicine Creek and Point Elliott.

*Id.* at 1102–04.

The Court's specific factual findings underlying denial of the Samish request for Treaty Tribe status were set forth as follows:

*Specific Findings as to Intervenor Samish Tribe*

(22). The Intervenor Samish Indian Tribe (herein referred to as the Intervenor Samish Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1855 were known as Samish Indians and who were party to the Treaty of Point Elliott. The 1855 Samish were not named in the treaty but were assigned, for the purpose of including them in the treaty, to the Lummi signer, Chow-its-hoot, who signed the treaty for the Lummi and the other northern bands. (PTO Part 2 PP 1 and 2; Ex. USA–75 pp. 8–9) Official estimates of the number of Samish at

treaty times varied from about 98 to about 150 persons. (Ex. USA–75 p. 13)

(23). Pursuant to the treaty most of the Samish people initially moved to the Lummi Reservation. Later others moved to the Swinomish Reservation. The present-day Lummi and Swinomish Reservation tribes include descendants of the 1855 Samish Indians. (Ex. USA–75 pp. 2, 14–16; Ex. USA–30; Ex. USA–74, pp. 3–4)

(24). The Intervenor Samish Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 261 which resulted in a monetary judgment award. (Ex. USA–111) This award will be distributed per capita to the descendants of the Samish Tribe of Indians as it existed in 1859, born on or prior to and living on the effective date of the plan prepared by the Department of the Interior for the use and distribution of judgment funds. (41 F.R. 5140, Feb. 4, 1976).

(25). The Intervenor Samish Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements nor membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 P 2) Said Intervenor has adopted a constitution and bylaws pursuant to which it has a tribal council and a tribal chairman and purports to operate as an identifiable and distinct entity on behalf of its members. It claims 549 members. (Ex. SA–M–2; Ex. SA–79)

(26). The Intervenor Samish Tribe's constitution provides that its membership shall consist of all persons of Indian blood whose names appear on the official membership roll of the Samish Tribe to be dated June 1, 1975, as prepared by the Secretary of the Interior, and all persons born to any member of the Samish Tribe. (Exs. SA–M–2 and SA–M–3; Tr. 10/29/75, 267) No such roll is now in existence. (Exs. USA–M–16 and USA–107, p. 3) There is no requirement of specific minimum blood quantum either as to Samish blood in particular or Indian blood in general. (Exs. SA–M–2 and SA–M–3; Tr. 10/29/75, 273–274) The Intervenor's membership roll contains 549 persons many of whom are of only 1/16th degree Indian blood. Two have only 1/32nd Samish blood. (Ex. SA–79) The tribe does not prohibit dual membership and at least one member is an officer of the Lummi Tribe. (Tr. 10/29/75, 273)

(27). The members of the Intervenor Samish Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Ex. USA–107; Tr. 10/29/75, 232–235)

(28). The Intervenor Samish Tribe has had dealings with agencies of the United States, the State of Washington, and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Ex. USA–107 pp. 5–7)

(29). The Intervenor Samish Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott.

(30). The citizens comprising the Intervenor Samish Tribe have not maintained an organized tribal structure in a political sense.

*Id.* at 1105–06.

In moving to reopen, the Samish argue that the 1996 federal recognition constituted an "extraordinary circumstance" which would warrant reopening the judgment and a re-examination of their right to Treaty Tribe status. Their motion to reopen initiated this subproceeding, as a part of the ongoing *United States v. Washington,* C70–9213. The motion was opposed by nine of the twenty-two tribes which had previously been recognized as Treaty Tribes, as well as by the United States. On December 19, 2002, in the Order which is quoted in part above, the Honorable Barbara J. Rothstein denied the motion to reopen. Dkt. # 68. The denial was based upon the separate conclusions that the federal recognition did not constitute extraordinary circumstances as required by Rule 60(b), and that finality concerns weighed against re-opening the judgment. *Id.*

The Ninth Circuit reversed this decision, finding that the 1996 federal recognition of the Samish "is an extraordinary circumstance that warrants setting aside the judgment in *Washington II.*" 394 F.3d at 1161. The appellate court also noted that this court's finality concerns were somewhat speculative and therefore insufficient to provide an independent basis for denial of the motion to reopen. *Id.* at 1162. The matter was thus remanded for further proceedings consistent with that opinion.

## DISCUSSION

### I. Standards for Rule 60(b) Motion

Federal Rule of Civil Procedure Rule 60(b) provides that "[o]n motion and upon such terms as are just, the court may relieve a party … from a final judgment, order, or proceeding for the following reasons" F.R.Civ.P. 60(b). There follows a list of five specific grounds, together with a sixth nonspecific ground: "any other reason justifying relief from the operation of the judgment." F.R.Civ.P. 60(b)(6). The Samish have brought their motion under this "catchall" provision, which applies when the reason asserted for relief is not covered by any other provision set forth in Rule 60(b). As stated in the remand order, the section should be used "sparingly as an equitable remedy to prevent manifest injustice," and is to be used "only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." 394 F.3d at 1158, *citing United States v. Alpine Land & Reservoir Co.,* 984 F.2d 1047, 1049 (9th Cir.1993). Thus, "a party seeking to reopen a case under Rule 60(b)(6) 'must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with the prosecution or defense of the action in a proper fashion.'" *Id., quoting Community Dental Services v. Tani,* 282 F.3d 1164, 1168 (9th Cir.2002). Further, as stated in an earlier order regarding a separate motion to reopen these proceedings brought by other tribal entities, a judgment may be set aside "only for reasons that would have prevented entry of the judgment in the first place, had the reasons been known at the time the judgment was entered." *United States v. Washington,* 98 F.3d 1159, 1164 (9th Cir.1996) (Circuit Judge Kozinski, concurring).

### II. Extraordinary circumstances

In the remand order, the appellate court found "extraordinary circumstances" in the following events:

In light of the government's "excessive delays and … misconduct" in withholding of recognition from the Samish, a

circumstance beyond their control; the government's position in *Washington II* that federal recognition was necessary and that future federal recognition might justify revisiting the treaty rights issue; and the district court's erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States' boiler-plate findings of fact in *Washington II*, we conclude that the Samish were effectively prevented from proving their tribal status "in a proper fashion."

*U.S. v. Washington*, 394 F.3d at 1159 (citing to the district court's language in *Greene*, where it noted that the Samish's "long journey for recognition has been made more difficult by excessive delays and governmental misconduct." *Greene v. Babbitt*, 943 F.Supp. at 1288–89).

The question, then, becomes whether these extraordinary circumstances justify reopening judgment under Rule 60(b) so that the Samish may present their case for Treaty Tribal status. The Samish argue that the Ninth Circuit's remand order amounts to a *per se* determination that they are entitled to such status. Certainly, the following statement appears to support that conclusion:

**As the Samish are a signatory tribe and have proved the single necessary and sufficient condition for the exercise of treaty rights, the res judicata effect of *Washington II* is all that is keeping the Samish from pursuing its treaty rights.**

394 F.3d at 1160. However, this language appears to conflict with prior repeated assurances given to the Treaty Tribes that the legal bases and processes leading to federal recognition and Treaty Tribe status are "fundamentally different." *Greene v. Babbitt*, 64 F.3d 1266, 1270 (9th Cir. 1995) (*Greene II* ); *citing Greene v. United States*, 996 F.2d 973 (9th Cir.1993)

(*Greene I* ). When the Tulalip Tribes sought to intervene in the Samish recognition proceedings to protect their interests, particularly their treaty fishing rights, the appellate court affirmed the district court's denial of the request, assuring the Treaty Tribes that "[f]ederal recognition does not self-execute treaty rights claims." *Greene v. United States*, 996 F.2d 973, 977 (9th Cir.1993) The appellate court further noted that "the Tulalip's interest in preserving the favorable effects of *stare decisis* [of *Washington II* ] is too speculative to warrant intervention," because, "[a]s we just said, the Samish may not gain fishing rights from federal recognition alone." *Id.* Thus, although it was denied intervenor status, the Tulalip Tribe was allowed to appear as *amicus curiae*

In a later appeal by the Secretary of the Interior in the same proceedings, the appellate court provided an extensive review of the concept that federal recognition and Treaty Tribe status are separate and distinct:

The Tulalip Tribe has participated in this litigation because of concern that recognition of the Samish as a Tribe could lead to Samish eligibility for treaty fishing rights in already over-fished fisheries. The district court held that the treaty rights adjudicated in *Washington II* and the tribal recognition leading to government benefits for individual Samish are distinct issues.

In this appeal, the Tulalip Tribe emphasizes that in the petition for recognition, the Samish Tribe has not claimed to be any tribe other than the historical Samish Tribe that was party to the Treaty of Point Elliot. To the extent that the Samish rely upon historical roots in this litigation, the roots are probably the same as those they posited in *Washington II*. However, other decisions of this court demonstrate that the legal issue

and the factual issue, as well as the stakes, are very different.

We specifically recognized the distinctions in *United States v. Washington,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (*Washington I*), in which we held that a tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights. We said:

> Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine.

*Id.* at 692–93. Once a tribe is determined to be a party to a treaty, its rights under such a treaty may be lost only by unequivocal action of Congress. *Id.* at 693. Thus, the recognition of the tribe for purposes of statutory benefits is a question wholly independent of treaty fishing rights.

We further recognized the distinction between treaty fishing rights and tribal recognition in *Washington II* where we held that the district court had erred in concluding that only federally recognized tribes may exercise treaty rights. We nevertheless affirmed denial of treaty rights on the independent factual finding of insufficient continuous political and cultural cohesion. *See,* 641 F.2d at 1372–74.

Our decision in *Greene v. United States,* 996 F.2d 973 (9th Cir.1993) can leave no serious doubt that our court regards the issues of tribal treaty status and federal acknowledgment as fundamentally different. We there held that the Tulalip Tribe was not entitled to intervene in this very litigation. We did so because the Tulalip's interest in preventing the Samish from gaining treaty fishing rights was not affected by this litigation, involving federal tribal recognition or, as it is termed in the applicable regulation, "acknowledgment." *See, e.g.,* 25 C.F.R. § 83.2 (acknowledgment of tribal existence a prerequisite to the federal protection, services and benefits available to Indian tribes). In discussing the difference between the Samish seeking federal acknowledgment and treaty fishing rights, we said in *Greene:*

> We recognize that the two inquiries are similar. Yet each determination serves a different legal purpose and has an independent effect. Federal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott.... Similarly, the Samish need not assert treaty fishing rights to gain federal recognition.

*Greene v. Babbitt,* 64 F.3d at 1270–71 (*quoting Greene,* 996 F.2d at 976–977).

The Court has quoted this section at length, to illustrate the difficulties that have arisen from the following language in the order of remand:

> **Indeed, we have never held that recognition of a tribe—as opposed to non-recognition—is irrelevant to its exercise of treaty right, despite some dicta to the contrary.** *See, Greene v. Babbitt,* **64 F.3d at 1270 (incorrectly asserting that in** *Washington I* **"we held that a tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights").**

*U.S. v. Washington,* 394 F.3d at 1158. The extensive discussion in *Greene* of the

historical background, and the repeated separation of treaty status from federal recognition in four different appellate decisions should not be written off as simply "dicta." *See, Washington I,* 520 F.2d at 692–93; *Washington II,* 641 F.2d at 1372–74; *Greene I,* 996 F.2d at 976–77; *Greene II,* 64 F.3d at 1270–71.

However, some reconciliation of this statement with the appellate court's own earlier pronouncements on the possible effect of federal recognition can be found in the court's reference back to this section in *Washington III;*

> We have defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure.
>
> This single condition reflects our determination that the sole purpose of requiring proof of tribal status is to identify the group asserting treaty rights as the group named in the treaty. For this purpose, tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community.

*United States v. Washington,* 641 F.2d at 1372–73 (*citing United States v. Washington,* 520 F.2d at 693). Portions of this section—the first and third sentences—were quoted in the order of remand. 394 F.3d at 1158. This section clarifies that the "necessary and sufficient" condition for the exercise of treaty rights is not federal recognition in and of itself, but rather the finding of "an organized tribal structure" which has been maintained by "a group of Indians descended from a treaty signatory." *Id.*

Judge Boldt's decision, above, specifically found that "the citizens comprising the Intervenor Samish Tribe have not maintained an organized tribal structure in a political sense." *U.S. v. Washington,* 476 F.Supp. 1101, 1106. The Samish necessarily seek by this motion to reopen the judgment in order to challenge this factual finding and prove it wrong. This is so because, as set forth above, the fact of federal recognition is not itself determinative of treaty status. Thus, the finding of extraordinary circumstances in the federal recognition does not of itself justify granting the Samish motion to reopen; the Court must proceed to address other factors in the Rule 60 equation. These, as determined by the Court in its Order dated February 28, 2006, are issues of timeliness and equitable considerations. Dkt. # 158.

## III. Timeliness

The Treaty Tribes assert that the Rule 60(b) motion is untimely, because it was not filed within a reasonable time after the issuance of a final decision in the federal recognition proceedings. The final decision in the recognition proceedings was signed by Assistant Secretary Ada Deer on November 8, 1995.[3] As described above, the Samish returned to the district court seeking to reinstate certain factual findings that had been rejected by Assistant Secretary Deer. The Court's decision on that issue was filed October 15, 1996. *Greene v. Babbitt,* 943 F.Supp. 1278 (W.D.Wa.1996). The motion to reopen the judgment was not filed until December 13, 2001,[4] six years after Assistant Secretary Deer issued her final decision.

---

**3.** A complete copy of this decision was filed in the *Greene* proceedings. *See, Greene v. Babbitt,* 89–645TSZ, Dkt. # 347–6, pp. 446–487.

**4.** This original motion was stricken by the Court for failure to comply with the conference requirements of Paragraph 25 of the Permanent Injunction. Dkt. # 23. The Sam-

■ A Rule 60(b)(6) motion must be brought within a reasonable time. F.R.Civ.Proc. 60(c)(1). For motions brought under Rule 60(b)(1), (2), or (3), based upon mistake or excusable neglect, newly discovered evidence, or fraud or misconduct, the motion must be brought within one year of the judgment sought to be vacated. *Id.* However, this time limit does not expressly apply to motions brought under the catchall provision of Rule 60(b)(6). Thus, the timeliness of a Rule 60(b)(6) motion is a matter within the district court's discretion, considering the facts of the case. *United States v. Holtzman,* 762 F.2d 720, 725 (9th Cir.1985). The Court may consider not only the length of the delay, but also whether the movant has shown good cause for the delay, and whether other parties have been prejudiced thereby. *In re Pacific Far East Lines, Inc.,* 889 F.2d 242, 249 (9th Cir.1989).

■ The Treaty Tribes assert that the Samish have shown no good cause for the delay, because the tribe had all the legal resources, as well as sufficient funds, to seek reopening in late 1995, immediately after Ada Deer's final decision was rendered. Instead, the Samish chose to use available legal resources to return to court in *Greene* to re-litigate the matter of the findings, rather than proceed immediately to seek re-opening the judgment here. And once they succeeded in their quest in *Greene,* they delayed another three years before filing the original motion to reopen in late 2001.

In response to these arguments, the Samish argue that they "raised the subject of restoring its treaty rights at every available opportunity since re-recognition in 1996, repeatedly sought BIA assistance

and financial aid in bringing an action to restore its treaty rights, and brought this Rule 60(b) motion within a short time after finally obtaining financial resources necessary to fully research, prepare, and file this motion." Supplemental Brief of Samish Indian Nation, Dkt. # 236, p. 11–12. They explain that while they had legal counsel during the recognition proceedings, such counsel worked *pro bono* or received limited compensation from the grants, and ended their representation "[o]nce Samish recognition was finalized in late 1996." Reply Brief of Samish Indian nation, Dkt. # 259, pp. 16–17.

These arguments fail to demonstrate good cause for the delay. First, the Samish nowhere assert that they tried to secure *pro bono* representation for their pursuit of treat rights, as they did for tribal recognition proceedings, nor have they demonstrated why they could not do so. The Court finds, under the circumstances presented here, that neither lack of counsel nor lack of funds to pay counsel is an adequate excuse for the delay in filing.

Further, the Samish argument fails to account for the year that passed between Assistant Secretary Deer's November 1995, final decision, and the initiation of their effort to secure government funding in late 1996. Their assertion of the 1996 date is based on their assumption that they could not pursue treaty rights based on the 1995 final decision on recognition, but necessarily had to first secure reinstatement of the ALJ's factual findings which had been deleted by Assistant Secretary Deer. They assert that the reinstated findings were "an essential component of the Samish Tribe's recognition," and that "[t]he Court's decision to reinstate the

---

ish were given leave to re-file the Rule 60(b) motion after compliance with Paragraph 25.

The revised motion to reopen was filed August 26, 2002. Dkt. # 39.

**924**

factual findings requested by the Samish[5] is proof" that the Court agreed. Reply Brief, Dkt. # 259, p. 5 n. 4. However, this argument mischaracterizes the Court's decision in *Greene*. The Court noted that the rejected findings of fact were "of vital importance to the Samish," not that they were essential to recognition. *Greene*, 943 F.Supp. at 1283. The Court described the rejected findings as ones that "would be favorable to the Samish in connection with their eligibility for benefits under federal law" and the resulting injury as the potential for "preclusive effect in future litigation concerning Samish membership, claims to tribal territory, and possible government liability for past benefits." *Id.* at 1284. Conspicuously absent is any mention of the possible impact on treaty rights, an omission which appears deliberate in light of the *Greene* court's careful separation of treaty rights and federal recognition processes.

The basis of the *Greene* court's decision to reinstate the rejected findings was the government misconduct that led to the rejection of the ALJ's findings, not the necessity of those findings to the Samish pursuit of treaty rights. *Id.* at 1284–85. The Court therefore rejects the Samish argument that their return to court in *Greene* to secure reinstatement of the deleted ALJ findings was a necessary step to be taken before pursuit of their treaty rights. Instead, the Court regards this as a tactical choice or litigation strategy, and not a reasonable justification for delay.

Courts have found delays of four years not unreasonable when extraordinary circumstances were presented. *Holtzman*, 762 F.2d at 725, *citing Washington v. Penwell*, 700 F.2d 570, 572–73 (9th Cir.1983). On the other hand, delays of two years, six years, or even twenty-two months have

been found unreasonable in the absence of unreasonable circumstances. *In re Hammer*, 940 F.2d 524, 526 (9th Cir.1991) (two years); *Twentieth Century–Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir.1981) (six years); *Morse–Starrett Products Co. v. Steccone*, 205 F.2d 244, 249 (9th Cir.1953) (twenty-two months). While each case must be considered in light of the individual facts, there is a common thread of finding delays of two years or more unreasonable where no extraordinary circumstances are presented. The Court finds no extraordinary circumstances have been advanced here to justify the delay, regardless whether that delay is considered to be five years or six. As succinctly stated by the Ninth Circuit Court of Appeals in a case involving a defense of laches, "equity aids the vigilant." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir.2001).

█ As for prejudice to other parties, the Treaty Tribes have adequately demonstrated prejudice that has resulted from the Samish delay in filing their Rule 60(b). This Court has issued numerous decisions in ongoing subproceedings in this case, particularly in the shellfish subproceedings, since November 8, 1995. If the Rule 60(b) motion were granted, the Court's rulings in many of these subproceedings would be implicated, causing uncertainty for the Treaty Tribes and their fishing and shellfishing operations.

Under the facts of this case, the length of the delay, the resulting prejudice in impact upon the interim decisions in subproceedings in this case, and the absence of good cause shown, all lead the Court to find the length of delay unreasonable, and the Rule 60(b) motion untimely.

---

**5.** The nuances of the reinstatement of "factual findings **requested by the Samish**" will be addressed below, under equitable considerations.

## IV. Equitable Considerations

■ In asking the Court to consider equitable factors in deciding the motion to reopen, the Treaty Tribes have invoked the well-established principle that Rule 60(b) should be used "sparingly as an equitable remedy to prevent manifest injustice." *U.S. v. Alpine Land and Reservoir Co.,* 984 F.2d at 1049. They call upon the age-old maxim that "he who comes into equity must come with clean hands," and list a number of examples Samish actions which they assert constitute unclean hands. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). This doctrine is more than a "mere banality"; it is a "self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* The Court has ruled previously that equitable considerations had been raised earlier in these proceedings but had not been addressed, and thus were properly before the Court for consideration on the merits. Dkt. # 158.

The Treaty Tribes have advanced a number of actions which they assert constitute inequitable behavior on the part of the Samish. Treaty Tribes Response Brief, Dkt. # 256, pp. 15. They also contend that the Samish have changed their position on important questions such as the relation between federal recognition and treaty rights, and should be barred by the doctrine of judicial estoppel from taking inconsistent position. Treaty Tribes Response Brief, Dkt. # 256. pp. 15–29. As set forth below, the Court finds sufficient grounds in the Samish inequitable conduct

to weigh against granting the Rule 60(b) motion, and thus does not reach the estoppel question.

The Treaty Tribes' equitable argument is based on the conduct of the Samish in seeking reinstatement of the ALJ's findings[6] in *Greene,* together with subsequent arguments based on that reinstatement. The essence of the Treaty Tribes' complaint is that the Samish succeeded in establishing a revised version of the findings, one more favorable to them, instead of Judge Torbett's original findings. The Treaty Tribes refer to the Samish version of the findings as "faux" findings. These "faux" findings were cited by the Ninth Circuit Court of Appeals in its Order of Remand to this Court, and may have been in part a basis for that decision. *U.S. v. Washington,* 394 F.3d at 1160.

The two findings at issue, as they were stated by ALJ Torbett, are set forth below.

> The Noowhaha tribe and the Samish were at one time different tribes. Dr. Suttles and Dr. Hadja testified that the two tribes had combined probably around 1850 and that they had been one tribe since that time. This conclusion of Dr. Suttles and Dr. Hadja is controverted by the Defendants but the undersigned is convinced that the conclusions drawn by these two witnesses are sound.

Recommended Decision of ALJ Torbett, p. 22 (found in C89–645TSZ, Dkt. # 347–5, p. 56). This finding was rejected by Assistant Secretary Deer in her Final Decision:

> The ALJ's finding that the Noowaha and the Samish combined in pre-treaty times is rejected (recommended decision 22). A review of the specific findings of fact in the recommended decision (find-

**6.** Although three ALJ findings were contested and reinstated in *Greene,* only two of those are at issue here.

ings 63 and 67), the testimony of the plaintiff's witnesses, and their writings, which form part of the administrative record of this case, reveals that by "combined" these individual meant that the two tribes formed an alliance in pretreaty times (cited in Def. Brief 149). The Department has never objected to this characterization of the relationship between the two tribes in pre-treaty times. However, a political alliance does not meet the requirements of criterion 83.7(e) for descent from a historical tribe or from tribes which "combined into a single autonomous political unit" (emphasis added).

In addition, the Federal district court in *United States v. Washington,* No. 9213, Subproceeding 89–3 (W.D.Wash) (Shellfish) held that the present Upper Skagit Tribe is the successor to the historical Noowhaha. The district court made specific findings concerning the incorporation of Noowhaha into the Upper Skagit. These findings are consistent with the Department's previous findings concerning the Noowhaha which were that many Noowhaha joined the Upper Skagit Tribe and that the Upper Skagit had been considered to represent the Noowhaha in the past, although some Noowhaha families moved to the Swinomish and Lummi Reservations (ASIA 1982a, 1982b, 1987). The Department reaffirms that the present Upper Skagit Tribe is the successor to the historical Noowhaha.

Previously, the Indian Claims Commission, in its March 11, 1958, opinion concerning the claim of the Samish in docket 261, rejected the Samish's contention there was a merger between the Samish and the Noowhaha tribe at the time of the Point Elliott Treaty of 1855 (Indian Claims Commission 1958).

Final Decision, pp. 12–13, found in 89–645TSZ, Dkt. # 347–6, p. 14.

In the second finding at issue here, ALJ Torbett stated as follows:.

> Dr. Hajda explained that, although many Samish Indians had held public office on the Lummi and Swinomish Reservations, they continued to consider themselves as Samish and participate in Samish activities. She compared this to American Indians who had served in the U.S. armed forces, without considering themselves any less Indian as a consequence, and to the situation of the Welsh (her own ancestry), who participated actively in British politics but fiercely retained their own distinct national identity. While individual members of Samish families living today on reservations, such as the Edwards, may have given up their Samish identity, Dr. Hajda felt that on the whole they had not. Samish leaders living at Swinomish were active in Swinomish affairs as a way of gaining personal prestige, and not as a declaration of Swinomish identity.

Finding 169, Appendix B p. 69, found at 89–645TSZ, Dkt. # 347–5, p. 100 (internal citations to administrative record omitted). In the Final Decision, all of this finding after the very first sentence was rejected by the Assistant Secretary, without explanation. Final Decision, p. 35, found at 89–645TSZ, Dkt. # 347–6, p. 36.

After the Final Decision was issued, the Samish returned to court in *Greene* to ask that the original ALJ findings be reinstated. They demonstrated that there had been inappropriate *ex parte* contact between the Assistant Secretary and government lawyer Scott Keep. In granting the Samish motion to reinstate the ALJ's findings, the Court found as follows:

> The *ex parte* communications between the decision maker, Assistant Secretary Ada Deer, and the Department's lawyer,

Scott Keep, violated the Administrative Procedure Act, the Samish Tribe's due process rights under the Fifth Amendment, and this Court's Order incorporating the terms of the Joint Status Report. Because the Bureau of Indian Affairs has repeatedly and consistently disregarded the rights of the Samish and caused extraordinary delay in the processing of the Samish's claims, the Court finds that it should grant relief without remand to the agency. The appropriate remedy under the unique circumstances of this case is to **reinstate the three contested findings of the Administrative Law Judge** that were arbitrarily rejected by the decision maker after her ex parte meeting with the government's lawyer.

*Greene,* 943 F.Supp. at 1289. The Court also found Mr. Keep in contempt of Court, but upon reconsideration that finding was deleted.

The issue of the "faux findings" arises from the following language late in the *Greene* decision:

*Reinstatement of Contested Findings by the Court*

The Samish seek to have the Court reinstate three particular findings of the ALJ that were rejected by the Assistant Secretary [FN 13]. They argue that **these proposed findings** were necessary to the tribal recognition process. Plaintiffs contend that the first finding justifies including in the plaintiffs' tribe members of several families which are of Noowhaha, rather than Samish decent [sic]; the second finding establishes a necessary basis for the plaintiffs to continue to assert interests, as a tribe, in the traditional territory of the Samish; and the third finding goes to the potential liability of defendants, as a matter of the Federal–Indian tribe relationship, for wrongfully denying plaintiffs benefits and generating twenty years of administrative proceedings and litigation.

FN 13. The three **proposed findings** that were rejected by the Assistant Secretary were as follows:

(A) a substantial part of the Noowhaha tribe merged historically with the Samish, such that the present-day Samish Tribe may have interests in traditional Noowhaha territory which derive through these Noowhaha family lines (*see* Final Determination at 12–13, 32);

(B) the Samish family lines that settled on the Swinomish Indian Reservation did not relinquish their Samish affiliation, so there was no historical merger of the Samish with the Swinomish (*see* Final Determination at 35); and

(C) the omission of the Samish from a list of tribes prepared by the Defendants in the 1960s was neither based on actual research, nor was it intended to be used as the basis for determining which Indian groups are to be recognized by the United States (*see* Final Determination at 16, 38–39).

Rather than remand to the Department, the Court **reinstates** the contested findings. Failure to do so would subject the Samish to relitigation of issues already decided in their favor by the Administrative law Judge and improperly rejected by Assistant Secretary Deer. That would be an unacceptable outcome under all the circumstances of this case. Administrative Law Judge Torbett conducted a thorough and proper hearing on the question of the Samish's tribal status, and made exhaustive proposed findings of fact after considering all the evidence and the credibility of the witnesses. Ada Deer, the decision maker, arbitrarily and in violation of clearly established law rejected those proposed

findings and inserted new findings drafted by Mr. Keep. Under these limited circumstances, where the agency has repeatedly demonstrated a complete lack of regard for the substantive and procedural rights of the petitioning party and the agency's decision maker has failed to maintain her role as an impartial and disinterested adjudicator, it is appropriate for this Court to "use its equitable power to order relief tailored to the situation." In this case, the government should be bound by the findings of the Administrative Law Judge, which were prepared after all parties had an opportunity to be heard. The ALJ carefully considered and weighed all the evidence, including the testimony of the parties' witnesses, and made findings consistent with the evidence. Assistant Secretary Deer's ultimate rejection of the findings was based solely on improper *ex parte* contacts with one of the parties' lawyers. Under these circumstances, **reinstatement of the rejected findings** is the appropriate remedy.

*Greene,* 943 F.Supp. at 1288–89 (internal citations omitted; emphases added). (As noted above, Finding C is not at issue here). On November 1, 1996, the Court entered judgment on the docket, summarized with the following language:

JUDGMENT: Ct enters Judgment in FAVOR of the Plaintiffs & holds that the Dept of Interior violated the 5th amendment due process clause and 553 of the Administrative Procedure Act. Court enters judgment confirming that the Samish Tribal Organization exists as an Indian Tribe w/in the meaning of the federal law. Three findings of Administrative Law Judge David Torbett entered on 8/31/95 are REINSTATED. Plaintiff is entitled to its taxable costs against the Defendants. [Refer to judgment for further details] (cc: counsel, Judge, Judgment Book, C.C.) Entered on: 11/1/96 (Entered: 11/01/1996)

*Greene,* C89–645TSZ, Dkt. # 330. However, the actual judgment includes, after the finding that "the Samish Tribal Organization exists as an Indian tribe within the meaning of federal law," the following entry:

(3) The following three findings of Administrative Law Judge David Torbett, originally entered on August 31, 1995 but later rejected by Assistant Secretary Deer, are reinstated:

1. Part of the Noowhaha tribe merged with the Samish (see ALJ Recommended Decision at 22; Final Determination dated November 8, 1995, at 12–13, 32).

2. Many of the Samish families that settled on the Swinomish Indian Reservation did not relinquish their Samish affiliation (see Final Determination at 35, and references to record contained therein).

3. The Department of Interior could not adequately explain why the Samish had been omitted from a list of federally recognized tribes prepared during the 1970s (see ALJ findings 1–3); (final Determination at 16, 38–39).

*Greene,* C89–645TSZ, Dkt. # 330 (although not available on the electronic docket, a copy of the judgment is provided in C89–645TSZ at Dkt. # 347–4, pp. 264–65).

The findings designated as "proposed findings" in footnote 13, and summarized in the judgment, are the findings designated as "faux findings" by the Treaty Tribes. It is the Treaty Tribes' position in their "unclean hands" argument that the Samish have improperly presented these findings to this Court and to the Ninth Circuit Court of Appeals as the findings that were in fact reinstated by the Court in *Greene.* Such substitution would be significant, as these findings are more favorable to the

Samish position with respect to treaty rights than the findings as written by ALJ Torbett.

The Treaty Tribes have pointed out that these footnote 13 findings were quoted verbatim from the Samish reply brief presented on the motion before the Court in *Greene*. *See,* Jannetta Declaration, Dkt. # 250, p. 570. These findings are presented in the reply brief in the form of a block quote, indented and single-spaced. *Id.* The style of presentation and citation makes them to be a quotation of the actual findings of the ALJ, but as demonstrated above, they are quite different. Indeed, in that they state that the Samish and Noowhaha "merged" rather than "combined," and deny any merger of the Samish with the Swinomish, they are much more favorable to the Samish claim to treaty tribe status than the ALJ's actual findings.

Following the district court's quotation of these findings in footnote 13, they were cited by the Ninth Circuit Court of Appeals, in reversing this Court's Order in this case, as though they were the actual factual findings of the ALJ. See, *U.S. v. Washington,* 394 F.3d at 1160 ("The district court in *Greene v. Babbitt* specifically reinstated a finding by the ALJ that the Samish and the Swinomish had not merged, 943 F.Supp. at 1288 & n. 13, and the fact that some members of the Swinomish and Lummi tribes have Samish ancestry does not make them political successors to the Samish.") According to the Treaty Tribes, the Samish quoted the "faux" findings, rather than the actual ALJ findings, in making its arguments to the Ninth Circuit. Thus, these altered findings appear to have taken on a life of their own. According to the Treaty

Tribes, this constitutes a fraud on the Court.

The Samish have responded to the accusation of misconduct by asserting that Judge Zilly, in *Greene* "accepted Samish's interpretation of the findings." Samish Reply, Dkt. # 259, p. 14 n. 14. Specifically, they argue,

The third and final general equitable issue raised by Treaty Tribes is an argument that the Samish Tribe committed "fraud" on the federal courts by "misleading" the courts on the findings of fact made by Judge Torbett in the Samish Acknowledgment proceeding. This issue was litigated and decided against Treaty Tribes in 1996. Treaty Tribes (and the United States) did not appeal it, and they present no justification for raising it again here. Treaty Tribes claim that it was "inexplicable" that Judge Zilly accepted the factual conclusions presented by the Samish Tribe. At the hearing on these issues and the Court's decision shows that Judge Zilly knew exactly what he was doing. The opinion in *Greene v. Babbitt* shows that the judge cited the Samish Tribes's factual conclusions with approval three separate times. 943 F.Supp. at 1283 (just above where the ALJ's findings are quoted); 1288 (at two separate spots). These factual conclusions were repeated again in the judgment.

*Id.* at 14.[7]

During the course of these proceedings, the Treaty Tribes requested a stay so that they could approach the Court in *Greene* and request relief from the judgment. Dkt. # 265. On the same day that they filed their motion for a stay, the Treaty Tribes filed two motions in *Greene v. Bab-*

---

7. The Samish assertion that the Treaty Tribes did not appeal completely ignores the fact that they were denied intervenor status in *Greene* and could not have appealed. Only the United States could appeal.

*bitt*, C89–645TSZ: a Rule 60(b) motion for relief from judgment (Dkt. # 345), and a motion "for immediate relief from post-recognition judgment and order" (Dkt. # 346). The Court granted the motion to stay in this case, staying the proceedings until such time as the Court issued a ruling on the *Greene* motions. Dkt. # 279.

On January 26, 2007, the Honorable Thomas S. Zilly issued his ruling on the motions in *Greene,* denying them on grounds of sovereign immunity, and lack of subject matter jurisdiction. *Greene v. Babbitt,* C89–645TSZ, Dkt. # 365. He also found that the Treaty Tribes lacked standing to file a Rule 60(b) motion as they were not parties to that case, and reiterated the principle that "[f]ederal recognition has a legal effect that is independent of treaty rights and treaty status." *Id.* at p. 4. This Court then lifted the stay and set a briefing schedule so the parties could address the effect of Judge Zilly's ruling on the issues in this case. Dkt. ## 299, 301.

In their post-stay memorandum, the Treaty Tribes raised for the first time the issue of their sovereign immunity, arguing that it bars suit by the Samish. Dkt. # 302, p. 4. This assertion was not pressed at oral argument, and the Court deems it meritless. The Samish post-stay memorandum addressed the relationship between the *Greene* ruling and the Treaty Tribes' unclean hands argument, asserting that Judge Zilly's ruling endorsed the Samish position on the reinstated findings.

> Perhaps the most extreme argument being made by Treaty Tribes in the remand phase of the Samish Tribe's Rule 60(b)(6) sub-proceeding is Treaty Tribes' claim that the Samish Tribe engaged in fraud, deception and other assorted nefarious acts to "trick" Judge Zilly into reinstating the wrong critical factual findings from Administrative Law Judge Torbett's recommended decision in favor of Samish recognition. Much of Treaty Tribes' pleadings on remand have been directed at this issue, under the heading of alleged inequitable conduct justifying denial of the Samish Tribe's rule 60(b)(6) motion. After the Samish Tribe appealed Assistant Secretary for Indian Affairs Ada Deer's November 8, 1995 deletion of Judge Torbett's August 31, 1995 recommended factual findings to federal court, Judge Zilly concluded Samish's recognition proceeding by declaring the court's version of the factual findings, not the original findings recommended by Judge Torbett or the Samish Tribe's proposed factual conclusion.

> . . . .

> Judge Zilly rejected Treaty Tribes' arguments on this issue: "The Four Tribes also ask the Court to revise factual findings in the 1996 order as 'clerical mistakes' pursuant to Fed.R.Civ. Proc. 60(a). However, the substantive revisions advocated by the Four Tribes are not 'clerical mistakes' as that term is used in Rule 60(a)." Order, Dkt. # 365, p. 3 n. 1 (citation omitted). This ruling resolves this issue. Treaty Tribes have litigated this issue and lost, and did not appeal. They cannot argue in the present subproceeding that the factual findings entered by Judge Zilly in *Greene v. Babbitt* can be ignored because they were "mistaken." Judge Zilly has characterized Treaty Tribes' request to change the Court's actual finding as a "substantive" revision, not a clerical mistake. Judge Zilly's ruling reaffirmed that he intended to make the specific factual findings set out in his Order and in the Judgment.

Samish Opening Additional Brief, Dkt. # 303, pp. 13–15.

The Samish assertion that this ruling "reaffirmed" that the Court intended to substitute the findings set out in footnote

13 and in the judgment for the actual findings made by Administrative Law Judge Torbett is without merit. The Court's ruling was based solely on principles of sovereign immunity, standing and jurisdiction; the Court was unable to reach the merits of the Treaty Tribes' Rule 60(b) motion. The characterization of the revisions advocated by the Treaty Tribes as substantive rather than mere clerical mistakes was a basis for finding the motion must be brought under Rule 60(b) rather than Rule 60(a). The question of whether the findings set forth in the judgment were included by mistake remains unresolved.

However, this Court finds in the plain language of the Order underlying that judgment no support for the Samish position on the factual findings. The Court in *Greene* quoted the actual findings of the Administrative Law Judge in the body of the opinion, and discussed their significance. *Greene v. Babbitt*, 943 F.Supp. at 1283–84. And the Court repeatedly stated that these findings were **reinstated.** The word "reinstate" has in this context but a single plain meaning: that is "to restore to a former position or state" (*Oxford English Dictionary* online edition) or, stated differently, "to restore to a previous effective state" (*Webster's New Collegiate Dictionary*, 1977); "to place again in a former state or position; to restore" (*Black's law Dictionary, Seventh Edition*, 1999). It is thus only the factual findings as they were originally written by Administrative Law Judge Torbett that could be reinstated, and the Court's language is clear that this

is what occurred. Reinstatement of the original findings was found by the Court to be the appropriate remedy for the due process violation caused by Assistant Secretary Deer's improper rejection of the ALJ's findings. *Greene*, 943 F.Supp. at 1288–89. In the final sentence of the Order, the Court stated that "[t]he appropriate remedy under the unique circumstances of this case is to **reinstate the three contested findings of the Administrative Law Judge** that were arbitrarily rejected by the decision maker after her *ex parte* meeting with the government's lawyer. IT IS SO ORDERED." *Id.* at 1289.

The assertion of the Samish that the Court adopted their version of the findings by quoting them in footnote 13 is thus erroneous. Such a change in the language would have constituted a substitution or replacement, not a reinstatement. The findings set forth in footnote 13 and designated as "proposed findings" must thus be regarded as a paraphrase of what the Samish requested in their motion; they are not findings that were in fact reinstated, because only the original findings could be "reinstated." While this Court cannot account for the appearance of the Samish version of the findings in the judgment, it notes the judgment clearly states that it is the findings of Administrative Law Judge that were reinstated.[8]

The Court finds that the Samish conduct in repeatedly asserting that their version of the findings are the ones that have been adopted by the Court constitutes inequitable conduct and "unclean hands."[9] Their

8. The Federal Circuit Court of Appeals has noted in regard to this matter that it was the "omitted findings" of the ALJ, which are fully set forth in the opinion, that were reinstated. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1362 (Fed.Cir.2005).

9. This is not the first time that the Samish have tried to substitute their own view of their

status for that of the courts. In 2003, the Court of Federal Claims chided the Samish for presenting a "misleading" argument on the issue of their treaty tribe status. The Samish had cited to *U.S. v. Washington* as saying that "members of the Samish Tribe were 'descendants of Samish Indians who were party to treaty of Point Elliot [sic]'"

argument, set forth above, that the Court "concluded Samish's recognition proceeding by declaring the Court's version of the factual findings, not the original findings recommended by Judge Torbett or the Samish Tribe's proposed conclusions" is improper in several respects. The Court did not declare its own version of the findings; as set forth above it could only reinstate what was in the original ALJ findings. The Court did, however, quote from the Samish proposed findings in the controversial footnote 13. That footnote, as explained above, is taken verbatim from the block quote set forth in the Samish reply brief in *Greene*. *Greene v. Babbitt*, C89–545TSZ, Dkt. # 293, p. 4. In presenting these findings in such a form that they appear to be the actual findings of Administrative Law Judge Torbett, and then repeatedly asserting that these more favorable findings are the ones that were in fact "reinstated" by the Court, the Samish have acted inequitably, a factor to be weighed against other factors in deciding this Rule 60(b) motion.

## V. Finality

■ In the Order remanding the matter to this Court, the Ninth Circuit found this Court's concerns over finality too speculative to support denial of the Rule 60(b) motion, in light of the Samish proposal for a plan to minimize the disruptive effects of their entry into this case. "[H]ad the district court properly concluded that federal recognition was an extraordinary circumstance the somewhat speculative concerns about finality are in-

sufficient to have carried the day." *U.S. v. Washington*, 394 F.3d at 1162. The appellate court also noted that "the fact that the district court has ongoing judicial supervision of *Washington I* undercuts these finality concerns. . . . Indeed, the 17,500 docket entries and more than 50 separately-numbered subproceedings in *Washington I* are testament to the inherent *lack* of finality of the judgment." *Id.* (emphasis in original).

The Court now renews its concerns regarding respect for the finality of this judgment. There is a significant change from the prior circumstances, in that the Samish proposal for integrating themselves into this case as a Treaty Tribe with a minimum of disruption has been withdrawn. As a result, the specter of disruption and even chaos in management of this case is once again a serious concern. As for the "inherent lack of finality," as of today the docket in *Washington I* runs to 19,053 entries.[10] However, a great many of these entries are notices of appearance, administrative notations, and other matters not indicative of litigation activity or Court involvement. The Court has retained jurisdiction in this case for limited purposes only, as set out in the Order Modifying Paragraph 25 of the Permanent Injunction dated August 23, 1993.[11] *U.S. v. Washington*, C70–9213, Dkt. # 13599. That Order provides for the initiation of dispute resolution in matters within the reach of the Court's jurisdiction, followed by the filing of a subproceeding, each of which is given a separate case number and

*Samish Indian Nation v. United States*, 58 Fed.Cl. 114, 121 n. 17. The court quoted the actual words of the case to demonstrate that they were quite different from what the Samish stated. *Id., quoting U.S. v. Washington*, 476 F.Supp. at 1105–06.

**10.** Court staff are planning a little celebration when the docket reaches 20,000 entries.

**11.** The Court retained such jurisdiction for these limited purposes in part to avoid later assertion of sovereign immunity by the Treaty Tribes, the State of Washington, or the United States. The Court does not have jurisdiction to consider matters outside those set forth in the Order Modifying Paragraph 25.

treated as a separate case. As judgment is entered in each subproceeding, that judgment is no less final for the fact that other subproceedings are ongoing.

It would seriously offend the well-established principle of the finality of judgments if this case were to be reopened for the purpose advanced here. As described in the factual recitation set forth above, the treaty status of the Samish was litigated and decided in 1979, after a full and fair trial and subsequent evidentiary hearing. The Samish first had a five-day trial before Magistrate Judge Cooper, sitting as a Special Master. Magistrate Judge Cooper determined, on the basis of evidence presented by the Samish and by the Treaty Tribes, that the Samish were neither a treaty tribe nor a political successor to a signatory treaty tribe. The Samish appealed this determination to Judge Boldt, who held a *de novo* evidentiary hearing. Judge Boldt's ruling includes findings that the present-day Lummi and Swinomish Reservation tribes include descendants of the 1855 Samish Indians (FF 23); that the Samish membership rolls have no requirement for any particular quantum of Indian ancestry, and that those rolls contain members with as little as 1/16 or 1/32 Indian ancestry (FF 26); that the members of the Samish Tribe have not lived as a continuous separate, distinct and cohesive Indian cultural or political community (FF 27), and that the Samish had not maintained an organized tribal structure in a political sense (FF 30). *U.S. v. Washington*, 476 F.Supp. at 1106. He also found that the tribe was not recognized by the United States as an Indian governmental or political entity (FF 25).

Judge Boldt's decision on the matter was affirmed by the Ninth Circuit, which held that the conclusion of law that "only tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights" was error, but that the finding of fact with respect to a lack of political organization independently supported the decision. *U.S. v. Washington*, 641 F.2d at 1372–73. The Supreme Court denied certiorari. This is a final judgment, and the fact that a different tribunal, applying different standards in furtherance of a different purpose, reached a contrary result is no basis for reopening it. The Samish have demonstrated no flaw in the process of the previous proceedings; instead they take issue with the result. Yet it would impugn the very integrity of the legal process to allow the Samish to re-litigate a matter that was determined after a full and fair hearing, and affirmed on appeal. This is especially so when the later administrative proceedings that resulted in a decision favorable to the Samish were not adversarial proceedings, as between the Samish and the Treaty Tribes. Some Treaty Tribes were allowed to file amicus briefs, but none was allowed to present evidence. Thus, the conflicting claims of other tribes to be successors to the treaty-time Samish were not before the ALJ in the acknowledgment proceedings.

It is not only this judgment that is at issue. In the so-called shellfish subproceeding, the Court determined that the Upper Skagit would be recognized as the successor to the treaty-time Noowhaha. *U.S. v. Washington*, 873 F.Supp. 1422, 1449 (W.D.Wash.1994). The finality of that decision and others would be at risk if the Samish motion were to be granted.

CONCLUSION

Rule 60(b) authorizes setting aside a judgment "only for reasons that would have prevented entry of the judgment in the first place, had the reasons been known at the time judgment was entered." *U.S. v. Washington*, 98 F.3d 1159, 1164

(9th Cir.1996) (Judge Kozinski, concurring). Here, the Ninth Circuit has found the requisite extraordinary circumstances in the events that led to federal recognition of the Samish tribe. However, it cannot be said with any degree of certainty that federal recognition in 1978 "would have prevented entry" of the judgment against the Samish regarding treaty status. Lack of federal recognition was but one of many factors listed by Judge Boldt in denying the Samish request for treaty tribe status. Other "unrecognized tribes," such as the Stillaguamish and the Upper Skagit, which did not have federally-approved membership rolls and did not reside on reservations, were accorded fishing rights and full participation in this case. See U.S. v. Washington 641 F.2d 1368, 1374 (9th Cir.1981); citing U.S. v. Washington, 384 F.Supp. at 327, 378–79. This suggests that the crucial factor for Judge Boldt's determination was the absence of an organized tribal structure (See, Finding of Fact 30: "The citizens comprising the Intervenor Samish Tribe have not maintained an organized tribal structure in a political sense." U.S. v. Washington, 476 F.Supp. at 1106). The Samish have asserted no grounds demonstrating that they were prevented from proving the continuity of their tribal organization at the trial held before Magistrate Judge Cooper and the de novo evidentiary hearing held by Judge Boldt.

The Court now finds, after full consideration of the extensive record and the parties' memoranda and exhibits, that the extraordinary circumstances which led to federal recognition of the Samish Tribe cannot overcome the other factors in the Rule 60(b) equation, such as timeliness and equitable considerations, and respect for the finality of the judgment. The Court further finds no basis for allowing the matter of the Samish treaty tribe status to be re-litigated. The Rule 60(b) motion is accordingly DENIED.

## JOINT MOTION FOR ORDER TO ADOPT STIPULATION REGARDING IMPLEMENTATION OF SHELLFISH SETTLEMENT AGREEMENT

Sub-proceeding 89–3 (Shellfish)

(October 10, 2008)

The Plaintiff Indian Tribes and Intervenor–Defendant Puget Sound Commercial Shellfish Growers seek this Court's entry of an Order that adopts those Parties' Stipulation Implementing Shellfish Settlement Agreement, attached hereto as Exhibit A. Plaintiff United States and Defendant State of Washington have informed counsel that they have no objection to this Motion.

The undersigned representatives of the Parties affirm and agree that the Stipulation is fair and reasonable and, by signatures of their representatives below, the Parties consent to and are fully bound by all its terms and consent to the Order Adopting the Stipulation.

### EXHIBIT A

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA, et al., Plaintiff,

v.

STATE OF WASHINGTON, et al., Defendant.

No. C70–9213

Sub-proceeding 89–3 (Shellfish)

STIPULATION REGARDING IMPLEMENTATION OF SHELLFISH SETTLEMENT AGREEMENT

The Settlement Agreement, Dkt. # 14476, adopted by the Court in the Order And Consent Decree Approving Settlement Agreement, Dkt. # 14477, requires those persons seeking to be considered Intervenor–Defendants under 12 of the Settlement Agreement to intervene and serve and file documentation establishing that they meet the terms of 12 by March 1, 2008. In addition, ¶ 11 of the Settlement Agreement provides that any dispute regarding the qualifications of any person to become an Intervenor–Defendant pursuant to 12 shall be resolved as set forth in the Revised Shellfish Implementation Plan and that the Court retains continuing jurisdiction for that purpose. The Plaintiff Tribes and Intervenor–Defendants previously stipulated, and an order was entered by the Court on February 8, 2008, Dkt. # 14482, that the Plaintiff Tribes are required to initiate the dispute resolution process by filing objections to requests for intervention within eight months of service of each request for intervention. An amendment to the prior Stipulated Order is now jointly sought to provide the parties additional time to resolve disputes prior to invocation of the dispute resolution process.

The parties are actively cooperating with respect to issues regarding the persons and tidelands able to participate in the Settlement Agreement. If additional time is permitted for continued discussions, the parties believe that some or most issues may be resolved without the need for the Court's dispute resolution process, and thus the parties jointly request that the deadline for the Plaintiff Tribes to file objections be extended to June 30, 2009. The Intervenor–Defendant Commercial Shellfish Growers and Plaintiff Tribes therefore stipulate as follows:

Paragraph 2 of the February 8, 2008, Order Adopting Stipulation Re Shellfish Settlement Agreement, Dkt. No. 14482, shall be amended such that the Plaintiff Tribes shall have until June 30, 2009 to file and serve any objection to any notice and request for intervention. In all other respects the Order Adopting Stipulation Re Shellfish Settlement Agreement shall remain unchanged.

## ORDER ADOPTING STIPULATION REGARDING IMPLEMENTATION OF SHELLFISH SETTLEMENT AGREEMENT

Sub-proceeding 89–3 (Shellfish)

(October 21, 2008)

IT IS HEREBY ORDERED:

The Court, having reviewed the Joint Motion for Order to Adopt Stipulation Re: Implementation of Shellfish Settlement Agreement, including the attached Stipulation Regarding Implementation of Shellfish Settlement Agreement, finds that the Stipulation is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Stipulation is hereby entered and approved.

## ORDER ON MOTION TO DISMISS

Subproceeding No. 05–4

(November 13, 2008)

This matter has been remanded to this Court by the Ninth Circuit Court of Appeals for this Court's failure to state a basis for its jurisdiction. It is now before the Court for consideration of the motion to dismiss filed by the Suquamish Tribe ("Suquamish"). Dkt. # 82. The Court has reviewed the motion, the response and replies, and relevant case documents. For

the reasons set forth below, the Court shall DENY the motion to dismiss.

## DISCUSSION

This is one of two Requests for Determination filed by Treaty Tribes concerning the extent of the usual and accustomed fishing grounds ("U & A") of the Suquamish, described by the Honorable George Boldt in 1978 as follows:

> The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington,* 459 F.Supp. 1020, 1049 (1978). In June, 2005, two months before this subproceeding was initiated, the Upper Skagit Indian Tribe ("Upper Skagit") filed a Request for Determination ("Request") asking the Court to determine that certain defined areas of Saratoga Passage and Skagit Bay, both to the east of Whidbey Island, are not within the Suquamish U & A as defined by Judge Boldt. *U.S. v. Washington,* Cause No. 70–9213, subproceeding 05–03. The Court found in subproceeding 05–03 that it retained jurisdiction under Paragraph 25 of the permanent injunction in this case, as modified August 23, 1993, to consider the Request of the Upper Skagit. That matter was decided on motions for summary judgment, and is currently on appeal.

This Request for Determination was filed as subproceeding 05–04 by the Tulalip Tribes ("Tulalip"), who ask the Court to find that certain inland marine waters on the east side of Admiralty Inlet (specifically including Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay) as well as Saratoga Passage, Penn Cove, Holmes Harbor, Possession ·Sound south to Point Wells, Port Susan, Tulalip Bay, and Port Gardner do not lie within the Suquamish U & A as it was defined by Judge Boldt in 1978. Request for Determination, ¶ 3. The Tulalip assert that they do not seek to re-litigate the adjudicated U & A of the Suquamish Tribe, but rather seek to clarify ambiguities in the language and identify the geographic scope of the area delineated by Judge Boldt. Request for Determination, ¶ 4. The matter was earlier dismissed on the basis of laches and res judicata. Dkt. # 17. On appeal, the matter was remanded to this Court for a determination of this Court's continuing jurisdiction in the matter.

Following remand, the Tulalip filed an Amended Request for Determination. Dkt. # 81. The Suquamish then moved to dismiss, asserting lack of jurisdiction, equitable estoppel, laches, and res judicata. Dkt. # 82. The Tulalip have opposed the motion.

■ The Court has retained jurisdiction in this case, C70–9213, for certain specified purposes set forth in Paragraph 25 of the Permanent Injunction. *U.S. v. Washington,* 384 F.Supp. 312, 419 (W.D.Wash.1974), as amended by Court Order dated August 23, 1993. C70–9213, Dkt. # 13599. This paragraph determines the scope of this Court's jurisdiction. In a recent Order finding no basis for jurisdiction over an inter-tribal dispute regarding resource allocation, the Court construed that scope strictly, finding that "the Court has retained°jurisdiction in this case for the specific purposes set forth in Paragraph 25, and no other." *U.S. v. Washington,* C70–9213, Subproceeding 05–02, Dkt. # 94, p. 6.

In their original Request for Determination, the Tulalip invoked the jurisdiction of this Court under Paragraph 25(a)(3), (a)(4), and (a)(7). Dkt. # 1. In their amended

Request, they additionally invoke Paragraph 25(a)(1) as a basis for jurisdiction. Dkt. # 81.

Paragraph 25 states, in relevant part,

(a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

(1) Whether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # 1 or this injunction;

. . . .

(3) Whether a tribe is entitled to exercise powers of self-regulation;

(4) Disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

. . . and

(7) Such other matters as the court may deem appropriate.

C70–9213, Dkt. # 13599.

As noted above, the Court earlier found in Subproceeding 05–03 that it retained jurisdiction over a similar dispute between the Suquamish and the Upper Skagit Indian Tribe regarding the extent of the Suquamish U & A. C70–9213, Subproceeding 05–03, Dkt. # 43. Such dispute fell within the scope of paragraph 25(a)(1), pursuant to which the Court retains jurisdiction to determine whether the actions of the Suquamish in fishing certain areas are in conformity with Final Decision # 1 or the permanent injunction. *Id.* The same reasoning applies here. The Request alleges that the Suquamish have been fishing in areas that are not within their U & A as it was determined by Judge Boldt, and therefore their actions are not "in con-

formity with Final Decision # 1 or this injunction". Paragraph 25(a)(1). While the Suquamish argue that a 1983 settlement agreement precludes use of Paragraph 25(a)(1) as a basis for jurisdiction, the Court disagrees. The 1983 agreement may further define the rights of these two parties, but it does not deprive this Court of Paragraph 25(a)(1) jurisdiction.[1]

The Court therefore finds that it retains jurisdiction over this dispute pursuant to that section. The Suquamish motion to dismiss for lack of jurisdiction shall be denied.

As to the remaining bases advanced for dismissal, all three—laches, estoppel, and res judicata—require a factual analysis which is not appropriate on a motion to dismiss. The Court shall deny the motion to dismiss on these bases, without prejudice to renewal by motion for summary judgment at the appropriate time.

## CONCLUSION

The Suquamish Tribe's motion to dismiss is DENIED. Pursuant to F.R.Civ. Proc. 12(a)(4). the Court grants the Suquamish request for a ten-day extension of time to file an answer to the Request for Determination. The answer shall accordingly be filed within twenty (20) days of the date of this Order.

## ORDER ON MOTION FOR CERTIFICATE OF APPEALABILITY

### Subproceeding No. 05–4

### (January 5, 2009)

This matter comes before the Court for consideration of the motion by the Suquamish Tribe for leave to proceed to in-

---

1. The Court notes that the Suquamish have now initiated a new subproceeding based on the 1983 settlement agreement. *United States*

*v. Washington*, C70–9213, Subproceeding 08–1RSM.

terlocutory appeal of the Court's November 13, 2008 Order on Motion to Dismiss. The Suquamish assert that the Court's ruling on subject matter jurisdiction conflicts with two previous Orders issued by this Court, in Subproceedings 05–03 and 05–02, both of which are currently on appeal. The Suquamish contend that it would best conserve judicial resources if the matter of jurisdiction could be resolved now.

The requirements for certification are that the case present a "controlling question of law" as to which there is "substantial ground for difference of opinion," and that an immediate appeal from the Order may "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The party seeking certification bears the burden of showing that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (quoting *Fisons, Ltd. v. United States*, 458 F.2d 1241, 1248 (7th Cir.1972)).

In this case, there is a controlling question of law regarding the Court's jurisdiction to consider the Amended Request for Determination. Immediate appeal from this Court's denial of the motion to dismiss may materially advance the ultimate termination of this litigation, in that the question of this Court's continuing jurisdiction in a parallel case (*U.S. v. Washington*, C70–9213, Subproceeding 05–03) is already before the Ninth Circuit Court of Appeals. A ruling that the Court has no jurisdiction to consider the Request for Determination in Subproceeding 05–03 would be dispositive of the question in this one as well. As for the "substantial ground for difference of opinion," the Court notes that the Ninth Circuit Court of Appeals has accepted the jurisdictional question for appeal in Subproceedings 05–03 and 05–02, and has not yet resolved the matter, so it could be said to provide ground for difference of opinion. Where an issue has not been squarely addressed by the Ninth Circuit Court of Appeals and is "inextricably intertwined" with an issue already on appeal, certification is appropriate. *Wells Fargo Bank v. Bourns, Inc.*, 860 F.Supp. 709, 717 (N.D.Cal.1994).

In certifying this matter for interlocutory appeal, the Court declines to find that its own recent rulings on jurisdiction in this matter in Subproceedings 05–02, 05–03 and 05–04 are inconsistent in any way. In Subproceeding 05–03, the Upper Skagit alleged subject matter jurisdiction "pursuant to the continuing jurisdiction of this Court in *U.S. v. Washington.*" Subproceeding 05–03, Dkt. # 1, p. 3. In joining the subproceeding with a Cross–Request for Determination, the Swinomish Indian Tribal Community alleged jurisdiction under paragraph 25(a)(1) of the Order Modifying Paragraph 25 of the Permanent Injunction. Subproceeding 05–03, Dkt. # 44, p. 2. This paragraph provides for the continuing jurisdiction of this Court to determine "whether or not the actions intended or effected by any party ... are in conformity with final Decision # I or this injunction ..." C70–9213, Dkt. # 13599, p. 1. In denying a motion to dismiss for lack of jurisdiction, the Court found that

[t]he Request alleges that the Suquamish have been fishing for crab in certain areas on the east side of Whidbey Island that are within the Upper Skagit's own U & A, and that this action is not in conformity with Judge Boldt's determination of the Suquamish U & A because this area is not included within Puget Sound as Judge Boldt intended that term. This Court therefore has jurisdic-

tion under Paragraph 25 to consider this Request.

Subproceeding 05–03, Dkt. # 43, p. 2. By referring to actions "not in conformity with" Judge Boldt's decision (which set forth the extent of the Suquamish Tribe's usual and accustomed fishing area ("U & A")), the Court specifically found that it retained jurisdiction under Paragraph 25(a)(1) to consider the Request for Determination filed by the Upper Skagit and joined by the Swinomish.

The same jurisdictional basis applies to the Request for Determination filed by the Tulalip in this subproceeding, as the Court has held in the Order which the Suquamish seek to appeal. The Tulalip asserted Paragraph 25(a)(1) in the Amended Request for Determination. Dkt. # 81, p. 2. The Request asks this Court for a determination that the "actions intended or effected by any party" (namely, actions of the Suquamish Tribe in fishing in certain areas) are "in conformity" with Judge Boldt's determination on the boundaries of the Suquamish usual and accustomed fishing areas. *U.S. v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash.1978). The fact that the Court's determination requires interpretation of terms used by Judge Boldt in his ruling does not alter the jurisdictional basis.

In Subproceeding 05–02, by contrast, the Court found that it did not have jurisdiction over a resource allocation dispute between Treaty Tribes. The requesting Tribes invoked this Court's jurisdiction under several provisions of Paragraph 25, namely 25(a)(1) ("whether or not the actions intended or effected by any party in conformity with Final Decision # 1 or this injunction"); 25(a)(4) ("disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves"); and 25(a)(7) ("such other matters as the court may deem appropri-

ate"). In dismissing the Request for Determination for lack of jurisdiction, the Court stated that "the Court has retained jurisdiction in this case for the specific purposes set forth in Paragraph 25, and no other. The request for allocation of the treaty harvest as a form of equitable relief does not fall within any of the purposes set forth therein." Subproceeding 05–02, Dkt. # 94, p. 6.

With respect to Paragraph 25(a)(1), the Court found that the requesting party had not identified any "action" by any party which is, or is not, in conformity with Final Decision # 1 or the Injunction. *Id.,* p. 5. Instead, the Skokomish Tribe, as requesting party, was asking the Court to "declare an equitable treaty fishing harvest allocation for the available harvest of all species of finfish and shellfish in Hood Canal." *Id.,* p. 2. Allocation among Treaty Tribes with overlapping fishing areas (as opposed to apportionment between Tribal and non-Tribal fishermen) was not part of Final Decision # I nor the permanent injunction in *U.S. v. Washington.* This request therefore did not fit within the limits of paragraph 25(a)(1) With respect to Paragraph 25(a)(4), the Court found that the equitable right of any one Treaty Tribe to harvest a certain allocation of fish does not raise a dispute "concerning the subject matter of this case," because the subject matter of this case is treaty fishing rights, not inter-tribal allocation. *Id.,* p. 4. Finally, with respect to paragraph 25(a)(7), the Court simply declined to exercise the discretion afforded it in that paragraph "in light of the considerations set forth elsewhere" in the opinion. *Id.,* p. 5.

The Ninth Circuit Court of Appeals heard oral argument in the two Subproceedings now on appeal on October 21, 2008, and a ruling may be forthcoming at any time. The jurisdictional issue in this subproceeding is inextricably intertwined

with the one currently on appeal on Subproceeding 05–03. Judicial efficiency would be promoted, and the termination of this litigation advanced, if these cases were joined for consideration before the Circuit. Upon the ruling on these issues by the Ninth Circuit, the action could then be more efficiently managed by this Court. The Court therefore finds that it would best conserve judicial resources, and the parties' as well, to certify the matter for interlocutory appeal and allow the Suquamish to request that this appeal be consolidated with the appeal in Subproceeding 05–03.

## CONCLUSION

Accordingly, the motion of the Suquamish Tribe for certification of the Court's Order on Motion to Dismiss, dated November 13, 2008, for interlocutory appeal is GRANTED. The Court designates that Order as immediately appealable pursuant to 28 U.S.C. § 1292(b), solely as to the issue of this Court's jurisdiction over this Amended Request for Determination under Paragraph 25 of the Permanent Injunction, as modified August 23, 1993. *U.S. v. Washington,* C70–9213, Dkt. # 13599. The Suquamish appeal shall include a request that the appeal be consolidated with the appeal in Subproceeding 05–03. This subproceeding is STAYED until the Ninth Circuit Court of Appeals has either declined to accept the interlocutory appeal, or has accepted the appeal and issued an opinion dispositive of the issue.

## ORDER ON MOTION TO DISMISS

### Subproceeding No. 89–2

### (June 16, 2009)

■ This matter is before the Court for consideration of the Lummi Nation's motion to dismiss the motion for contempt filed by the Lower Elwha Klallam Tribe, Port Gamble S'Klallam Tribe, and the Jamestown S'Klallam Tribe (collectively, the "Klallams"). Dkt. ## 217, 221. The Klallams' motion asks the Court to issue an Order to Show Cause why the Lummi Nation should not be held in contempt for violating orders of this Court and the Ninth Circuit Court of Appeals regarding the extent of the Lummi Nation usual and accustomed fishing area ("U & A"). The Lummi Nation asserts in their motion to dismiss that the contempt motion, filed in a closed subproceeding, is improper, and the issue regarding Lummi Nation fishing in the disputed area should be addressed in a new subproceeding filed according to the procedures outlined in Paragraph 25 of the permanent injunction, as amended August 23, 1993. C70–9213, Dkt. # 13599. The Court agrees.

The Klallams assert in their contempt motion that the Lummi Nation has issued fishing regulations for the area south of the San Juan Islands and west of Whidbey Island, in clear violation of orders issued by the Court in this subproceeding and affirmed in part by the Ninth Circuit Court of Appeals. The courts found that the U & A of the Lummi Nation, described by Judge Boldt as "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle ..." did not include the Strait of Juan de Fuca or the mouth of Hood Canal, but did include Admiralty Inlet. *United States v. Washington,* 384 F.Supp. 312, 361 (W.D.Wash.1974); *U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 453 (9th Cir.2000). Nowhere did either this Court or the Ninth Circuit Court of Appeals define the boundaries of the Strait of Juan de Fuca for the purpose of exclusion from the Lummi U & A. While the marine area immediately west of Whidbey Island and south of the San Juan Islands may be considered

part of the Strait of Juan de Fuca, some portion of this area is necessarily also within the Lummi U & A, because otherwise there would be no connection between Haro, Rosario, and Georgia Straits to the north and Admiralty Inlet to the south— all areas that are indisputably within the Lummi U & A. The Court cannot find the Lummi Nation in contempt without first defining the western boundary of the Lummi U & A in this area. For that determination, particularly in light of the fact that other tribes have an interest in this issue, the procedures set forth in Paragraph 25 are appropriate.

Accordingly, the Lummi Nation's motion to dismiss (Dkt. # 221) is GRANTED. The Klallams' motion for an order to show cause (Dkt. # 217) is DENIED, without prejudice to renewal as a new subproceeding, following the procedures set forth in Paragraph 25.[1]

## ORDER ON MOTIONS FOR RECONSIDERATION

### Subproceeding No. 89–2

### (July 14, 2009)

The Port Gamble S'Klallam Tribe and Jamestown S'Klallam Tribe (together, the "S'Klallam"), and the Lower Elwha Klallam Tribe ("Lower Elwha") have moved for reconsideration of the Court's June 16, 2009 Order granting the Lummi Nation's motion to dismiss (Dkt. ## 235, 237, 238). Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier...." Local Rule CR 7(h)(1). The Court deems it unnecessary

to direct a response to the motions, and shall, for the reasons which follow, deny both motions, but with one clarification.

The S'Klallam assert that the Court's Order violates "the bedrock principle of finality," and "ignore[s] precedent" set forth in previous Orders of this Court and the Ninth Circuit Court of Appeals. That is not the case. These previous Orders addressed the question of the extent of the Lummi usual and accustomed fishing area ("U & A"), described by Judge Boldt as including both defined reef net areas (Finding of Fact No. 45) and, in Finding of Fact 46, "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *United States v. Washington,* 384 F.Supp. 312, 360 (W.D.Wash.1974) (*Decision* ). In considering the issue, United States District Judge Robert Coyle ruled that Judge Boldt's language in Finding of Fact 46 was ambiguous, and this determination was confirmed by the Ninth Circuit Court of Appeals. *United States v. Lummi Indian Tribe,* 235 F.3d 443, 449 (9th Cir.2000). Specifically, the Ninth Circuit ruled that "[t]he phrase used by Judge Boldt is ambiguous because it does not delineate the western boundary of the Lummi's usual and accustomed grounds and stations." *Id.*

The tribes who initiated this subproceeding in 1989 sought a determination that the Lummi were violating *Decision I* by fishing in certain areas, designated as the Strait of Juan de Fuca, Admiralty Inlet, and the mouth of the Hood Canal. Judge Coyle, after considering evidence that was before Judge Boldt and a supplemental declaration by historian and expert Barbara Lane, ruled that the Lummi U &

---

1. The Court shall retain the courtesy copies of the exhibits to the Klallams' motion, which were presented to the Court in spiral-bound copies, for use in the new subproceeding so that this effort need not be duplicated. *See,* Dkt. ## 218, 219. The documents will still need to be filed electronically in the new subproceeding.

A did not include any of the three disputed areas. United States District Judge Barbara Rothstein adhered to this ruling when the matter was later brought before her. This determination was upheld by the Ninth Circuit Court of Appeals as to the Strait of Juan de Fuca and Hood Canal, but reversed as to Admiralty Inlet. *Id.,* at 452–53.

In moving for reconsideration, the S'Klallam assert that the exclusion of the Strait of Juan de Fuca from the Lummi U & A finally determined the western boundary of that U & A. However, nowhere have they pointed to any language actually defining that western boundary or the boundaries of the Strait of Juan de Fuca, as that term was used by Judge Coyle, Judge Rothstein, and the Ninth Circuit Court of Appeals in prior Orders in this case. The area subject to the immediate dispute is viewed by the Court as the open marine area to the south of the San Juan Islands and immediately to the west of Whidbey Island. Geographers and nautical map-makers of today may or may not consider this area as within the Strait of Juan de Fuca, but there has been no evidence presented to this Court to indicate what Judge Boldt, Judge Coyle, or the Ninth Circuit Court of Appeals considered to be the eastern extent of the Strait of Juan de Fuca. Indeed, the Ninth Circuit arrived at its conclusion with respect to the Strait of Juan de Fuca by finding that Judge Boldt considered the Strait of Juan de Fuca and Puget Sound to be two distinct regions. *Id.* at 452–53. Significantly, the Ninth Circuit stated, "It is clear that Judge Boldt viewed Puget Sound and the Strait of Juan de Fuca as two distinct regions, **with the Strait lying to the west of the Sound.**" *Id.* (emphasis added).

The context of the citations to Judge Boldt's findings, with references to areas fished by the Makahs and Quileute suggests that the Strait of Juan de Fuca may have been regarded by the Ninth Circuit as the passageway to the west of the area now under dispute, and not encompassing it.[1]

Consideration of various courts' and parties' use of the term is further complicated by the fact that Judge Boldt referred directly to "the Straits" in Finding of Fact No. 45, finding that the Lummi's "single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River." *U.S. v. Washington,* 384 F.Supp. at 360. Dr. Lane, in a later-filed declaration, explained that the Straits to which she referred in her reports—upon which Judge Boldt placed great reliance—were Haro, Rosario and Georgia Straits, and she "did not intend" her reference to include the Strait of Juan de Fuca. Paragraph 4, Declaration of Barbara Lane dated March 23, 1989, quoted in Judge Coyle's decision, C70–9213 Dkt. # 11596, p. 7. However, she admitted that these various straits were "not specifically denominated" in her report, so it remains under question whether Judge Boldt understood her intent. *Id.* Further, Dr. Lane described as separate areas the Strait of Juan de Fuca and "the open marine water beyond the immediate near shore area southwesterly of the San Juan Islands and westerly of northern Whidbey Island ..." Paragraph 5, Declaration of Barbara Lane dated March 23, 1989, quoted in Judge Coyle's decision, C70–9213 Dkt. # 11596, p. 7. This suggests that in

---

**1.** Indeed, if the language regarding the "the Strait lying to the west of the Sound" is taken literally, one could conclude that the Ninth Circuit did not regard the area under dispute as part of the Strait.

her view the Strait of Juan de Fuca did not include the area now under dispute.

These various statements and references cast doubt on the location and boundaries of the Strait of Juan de Fuca as the term was used by Judge Coyle and the Ninth Circuit Court of Appeals. It cannot be said that the exclusion of the Strait of Juan de Fuca from the Lummi U & A determined the western boundary of that U & A when the eastern limit of the Strait was itself not described. Accordingly, the Court declines to reconsider the ruling that the western boundary of the Lummi U & A remains undefined. The Lower Elwha and S'Klallam both ask the Court to reconsider the language stating that "[w]hile the marine area immediately west of Whidbey Island and south of the San Juan Island may be considered part of the Strait of Juan de Fuca, some portion of this area is necessarily also within the Lummi U & A, because otherwise there would be no connection between Haro, Rosario and Georgia Straits to the north and Admiralty Inlet to the south...." The S'Klallam argue that transit alone does not establish a U & A, citing Judge Boldt's observation that "occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the traveling Indians." Motion for Reconsideration, Dkt. # 237, p. 5; *quoting U.S. v. Washington*, 384 F.Supp. at 351 (Finding 14). While mindful of Judge Boldt's statement, the Court notes that the Ninth Circuit Court of Appeals used a similar geographic connection to find that Admiralty Inlet lies within the Lummi U & A, noting that "Admiralty Inlet would likely be a passage through which the Lummi would have traveled from the San Juan Islands in the north to the 'present environs of Seattle'." *U.S. v. Lummi Indian Tribe*, 235 F.3d at 453. Thus it cannot be said that transit or passage is absolutely prohibited as a consideration in determining the boundaries of a U & A.

The Lower Elwha contend that the argument that the disputed area "necessarily" lies within the Lummi U & A was addressed and rejected by Judge Rothstein when she ruled, eight years after Judge Coyle's decision, on motions directed to the Lummi cross-request for determination. The Lower Elwha assert that Judge Rothstein's ruling "necessarily covered not only the Strait of Juan de Fuca but also the unnamed 'waters west of Whidbey Island'." Lower Elwha Motion for Reconsideration, Dkt. 328, p. 5. However, to whatever extent that the Lummi cross-request included these "unnamed waters" as a specific and separate area from the Strait of Juan de Fuca, Judge Rothstein's Order did not address the merits of that issue. Instead, Judge Rothstein found that the Lummi cross-request did not cover "a different area from the area covered by the Four Tribes' initial request and by Judge Coyle's decision." Dkt. # 136, p. 3. She therefore was bound by Judge Coyle's earlier decision, properly applying, as the Ninth Circuit Court of Appeals found, the law of the case doctrine. *U.S. v. Lummi Indian Tribe*, 235 F.3d at 452.

As the appellate court noted, for the law of the case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" *Id.*, citing *Liberty Mutual Insurance Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir.1982). As Judge Rothstein's Order simply adhered to Judge Coyle's previous Order addressing the three areas designated as the Strait of Juan de Fuca, Admiralty Inlet, and the mouth of Hood Canal, it neither explicitly nor by necessary implication decided the issue of whether the "unnamed water" to

the west of Whidbey Island was intended by Judge Boldt to be included in the Lummi U & A. As stated by the Ninth Circuit, "the issue in question—whether Judge Boldt intended for the three disputed areas to be included in the Lummi's usual and accustomed grounds and stations— was explicitly decided by Judge Coyle." *Id.* That was the only issue explicitly decided by Judge Coyle. The Court therefore declines to find that the "law of the case" doctrine precludes consideration of location and boundaries of the Strait of Juan de Fuca as that term has been used in this case.

This Court's discussion in the dismissal Order of the disputed area south of the San Juan Islands, and its position relative to the Strait of Juan de Fuca, was intended simply to frame the issues to be decided in the event this dispute is re-filed as a Request for Determination. The Court's statements do not represent findings or conclusions, and the parties are cautioned not to cite them as such. This Court's ruling in the motion to dismiss is limited to a finding that it remains to be determined whether Judge Coyle and the Ninth Circuit Court of Appeals intended to include the disputed area in "the Strait of Juan de Fuca" when they excluded that body of water from the Lummi U & A. In order to clarify this limitation on the ruling, the Court hereby modifies the language of the dismissal Order to read, at lines 9–13 on page 2, as follows:

> While the marine area immediately west of Whidbey Island and south of the San Juan Islands may be considered **by geographers and others** as part of the Strait of Juan de Fuca, some portion of this area **may necessarily lie** within the Lummi U & A, because otherwise there would be no connection between Haro, Rosario, and Georgia Straits to the north and Admiralty Inlet to the south—

all areas that are indisputably within the Lummi U & A.

The Court's Order, Dkt. # 235, is hereby AMENDED to incorporate this clarification. Apart from this clarification, the two motions for reconsideration (Dkt. ## 237, 238) are DENIED.

## ORDER ON MOTION OF MAKAH INDIAN TRIBE TO CLARIFY THE STATUS QUO

### Subproceeding No. 91–1

### (February 26, 2010)

This matter is before the Court for consideration of a motion by the Makah Indian Nation asking the Court to clarify the *status quo* that controls the 2010 treaty halibut fishery. Dkt. # 209. The Makah propose in the motion that the 2004 and 2006 plans be adopted as the *status quo.* Responses to the motion were filed by the Jamestown and Port Gamble S'Klallam Tribes, the Lower Elwha Klallam Tribe, the Lummi Nation, the Quinault Indian Nation, the Quileute Indian Tribe, the Swinomish Tribal Community, the Hoh Tribe, and the Tulalip Tribes. The Court heard oral argument on the motion at a hearing on February 24, 2010, and has fully considered the issues in light of the history of this subproceeding. The parties are very familiar with that history and the facts and issues presented, and in the interest of expediting this ruling does not recite a background summary.

The Court now finds and rules as follows:

(1) While the Court has ruled previously that it does not have jurisdiction over allocation disputes between sovereign Tribes absent the consent of all, this motion does not present an allocation dispute. The Court has inherent power to clarify and enforce its prior rulings, and that is the action requested in this motion.

(2) The last management plan upon which all the Tribes agreed was the 2000 plan, as established in the Court's 2001 Order Establishing Interim Halibut Fishery Management Plan, dated March 21, 2001. Dkt. # 75. The Tribes did not reach consensus on subsequent changes to the plan. The 2004 plan was not signed by the Hoh, and the Quileute signed as "not happy" with the plan. Declaration of Russell Svec, Dkt. # 211, Exhibit B. In 2006, the Hoh again declined to sign, and the Port Gamble and Jamestown S'Klallam signed with noted reservations. *Id.*, Exhibit E.

(3) Accordingly, the motion of the Makah Indian Nation to clarify the *status quo* is GRANTED IN PART. The Court determines that the 2000 plan is the *status quo,* adjusted as necessary to reflect current fishing regulations and conditions.

(4) In the future, any Tribe may, after providing notice to the other Tribes, request that the Court refer the matter to a settlement judge to assist the Tribes in reaching an agreement to change the *status quo.* Such request shall be filed in this subproceeding on or before September 30 for the following year's halibut fishery. Such request does not fall within the requirements of Paragraph 25 for initiation of new subproceedings, and need not be preceded by the full meet and confer procedure set forth therein.

## MINUTE ORDER

### (March 5, 2010)

**Case Name:** In Re: Indian Halibut Share, et al v.

**Case Number:** 2:91–sp–1

**Document Number:** 236(No document attached)

**Docket Text:**

MINUTE ORDER [229] MOTION for Clarification and Request for Matter to be Heard Telephonically re (228 in 2:91–sp–00001–RSM, 19541 in 2:70–cv–09213–RSM) Order on Motion for Miscellaneous Relief, filed by Jamestown Band of Klallams, Port Gamble Band Clallam. By direction of Judge Ricardo S. Martinez:

The motion for clarification is GRANTED in that the Court will clarify its ruling, and DENIED as to the specific interpretation requested by the movants. The only conditions contemplated by the Court in ruling on the status quo were (1) changes in the total allowed catch (TAC) from year to year and (2) the opening date of the fishery. This was the specific intent of the Court's ruling as indicated by the phrase "adjusted as necessary," (LS)

## ORDER

### Sub–Proceeding 91–1

### (March 10, 2011)

This matter is now before the Court for consideration of a motion by the Port Gamble S'Klallam and Jamestown S'Klallam Tribes (together, "the S'Klallams") to modify both the *status quo* and the Court's Order dated March 5, 2010. Dkt. # 287. The motion requests, in part, that the Court intervene to adjust the "restricted fishery" provided for in the 2011 halibut management plan for the Tribal commercial fishery. Eight Tribes have opposed the motion, and one, the Skokomish Tribe, states that it neither supports nor opposes the request.

This motion was noted for consideration on March 4, 2011, eight days before the proposed March 12, 2011 opening of the halibut fishery. The motion presents issues that have been repeatedly before the Court, and which the parties have recently tried to settle, but without resolution. The Court finds that it cannot give full and

meaningful consideration to the issues presented in the short time available. The Court will therefore decline to rule on the motion as it concerns the 2011 halibut fishery. However, the motion shall be RE–NOTED on the Court's calendar for June 3, 2011, with oral argument to be scheduled by the courtroom deputy shortly thereafter.

In 2005, after a similar dispute arose, the Court scheduled a hearing to address the halibut fishery issues and "develop a plan to avoid a recurrence of this dispute in the 2006 season." Order on Motion of Certain Tribes to Adopt an Interim Halibut Commercial Fishery Plan, Dkt. # 149. Minutes entered after the hearing reflect that "no formal rulings or changes made at this time, parties will continue to work together to reach [a] management plan." Dkt. # 157. For the next several years the Court did not hear from them regarding the halibut fishery.

In 2010, the Makah Indian Nation asked the Court to clarify the *status quo* that controls the halibut fishery. The Court in ruling on the motion set forth a procedure for early resolution of halibut fishery disputes. Dkt. # 228. Pursuant to that direction, the S'Klallams, together with the Hoh Tribe, Quileute Tribe, and Quinault Indian Nation, requested a settlement judge last September, and the matter was referred to the Honorable Brian A. Tsuchida, United States Magistrate Judge, for settlement, Dkt. ## 274, 275, 280. The parties were unable to reach a settlement.

The 2000 plan, which has been determined to be the *status quo,* is now over ten years old, and may well need to be modified to reflect changes in the halibut fish-

ery since that date. In view of the recurring nature of this dispute, and the need to bring it to an end, the Court shall consider exercising its jurisdiction under section (7) of Paragraph 25 of the Permanent Injunction to modify the *status quo.* The Tribes may submit supplemental briefing on this issue, including proposed modifications to the 2000 plan, as supplemental responses to the S'Klallams motion, due May 20, 2011. The S'Klallams supplemental reply, which may extend to twenty pages, shall be due on June 3, 2011.

## ORDER ON MOTION FOR LEAVE TO FILE A CROSS–REQUEST FOR DETERMINATION

### subproceeding 09–1

### (April 12, 2011)

This matter is before the Court for consideration of a motion by the State of Washington ("Washington" or "the State") for leave to file a Cross–Request for Determination, together with the motion by the Quinault Indian Nation ("Quinault") to deny the State of Washington's motion.[1] Dkt. ## 41, 52. The Quileute Indian Tribe, Hoh Indian Tribe, and Quinault Indian Nation have opposed the State's motion. Dkt. ## 52, 54, 55. No party has requested oral argument. For the reasons set forth below, the motion by the State of Washington shall be denied.

## DISCUSSION

This subproceeding was initiated by a Request for Determination filed by the Makah Indian Tribe ("Makah"). Dkt. # 1. The Makah have requested that the Court determine the usual and accustomed fish-

---

**1.** The Court does not look favorably upon motions "to deny" another party's motion. This practice unnecessarily complicates the case docket, and allows the filing of an additional brief in the form of a reply to the

motion to deny. The Quinaults' motion to deny was timely filed as opposition to the State of Washington's motion, and will be considered as such rather than as a separate motion.

ing grounds ("U & A's") of the Quileute Indian Tribe ("Quileute") and the Quinault Indian Nation ("Quinault") in the Pacific Ocean, to the extent these were not determined in *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974) ("Final Decision # 1"). The U & A's of the Makah, Quileute, Quinault, and Hoh Indian Tribe were originally determined in Final Decision # 1, but no western boundaries of these U & A's in the Pacific Ocean were established. Request for Determination, Dkt. # 1, 3(a)(i), (i). At that time, this case was limited treaty fishing rights in waters within the jurisdiction of the State of Washington. *Id.* The Makah, pursuant to the continuing jurisdiction of this Court, subsequently sought a determination as to the westward extent of its U & A in offshore waters. *Id.* at ¶ 3(a)(iii). The boundaries of the Makah U & A in offshore waters were then determined by the Court, including a north-south boundary line drawn approximately forty miles offshore at longitude 125 °44′ W. *Id. United States v. Washington,* 626 F.Supp. 1405, 1467 (W.D.Wash.1985). The Makah ask in this Request for Determination that the Court similarly determine a western boundary to the U & A's of the Quinault Indian Nation and Quileute Indian Tribe. The Makah assert that this is necessary as the Quileute and Quinault have indicated an intent to enter the Pacific whiting fishery, which takes place in offshore waters, and in which the Makah are already an active participant.

The State of Washington has moved, pursuant to Paragraph 25(b)(4) of the Order Modifying Paragraph 25 of the Permanent Injunction, for leave to file a Cross-Request for Determination. Dkt. # 41. Paragraph 25 states, in relevant part,

> A party responding to a request [for determination] may assert a counter-request for determination if such counter-request relates directly to the subject matter of the request for determination. Cross-requests between respondents are discouraged and shall be permitted only with prior permission of the court.

*United States v. Washington,* C70–9213, Dkt. # 13599.

The cross-request which Washington seeks leave to file invokes the jurisdiction of this Court under Paragraphs 25(a)(1) and 25(a)(6). Under these sections, the Court has retained jurisdiction to determine "whether or not the actions intended or effected by any party ... are in conformity with Final Decision # 1 or this injunction," as well as "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # 1." *Id.* These are the same bases asserted in the Makah Request for Determination. Dkt. 1. Washington contends that its Cross–Request will not appreciably complicate these proceedings and will obviate the need for it to file a separate subproceeding of its own. The State asserts that it participated in the required pre-filing conferences. Declaration of Michael S. Grossmann, Dkt. # 42, ¶¶ 3, 4.

The Tribes opposing the State's motion do so on various bases, which the Court need not address in detail. The Court notes that objections based on sovereign immunity are foreclosed by this Court's continuing jurisdiction as expressed in Paragraph 25. However, in matters involving an inter-tribal dispute over a fishery, the Court has already found that Washington does not have a voice. The Court ruled in the Injunction portion of Final Decision # 1 that

> [w]here the fish allocated to Indian Treaty fishermen must be divided among two or more tribes having usual and accustomed fishing places through which the fish will pass, responsibility

for such division shall rest with the tribes involved.

*U.S. v. Washington,* 384 F.Supp. at 417. Nine years later, in a dispute between the same Tribes involved in this subproceeding, the Court noted that "[t]his Court's ruling that the question of intertribal allocation is a matter for the tribes rather than the state to resolve, prohibits the state from interfering with intertribal allocation. . . ." *United States v. Washington,* 626 F.Supp. 1405, 1470 (W.D.Wash.1985) (*citing* Paragraph 15 of the Injunction, set forth above). This ruling is particularly applicable here, where the area put in dispute by the Makah lies outside the territorial waters of the State of Washington.

While Washington asserts that its citizens, as non-treaty fishermen, will be affected by the outcome of this dispute, it has not demonstrated how. The allocation of fishing rights between treaty and non-treaty fishermen was determined long ago in this case, and will be unaffected by a ruling pursuant to Paragraph 25(a)(1) or (a)(6) in a dispute between tribes. Moreover, fishing for Pacific whiting and other fish in offshore waters is subject to management and regulation by the National Marine Fisheries Service ("NMFS"), pursuant to the Magnuson–Stevens Act, 16 U.S.C. § 1801 *et seq. See, Midwater Trawlers Co–Operative v. Department of Commerce,* 393 F.3d 994 (9th Cir.2004). NMFS has promulgated carefully crafted regulations which recognize the rights of treaty and non-treaty fishermen as they have been determined in this case. *See,* 50 C.F.R. §§ 660.320–.324, .385. Such regulatory power properly lies with the agency and will not be disturbed by this Court's consideration of U & A boundaries as requested by the Makah.

The motion by the State of Washington for leave to file a Cross–Request for Determination (Dkt. # 41) is accordingly DE-NIED. The motion by the Quinault Indian Nation to deny the State's Motion (Dkt. # 52) is STRICKEN from the motion calendar, as it has been considered as a response to the State's motion instead.

## ORDER ON MOTIONS TO DISMISS

### Subproceeding No. 09–1

### (September 28, 2011)

This matter is before the Court for consideration of two motions to dismiss, one by the Quinault Indian Nation ("Quinault") and one by the Quileute Tribe ("Quileute"), to dismiss the Request for Determination filed by the Makah Tribe ("Makah"). Dkt. ## 51, 53. The Makah Tribe has asked the Court to determine the extent of the usual and accustomed fishing areas of the Quinault and Quileute in the Pacific Ocean. Dkt. 1. The Quinault and Quileute assert in their motions that the Request should be summarily dismissed on grounds of sovereign immunity, lack of standing, failure to state a claim, lack of ripeness, and laches. For the reasons set forth below, both motions shall be denied.

## BACKGROUND

The history of this case and the development of the concept of "usual and accustomed" ("U & A") fishing areas are well known to the parties, and need not be repeated here. The U & A of the Quinault within the case area was described by Judge George H. Boldt as including

the following rivers and streams: Clearwater, Queets, Salmon, Quinault (including Lake Quinault and the Upper Quinault tributaries), Raft, Moclips, Copalis, and Joe Creek. Ocean fisheries were utilized in the waters adjacent to their territory.

*United States v. Washington,* 384 F.Supp. 312, 374 (W.D.Wash.1974) ("*Final Deci-*

*sion 1"*). In the same Order, Judge Boldt determined that

> [b]efore, during and after treaty times, the usual and accustomed fishing places of the Quileute and Hoh Indians included the Hoh river from the mouth to its uppermost reaches, its tributary creeks, the Quileute River and its tributary creeks, Dickey River, Soleduck river, Lake Dickey, Pleasant lake, Lake Ozette, and the adjacent tidewater and saltwater areas.... Along the adjacent Pacific coast Quileutes caught smelt, bass, puggy, codfish, halibut, flatfish, bullheads, devilfish shark, herring, sardines, sturgeons, seal, sea lion, porpoise and whale

*Id.* at 372.

A dispute has arisen between the Makah and these two coastal tribes regarding the extent of the two Tribes' U & A's in the Pacific Ocean. The Makah Request asks the Court to determine a western boundary to these U & A's. The Quinault and Quileute have each asserted that their sovereign immunity bars consideration of this request, and that the Makah lack standing to bring this claim or suit. Each tribe has also asserted additional bases for dismissal: the Quileute contend that the Makah claims are not ripe for adjudication, and the Quinault contend that the Request fails to state a cause of action, that the action is barred by laches, and that the Court should exercise its discretion to decline jurisdiction. These contentions shall be addressed below.

## DISCUSSION

### I. Sovereign Immunity

 Both the Quileute and the Quinault assert that their tribal sovereign immunity bars consideration of this Request. The Court finds otherwise. In 1983, the Quileute and Quinault joined the Hoh Tribe in filing a motion for a declaratory judgment and permanent injunction regarding the Makah ocean fishery for coho salmon. In denying a motion to dismiss filed by the Makah, the Court noted,

> Sovereign immunity is not a bar to the relief requested by the Quinault, Hoh and Quileute Tribes. The Makah Tribe waived its sovereign immunity and consented to full adjudication of its treaty fishing rights when it intervened in this case seeking a determination of those rights, and asking that the Court exercise its equitable power to protect those rights. The Court therefore has jurisdiction over the Makah to determine whether they threaten to infringe the adjudicated treaty rights of other tribes as alleged, and to grant equitable relief if it is appropriate.

*United States v. Washington,* 626 F.Supp. 1405, 1471 (W.D.Wash.1985).

Subsequently, when the Court proposed a "sunset order" that would bring this case to an end, the Quileute and Quinault joined other tribes in arguing that it would be unjust "to slam the door on the tribes in the name of court administrative efficiency." Joint Tribal Response and Objections to Proposed "Sunset Order," C70–9213, Dkt. # 13234, p. 11. The tribes expressed a concern that if this case were closed, "tribes could be immune from future suits by other tribes (for example to resolve intertribal allocation issues) or the State." *Id.,* p. 7.

> These two doctrines of sovereign immunity and indispensability make it quite possible, that once this case has ended, further litigation cannot be begun, throwing the possible final adjudication of critical matters into limbo and denying the tribes' [sic] the basic fairness which Magistrate Judge Weinberg mentions.

These issues do not arise if the case continues in active status. The northwest fisheries litigation makes it clear that the parties to this case, each of them and all of them, by seeking equitable relief, have waived their sovereign immunity at least to the extent that modification[s] of the original decrees are necessary.

*Id.,* p. 8 (citations omitted.). Based on the tribes' argument that continuation of his case "is the only real and viable mechanism that the tribes have for the fair adjudication of their treaty rights," the Court declined to enter the Sunset Order. C70–9213, Dkt. # 13292.

The Quinault and Quileute benefitted from the Court's ruling on the tribes' waiver of sovereign immunity in their dispute with the Makah in 1983–1985. They joined the other tribes in arguing against the Sunset Order on the basis that continuation of this case is necessary because of the waivers of sovereign immunity that are in place. They will not now be heard to assert that their sovereign immunity bars consideration of the Makah Request.

## II. Jurisdiction, Standing, Ripeness, Laches, and Failure to State a Claim

 Two months after declining to enter the Sunset Order, the Court modified Paragraph 25 of the Permanent Injunction in this case, establishing its continuing validity. Pursuant to both the original Paragraph 25 and the modification, this Court retained jurisdiction to determine "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I." *United States v. Washington,* 384 F.Supp. 312, 419 (W.D.Wash.1974); Order Modifying Paragraph 25 of Permanent Injunction, C70–9213, Dkt. # 13599 (August 11, 1993). Pursuant to the same provision, **any party** to

may invoke this Court's jurisdiction to make this determination. This provision sets a fairly low bar for establishing standing, which the Makah have met by asserting that the Quinault or the Quileute may interfere with their exercise of treaty fishing rights in the Pacific whiting, salmon, blackcod, and halibut fisheries.

 As for laches, this assertion by the Quinault is incompatible with the Quileute contention that the issue is not yet ripe. Further, the Quinault have not alleged sufficient facts with respect to the delay or the injury they will suffer for the Court to apply this equitable doctrine. Indeed, the injury has been wrongly identified. The Quinault contend that trial on the location of their U & A western boundary will "force Quinault to find and present evidence of where in the ocean its members fished at treaty times. What was difficult to prove 40 years ago is even more difficult today." Quinault Motion to Dismiss, Dkt. 51, p. 18–19. This argument misapprehends what evidence will be considered here. The Court views this dispute as one regarding Judge Boldt's use of the term "adjacent" in both the Quinault and Quileute U & A's. Thus there is a template for this subproceeding in the prior proceedings regarding the Suquamish U & A in the dispute between the Upper Skagit Indian Tribe and the Suquamish Indian Tribe. C70–9213RSM, subproceeding 05–03. The Court there determined that the only evidence that would be considered is what was in the record that was before Judge Boldt. *See,* C70–9213RSM, subproceeding 05–03, Dkt. # 71, p. 4, *citing Muckleshoot Indian Tribe, et al., v. Lummi Indian Tribe,* 141 F.3d 1355, 1359 (9th Cir.1998). Therefore the Quinault need look no further than the record for the evidence that will enable them to respond to the Request for Determination.

## CONCLUSION

This Court's jurisdiction has been properly invoked by the Makah under section (6) of Paragraph 25 of the permanent Injunction, because the western boundary of the Quinault and Quileute U & A's were not "specifically determined" in Final Decision I. They have properly stated a claim under this section, and it is ripe for consideration due to the ongoing dispute regarding various ocean fisheries in which these Tribes engage. The Court declines to find laches on the part of the Makah in asserting this claim. The motion to dismiss filed by the Quinault and the Quileute (Dkt. ## 51, 53) are accordingly DENIED.

## ORDER REGARDING DISPUTE RESOLUTION

Subproceeding No. 89–3–07.

(October 18, 2011)

KAREN L. STROMBOM, United States Magistrate Judge.

The State of Washington filed a request for dispute resolution under section 9 of the Shellfish Implementation Plan (SIP) to resolve a dispute between the State and the Squaxin Island Tribe regarding proposed leases of state land for private aquaculture activity.

In response to the State's request for dispute resolution, United States District Judge Ricardo Martinez referred this subproceeding to the undersigned magistrate judge to hear and determine the dispute pursuant to Paragraphs 9.1.1 and 9.2 of the Shellfish Implementation Plan.

The parties were given an opportunity to brief the issues and a hearing was conducted on October 14, 2011 before the undersigned judge.

## FACTS LEADING TO THE DISPUTE

The parties before the Court include the State of Washington, the Squaxin Island Tribe and three commercial shellfish companies, Arcadia Point Seafood, Seattle Shellfish LLC and Taylor Shellfish Company, Inc. (collectively, the "Growers").

The Growers cultivate geoduck clams on three farm sites in Mason County, which farms are located on leased private tidelands and within the Squaxin Island Tribe's exclusive Usual and Accustomed Grounds and Stations (U & A). The Growers provided notice, pursuant to Section 6.3 of the SIP regarding their plans to create artificial shellfish beds on the tideland parcels. These notices were sent to the Squaxin Island Tribe in 1998 (La Chine property with notice from Seattle Shellfish), 1999 (Rauschert property with notice from Taylor Shellfish Company), 2003 (Broehl property with notice from Arcadia Point Seafood) and 2004 (Myers property with notice from Arcadia Point Seafood) The Court notes that the Broehl and Myers property are side by side and are considered one site for purposes of this decision.

The State asserts in its Opening Brief that sometime in 2009 the Department of Natural Resources (DNR) became aware that the Growers had, without permission from the State, planted shellfish, primarily geoduck clams, across the boundaries of the respective private tidelands on state-owned aquatic lands. The DNR and the Growers subsequently negotiated an "agreement in principle to resolve these three trespasses." As part of the proposed agreement, "DNR would issue use authorizations, similar to a lease, allowing the Growers to tend their cultivated shellfish to maturity and then harvest them. No further planting would be allowed. Once all cultivated shellfish have matured and been harvested, the Growers' rights to use

the sites would terminate." (ECF No. 14, p. 5, Washington's Opening Brief).

Pursuant to 8.2.1 of the SIP, the State then gave notice to the Squaxin Island Tribe of the proposed aquaculture leases. The DNR subsequently advised the Squaxin Island Tribe of the results of the survey required of them under 8.1.2 of the SIP. The Squaxin Island Tribe responded by asserting that § 8.2 of the SIP was not applicable as it was "not intended to cover situations where a Grower has been intentionally or unintentionally trespassing on public lands." (ECF No. 15–1, p. 15, Letter from Andy Whitener). The Squaxin Island Tribe then asserted that it has the right to take 50% of the shellfish from public intertidal lands located within its U & A, including the geoduck that were planted on State owned aquatic lands by the Growers.

Due to the different positions taken by the State and the Squaxin Island Tribe, the State requested dispute resolution, pursuant to § 8.2.4 of the SIP. This section directs the Magistrate Judge to:

> determine whether or not the leased activity authorizes the taking of shellfish subject to Treaty harvest. If the lease does not, then the lease may be issued. If the land to be leased contains shellfish subject to the Treaty harvest, then the Magistrate Judge shall determine the tribal harvest of a Treaty share of such shellfish consistent with the sharing principles within paragraph 6.1.3, or allow the State and Tribe to reconsider agreement regarding tribal harvest.

The sharing principles of § 6.1.3 of the SIP reflect the case law which was developed in the *State v. Washington cases*. In particular, this section of the SIP authorizes tribal harvest "from each enhanced natural bed" of "fifty percent of the sustainable shellfish production (yield) from such beds that would exist absent the

Grower's and prior Grower's current and historic enhancement/cultivation activities."

## ISSUE PRESENTED FOR RESOLUTION

The State of Washington and the Growers take the position that § 8.2 of the SIP governs resolution of this dispute which, by its terms, applies to all "new or renewal leases for shellfish harvest or cultivation." In particular, the State proposes to settle the trespass dispute it has with the Growers by issuing a use authorization, similar to a lease, to permit the Growers to continue to cultivate and subsequently harvest the geoduck they planted on public lands. The State asserts that determination of the Treaty right to harvest shellfish is dependent on a determination of whether the sites in question contained natural beds of shellfish · prior to the Growers planting the shellfish. If there was no natural bed, then there is no Treaty right to fish. On the other hand, if there was a natural bed, then the Tribe retains Treaty harvest rights as determined in *Shellfish III*. That is, the Tribes "shall be entitled to fifty percent of the pre-enhanced sustainable shellfish production from those beds." *Id.* at p. 653. The State asserts this approach is consistent with the determination of Treaty fishing rights pursuant to the Stevens Treaties and that such approach must be followed in this case in which trespass on State owned lands is asserted.

The Growers support the State's position but also emphasize that they have invested resources, time and effort into the cultivation of the geoduck that were planted on public lands. They assert this requires consideration when the Court determines who should have the right to harvest the planted geoduck.

The Squaxin Island Tribe relies heavily on one State property law, and, in particu-

lar, the case of *Wiegardt v. State*, 27 Wash.2d 1, 175 P.2d 969 (1947), to support its position that it is entitled to harvest 50% of the geoduck planted by the Growers on public land. It is the Squaxin Island Tribe's position that because the Growers trespassed on public property that they do not own or have any legal interest in the planted geoduck. Rather, the State owns the geoduck because the clams were planted on public land. Since the geoduck were planted on public land and because they are owned by the State, the Tribe therefore has a right to harvest 50% of the geoduck found on the public lands at these sites, the State owns the other 50% and the Growers have no ownership interest whatsoever in the geoduck they planted.

For the reasons set forth below, the undersigned finds that the Squaxin Island Tribe's right to harvest geoduck in the areas under dispute is governed by their Treaty rights and is not dependent, connected or related in any way to State property law.

**Motions to Strike:** Pursuant to Federal Rule of Evidence 408, the Squaxin Island Tribe moved to strike Exhibit A to the Kisielius Declaration (ECF No. 21), which was submitted on behalf of the Growers. This motion to strike was not addressed by the Growers in their Reply. (ECF No. 35). The motion is GRANTED as it arguably was intended to prove the validity of a disputed claim between the parties.

The Squaxin Island Tribe also moved to strike sections of the State's and Growers' briefs which "contain discussions of proposed settlement terms in this case. State's Brief at 5, 7–8; Growers' Brief at 2, 5." This motion to strike is DENIED. The Court considers it appropriate to understand the general terms of the pro-

posed resolution between the State and Growers in this case. However, as discussed below, the Court did not consider the terms of the proposed agreement between the State and the Growers in its determination regarding the Squaxin Island Tribe's Treaty fishing rights.

**TRIBAL TREATY FISHING RIGHTS**

■ In *Shellfish I*[1], Judge Rafeedie determined the nature and extent of tribal off-reservation shellfishing rights and the affect the Shellfish Proviso had on those rights. In reaching his conclusions, he recognized a number of specific canons of construction which apply when interpreting the meaning of Indian treaties. One such canon required treaties with the Indians "to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.'" *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (quoting *Tulee v. Washington*, 315 U.S. 681, 684, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942)).

Judge Rafeedie concluded that the Shellfish Proviso "does not apply to natural or native beds and that, under the Shellfish Proviso, artificial beds may be staked or cultivated, notwithstanding their location on private tidal lands." *Shellfish I* at p. 1429. There is no dispute that at the time the various Stevens Treaties were signed "that private ownership of a parcel of tideland did not include private rights to the shellfish on that parcel." *Id.* at p. 1439. The converse was also true—an artificial bed placed on public tidelands did not divest ownership of the planted shellfish from the citizen who planted such shellfish. Tribal treaty fishing rights were dependent on the type of bed involved. If

1. *United States v. Washington*, 873 F.Supp. 1422 (1994)

it was natural—it was open to Indian fishing. If the shellfish beds were "staked or cultivated by citizens" (artificial beds) then such beds were not open to Indian fishing.

It is also important to note that Judge Rafeede's interpretation of the Shellfish Proviso was consistent with the Tribes' interpretation of the Proviso. The Tribes clearly opposed defining fishing rights based on any notion of private property ownership.

The Court is of the opinion that the present dispute between the State of Washington and the Squaxin Island Tribe must be analyzed pursuant to the definitions developed in interpreting the Stevens Treaties. That is, Treaty fishing rights are dependent on the type of shellfish bed that is at issue. If a shellfish bed at issue is artificial, then the Squaxin Island Indian Tribe has no Treaty fishing rights. On the other hand, if a shellfish bed is a natural bed, the Squaxin Island Tribe has a "fair share" fishing right, as that term has been interpreted in *Shellfish III*. This "fair share" is based on the Court's determination "that allocating fifty percent of the commercial Growers' shellfish harvest to the Tribes would unjustly enrich them." *Shellfish III* at p. 650.

Section 8.2.1 of the SIP prohibits the State of Washington from issuing a lease of tidelands and bedlands for shellfish harvest without first providing notice to an affected Tribe. The State is required to determine whether a natural bed is present in the location proposed to be covered by the lease and it must address circumstances where there has been enhancement of a natural bed. This includes those cases "where no enhancement activity has occurred recently enough to affect the density of shellfish beds" as well as when "past or present enhancement activity has affected the current density of shellfish beds." The language of the Shellfish Implementation Plan clearly covers a factual

situation such as this one presented by the Growers trespass on publicly owned lands. It was suggested at oral argument that the "past or present" phrase somehow refers back to what existed at the time the SIP was initially developed. There is nothing, however, in the language of the Shellfish Implementation Plan that supports such an inference. If the Court had intended to limit the application of this section, the word "present" would not have been used.

It is the conclusion of the undersigned judge that the Squaxin Island Tribe's Treaty fishing rights derive solely from the Stevens Treaties and not, in any fashion, on State law private property concepts. Further, the Squaxin Island Tribe's Treaty fishing rights at the locations in dispute are dependent on whether there is a natural bed of shellfish at the particular location. If there is a natural bed which has been enhanced, the Tribe's Treaty fishing right is limited to fifty percent of the pre-enhanced sustainable shellfish production from those beds. State property law plays no role in that analysis.

The approach endorsed by this Court is consistent with § 8.2 and § 6.1.3 of the SIP. In particular, the Court notes that § 8.2.4 requires a determination of a Treaty share of such shellfish consistent with the sharing principles within paragraph 6.1.3. Paragraph 6.1.3 places the burden of proof regarding an artificial bed or the amount of sustainable shellfish production that would exist absent enhancement on the Growers. The Court is of the opinion that this burden also applies under the circumstances of this case.

## TRIBE'S RELIANCE ON STATE PROPERTY LAW

While the Court does not accept the Squaxin Island Tribe position that State property law governs its right to fish, it is appropriate for the Court to address the issues they raise.

As noted earlier, the Squaxin Island Tribe asserts the right to harvest 50% of the shellfish planted by the Growers as they are of the view that the State of Washington now owns the shellfish due to the fact they were planted on public lands.

In their pleadings, the Squaxin Island Tribe asserts the following:

> In summary, the Tribe's treaty right to take fish includes all shellfish except those in "staked or cultivated" beds. By this Court's definition of those treaty terms, staked or cultivated beds are limited to shellfish planted by a Grower on lands owned or controlled by the Grower. Because the Growers in this case planted shellfish on State owned tidelands without authorization, the State is the owner of the planted shellfish. The Ninth Circuit has held that State owned shellfish beds cannot be staked or cultivated so the Tribe's treaty right to 50% of all shellfish outside staked or cultivated beds applies to those planted beds. The State may not authorize the Growers to take more than 50% of those shellfish.

ECF No. 30, p. 2.

In support of its assertion that the Court's definition of "staked or cultivated beds" are only those beds planted by Growers **on lands they own or control,** the Tribe cites to *Shellfish I* at p. 1441 and *Shellfish III* at p. 647–48. ECF No. 30, p. 3. The undersigned has reviewed those three pages several times and there is nothing in those sections of the Court's opinions to support the conclusion that a legal claim to "staked or cultivated beds by citizens" can only exist on lands owned or controlled by the citizen who planted the shellfish. In fact, the Court is clear that "when the signatory parties used those terms in the Proviso, 'they intended only to exclude Indians from artificial, or plant-ed, shellfish beds; they neither contemplated nor desired that the Indians would be excluded from natural shellfish beds.' *Id.* 'Therefore, the words 'any beds staked or cultivated by citizens,' describe artificial shellfish beds created by private citizens.' *Id.*" *Shellfish III* at p. 648. The words "own or control" are nowhere to be found in this definition.

The Tribe also relies on language contained in *Shellfish II*[2] to support its assertion that the Shellfish Proviso, in order to be applicable to the Growers, requires that they "owned or controlled" the land on which they planted the shellfish. The purpose of *Shellfish II* was "to provide a framework for the implementation of the Tribes' fishing rights under the Shellfish Proviso." *Id.* at p. 1457. The Court noted that "effectuating the Treaty shellfishing right presents a particularly difficult problem with respect to property owned or leased by commercial Shellfish Growers and Private Property Owners, as compared to that owned by the State of Washington." *Id.* at p. 1457. The Court acknowledged this particular difficulty as the "Shellfish Growers and Private Property Owners are, effectively, innocent purchasers who had no notice of the Tribes' Treaty fishing right when they acquired their property.... Consequently, it is incumbent upon this Court to use its equitable powers to effect a balance between the Tribes' Treaty shellfishing right and the Growers' and Owners' interest in the peaceful enjoyment and/or commercial development of their property." *Id.* at p. 1457.

It is clear that reference by Judge Rafeedie to property "owned or leased by Growers licensed by the State of Washington" was done not to change or affect the definition of "staked or cultivated by citizens." Rather, it was in acknowledgment of the particular circumstances presented

2. *United States v. Washington,* 898 F.Supp. 1453 (1995).

to the Court in that the Court was faced with the question of what should be decided regarding the private cultivation efforts of the Growers and the impact their efforts should, or should not have, on Tribal Treaty fishing rights.

Further, the reference in the Shellfish Implementation Plan in "6. Commercial Shellfish Growers" to property ownership or control makes it clear that this section only applies when the Grower have such rights. The reference does not operate to expand or change the treaty definitions of "staked or cultivated by citizens." Section 6 is not, however, applicable to the proceeding before the Court as it is undisputed that the Growers trespassed on State property. The fact of trespass, while not admitted by the Growers, is also not denied—therefore there is no factual dispute regarding the occurrence of a trespass. In addition, it is because of this trespass that the State and the Growers wished to resolve their dispute by entering into the settlement generally described above.

The Court concludes that reference in Section 6 of the SIP is not applicable to the facts of this case. And for that additional reason, the Tribe's assertion that the Growers must own or control the land on which they plant the shellfish has no relevance to the issue to be decided by the Court.

The Squaxin Tribe also asserts that, by operation of state law, planting shellfish on the public lands results in the State having ownership of the shellfish with the Tribe having a 50% Treaty fishing right and the Growers having no interest whatsoever in the shellfish they planted. This argument is not based on the assertion of a Treaty right but solely on the Tribe's interpretation of State property law and the domino affect they say follows as a consequence of that interpretation.

In *Fishing Vessel*[3] the Supreme Court of the United States stated "that neither party to the treaties may rely on the State's regulatory powers or on property law concepts to defeat the other's right to a 'fairly apportioned' share of each covered run of harvestable anadromous fish." *Id.* at p. 682. The Tribe's position ignores this limitation. They assert that pursuant to *Wiegardt v. State,* 27 Wash.2d 1, 175 P.2d 969 (1947) that ownership of the shellfish, once planted on State land, is automatically vested in the State and, in this case, that also means that the Growers no longer have any cognizable interest in the planted shellfish.

In *Wiegardt* the trial court dismissed the amended complaint on the grounds that it did not state facts sufficient to constitute a cause of action. The plaintiffs appealed. The complaint asserted that the Wiegardts were engaged in the business of cultivating and marketing oysters in Pacific County. They owned a "large and substantial oyster bed abutting upon tide lands of the state of Washington, known as the Long Island Oyster Reserve." *Id.* at p. 970. Through inadvertence and for a period 12 years the plaintiffs planted oysters on the State Reserve, which contained no natural bed of oysters. The State advertized for sale the oysters located on the Long Island Oyster Reserve. The Plaintiffs sought to enjoin the sale of the oysters they planted on the Reserve, asserting that the oysters are their personal property and not the property of the State of Washington.

The Plaintiffs relied on § 109 of chapter 31, Laws of 1915, p. 113, Rem.Rev.Stat. § 5763 which provided as follows:

When any person has, acting in good faith, planted oysters on tide or shore lands not containing any bed of natural oysters belong to the State of Washing-

3. 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)

ton, and not otherwise occupied for purposes of trade or commerce, *such oysters shall, pending the sale, lease or reservation of such* lands by the state, be considered as personal property, and the unauthorized taking of the same shall subject the offender to civil and criminal prosecution

. . .

*Wiegardt* at p. 971–972. The Court acknowledged that the oysters would be considered personal property, "until the sale, lease or reservation by the state." The problem with the Plaintiffs' position was that the land on which they planted the oysters, the Long Island Oyster Reserve, had been "forever reserved from sale or lease" by Laws of 1915, chapter 31, § 102, p. 110. Thus by law they could not claim the oysters as their personal property. The Court concluded that the oysters were, therefore, the property of the State of Washington.

That, however, was in 1947, and the law was specifically concerned with the maintenance of State oyster preserves. The undersigned believes that *Wiegardt* is not applicable to this dispute resolution for several reasons. First, Weigardt dealt specifically with oysters, a State resource that had special protection under the law, and oyster reserve land which the State reserved, forever, for public benefit. There is no such restriction in this case regarding the shellfish at issue—geoduck—or the location in which the Growers planted the geoduck.

Second, the Growers point out that R.C.W. 79.135.300 authorizes the department "to lease first or second-class tidelands which have been or that are set aside as state oyster reserves in the same manner as provided elsewhere in this chapter for the lease of those lands." It is not at all clear that if faced with the same facts today that the State Court would reach the same conclusion that it did in 1947.

Finally, Washington statutes permit and encourage the leasing of State tidelands for aquaculture use. *See* R.C.W. 79.105.

The difficulty the Court has with regard to the Tribe's analysis is that it relies solely on State law for its claim to Treaty fishing rights. In this particular portion of their argument there is absolutely no reliance on the applicable Treaty language or the cases that interpret the Treaties. Any issue regarding ownership pursuant to State law is an issue only between the State and the Growers. The undersigned does not believe that the Tribe can utilize State property law, as they interpret it, to give them greater fishing rights than they would have under the Treaty. This is exactly what they are attempting to do as under the Treaty the right to fish is determined by the type of shellfish bed they wish to fish. If it is artificial they have no fishing rights. If it is natural, they have their right to a "fair share." The Treaty right does not give them the right to anything more—but that is what they are attempting to accomplish in this case.

The Tribe also relies on the determination in *Shellfish III* that the State is not a "citizen" and it cannot therefore come under the protection of the Shellfish Proviso—which only excludes artificial beds from a Tribal fishery. Because the Shellfish Proviso does not apply to the State the Tribe then asserts that any planted shellfish bed on public property is, therefore, not artificial. If not artificial, then it is natural and the Tribe is entitled to harvest 50% of what was planted. The facts are clear that the shellfish were planted by the Growers and not the State and that the Growers planted the shellfish for their benefit and not on behalf of the State. The interpretation asserted by the Squaxin Island Tribe completely ignores the Treaty definitions of shellfish beds. By excluding the State from the definition of "citizen"

under the Shellfish Proviso, the Court only made available for Treaty fishing those shellfish planted by the State. It did not change the definitions of artificial or natural beds. It is also clear that the Treaty definitions of those terms are not dependent or connected in any fashion with State property law. The Tribe cannot use State property law to enlarge their fishing rights beyond what is provided under the Treaty.

The Tribe then concludes that the rule in Washington is one who owns tidelands also owns the shellfish located in or upon those tidelands. ECF No. 30, p. 10. The Court notes, however, that this was not the case prior to Washington becoming a State and was also not the case at the time of the Stevens Treaties. This argument fails.

## CONCLUSION

The Court therefore concludes that the Treaty right to fish governs this dispute and not the State property law interpretation urged by the Squaxin Island Tribe. This means that the Tribe has no right to fish an artificial bed and that the Tribe has a right to a "fair share" of an enhanced natural bed. Based on this Court's ruling, it will allow the State and Squaxin Island Tribe to reconsider agreement regarding tribal harvest, if any.

AMENDED ORDER GRANTING SU-QUAMISH AND TULALIP JOINT REQUEST FOR CLARIFICATION OF SECTION III. B.1 & B.6 OF 1983 MUCKLESHOOT SUQUAMISH AND TULALIP SETTLEMENT AGREEMENT

Subproceeding 08–01

(October 27, 2011)

RICARDO S. MARTINEZ, District Judge.

The Suquamish Tribe and the Tulalip Tribes' Joint Request for a clarification of Section III.B.6 of the 1983 Muckleshoot Suquamish and Tulalip Settlement Agreement came on for hearing on October 26, 2011. After consideration of the papers filed in support of and in opposition to the Request, the Court finds that:

1. The Muckleshoot, Suquamish, and Tulalip tribes entered into a court approved stipulated settlement in 1983;

2. The original intent of the parties in writing Sections III.B.1 and III.B.6 of the stipulated settlement was to provide tribes fishing in the Central Puget Sound marine waters known as Area 10 with an equal share of the fall chum in the Common Pool, as that term is defined in the stipulated settlement;

3. Prior to 1983, the court had not changed the geographic fishing area of any tribal party and it was reasonable for the parties entering into the stipulated settlement to assume that five tribes fishing in Area 10 would continue to fish in Area 10 into the future;

4. With the addition of Tulalip through the stipulated settlement, the parties understood that five tribes would fish in Area 10 so the stipulated settlement stated that the parties would each harvest one-fifth of the fall Chum Common Pool;

5. Substantial changes have occurred since 1983 in that as a result of subsequent subproceedings only two tribes, Suquamish and Tulalip now fish in Area 10 and the language in Section III.B.6 as written does not accurately represent the intent of the parties nor make it possible to fulfill the intent of the parties.

Based on these findings, satisfactory proof having been made and good cause appearing,

IT IS ORDERED that Sections III.B.1 and III.B.6 of the Muckleshoot Suquamish and Tulalip Stipulated Settlement are hereby clarified and reformed as follows:

Section III.B.1:

The maximum Tulalip harvest in areas 6B, 9, and 10 shall not exceed the equivalent of 90% of its Home Region Production by species plus its allowed share under Section III.B.6 below.

Section III.B.6:

Tribes who fish in Area 10 will each harvest an equal share of the Common Pool. The Tulalip and Suquamish Tribes agree that each will harvest a maximum of 40% of the Common Pool. Parties may elect to aggregate their percentage of the Common Pool shares, but such aggregation shall not affect the Common Pool share of a Tribe not a party to the aggregation. Suquamish and Tulalip may proceed to fish in accordance with Section III. B.6 as reformed above.

The clerk is directed to close subproceeding 08–01.

### SUPPLEMENTAL ORDER ON PARAGRAPH 25 PROCEDURES

(November 9, 2011)

The Court hereby establishes the following procedures for filing a new Request for Determination, and for additional filings in existing subproceedings, using the Court's electronic filing system (CM/ECF):

(1) Any party wishing to file a new Request for Determination shall, after complying with the pre-filing requirements of Paragraph 25 of the Permanent Injunction, as modified August 11, 1993, shall file an *ex parte* motion for leave to open a new subproceeding. The motion shall be filed in the main case of *U.S. v. Washington,* C70–9213, and shall be noted for consideration the same day as filed, pursuant to Local Rule CR 7. The motion shall clearly designate who shall be the requesting and responding or affected parties, and shall contain a certification that pre-filing meet and confer requirements of Paragraph 25(b) have been met. No legal argument or other documentation is necessary. The requesting party shall also e-mail a proposed Order to the Order box at Martinez Orders@wawd.uscourts.gov. The proposed Request for Determination shall be attached as an exhibit to the motion and filed under the same docket number, not filed as a separate docket entry.

(2) The Court shall consider the motion as soon as practicable and shall liberally grant such motions, provided the Request for Determination appears to fit within the purposes set forth at Paragraph 25(a) of the Permanent Injunction. C70–9213, Dkt. # 13599. The Order granting the motion for leave to file shall not constitute a final determination that the dispute is within the Court's jurisdiction under Paragraph 25, and such jurisdiction may still be questioned by the responding party.

(3) Upon granting the motion for leave to file a Request for Determination, the Court shall direct the Clerk to open a new subproceeding and assign the next number in sequence. Notice of the new subproceeding shall be sent electronically to all parties in C70–9213.

(4) All subsequent filings in the subproceeding shall be filed in the main case, C70–9213RSM, and then "spread" to the appropriate subproceeding using the utilities provided in CM/ECF. Choosing "yes" to the "spread effects" question will note motions and perform other functions, and generally should be affirmatively selected.

A party who has questions regarding this procedure may call the Case Administrator, Consuelo Ledesma, at **206–370–8455** for assistance. **A document which has been filed only in C70–9213 and has not been spread to the correct subproceeding may be regarded as not having been properly filed.**

(5) Declarations and other documents filed in support of a motion should reference the motion by docket number (from C70–9213) in the text entered on the docket sheet.

(6) Parties to *U.S. v. Washington* who are not named as requesting or responding parties, but who wish to participate in the subproceeding, may file a Notice of Appearance as an Interested Party, and will be entered as such on the docket by the Clerk.

(7) Corporate disclosure statements, where appropriate, shall be filed in accordance with Fed.R.Civ.P. 7.1 and shall be filed in both the main case, C70–9213, and in the subproceeding.

(8) The Court directs all parties to use care in filing documents in new and in existing subproceedings, to ensure that the documents are filed only in the appropriate subproceeding. The erroneous filling of unrelated documents in the wrong subproceedings has unnecessarily complicated the dockets of a number of subproceedings. A document may be spread to all subproceedings only if it relates to all subproceedings, such as a Notice of Unavailability or other filing which applies to all subproceedings. Otherwise, the filing party shall select only the relevant subproceeding when spreading the document from C70–9213 to the subproceeding.

(9) These procedures do not alter or amend the substantive requirements of Paragraph 25, as amended August 11, 1993, and are intended only to facilitate the process of opening new subproceedings, and maintaining existing subproceedings, using CM/ECF.

## ORDER ON MOTION FOR RECONSIDERATION

### Subproceeding 09–1

### (February 13, 2012)

This matter is before the Court for consideration of the State of Washington's Motion for Reconsideration. Dkt. # 75. Having considered the motion, the responses, and reply, the Court does now find and ORDER that the motion shall be denied.

## DISCUSSION

The State of Washington has requested reconsideration of the Court's April 2, 2011 Order denying the State's motion for leave to file a cross-request for determination. Dkt. # 74. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier. . . ." Local Rule CR 7(h)(1). The filing of cross-requests for determination is also discouraged. Order Modifying Paragraph 25 of Permanent Injunction, Dkt. # 13599 ¶ (b)(4). The State's motion fails to overcome this disfavor and fails to demonstrate manifest error in the prior ruling.

The State of Washington makes the following argument in its motion:

> Because neither tribe has an adjudicated U & A in the offshore waters where Washington manages its crab fishery, and because prior orders of this court preclude treaty fishing where there is no adjudicated U & A, Washington felt that filing a cross-petition in subproceeding 09–1 would be the best means to reach an orderly resolution of those tribes'

claims that Washington needs to restrict its harvesters to accommodate alleged offshore treaty harvesting rights. Denying Washington any participation in subproceeding 09–1 leaves the State with the untenable option of continuing to restrict its fishers based upon non-existent U & A's.

Motion for Reconsideration, Dkt. # 75, p. 5.

The State's reliance on the term **"adjudicated** U & A" is an oversimplification of the basic principle of this case, which is that "as intended and as used in the Indian treaties and in this decision 'in common' with means *sharing equally* the opportunity to take fish at 'usual and accustomed grounds and stations.'" *United States v. Washington,* 384 F.Supp. 312, 343 (W.D.Wash.1974) ("*Washington I*") (emphasis in original). The State cites generally to pp. 406–407 of *United States v. Washington,* 384 F.Supp. 312 for the statement that "prior orders of this court preclude treaty fishing where there is no adjudicated U & A." What the Court actually stated was that

> [t]he exercise of a Treaty Tribe's right to take anadromous fish outside of reservation boundaries is limited only be geographical extent of the usual and accustomed places, the limits of the harvestable stock and the number of fish which non-treaty fishermen shall have an opportunity to catch, as provided in the Decision of the Court.
>
> Because the right of each Treaty Tribe to take [ ] fish arises from a treaty with the United States, that right is preserved and protected under the supreme law of the land, does not depend on State law, is distinct from rights or privileges held by others, and may not be qualified by any action of the State.

*United States v. Washington,* 384 F.Supp. at 407 (Declaratory Judgment and Decree,

¶¶ 17, 18). The concept of an "adjudicated U & A," which arose later as a result of the process of determining each Treaty Tribe's usual and accustomed grounds and stations, cannot be applied to limit a treaty fisherman's rights as set forth in ¶¶ 17 and 18 of the Declaratory Judgment and Decree. The State's arguments set forth above thus do not support reconsideration of the Court's Order.

 The State also expresses concern over the Court's statement that the State "does not have a voice" in inter-tribal disputes regarding of fisheries. The Court clarifies that this statement and the prior rulings on which it is based are directed toward barring State participation on one side or the other of such disputes. That is, the State may not formally align itself with one Tribe against another in a dispute such as this. On the other hand, under the procedures in place for this case, the State may file memoranda on motions as an Interested Party, and the Court would welcome its participation on that level.

The State of Washington's motion for reconsideration (Dkt. # 75) is accordingly DENIED.

## ORDER ON MOTION TO DISMISS

### Subproceeding 11–1

### (February 13, 2012)

 This matter is now before the Court for consideration of a motion by the Squaxin Island Tribe to dismiss or stay consideration of the Request for Determination. Dkt. # 21. The basis for the motion is the failure of the Nisqually Tribe to comply with the Meet and Confer requirement of Paragraph 25 of the Permanent Injunction. In response, the Nisqually Tribe asserts that the Request for Determination should be considered under the provision for obtaining emergency relief.

However, the Request for Determination fails to comply with the specific requirements for obtaining emergency relief. The motion to dismiss shall accordingly be granted.

## DISCUSSION

Paragraph 25 of the Permanent Injunction, as modified August 11, 1993, provides that a party to this case may invoke the continuing jurisdiction of this Court only upon a showing that the party has met and conferred with "all parties that may be directly affected by the request" in an attempt to negotiate a settlement of the matter at issue. Order Modifying Paragraph 25 of Permanent Injunction, C70–9213, Dkt. # 13599, ¶ 25(b)(1). No Request for Determination may be filed sooner than fifteen days after the conclusion of the negotiations. *Id.* A party may demand mediation before the fifteen days have run. *Id.,* ¶ (b)(2).

The sole exception to the meet-and-confer requirement is in the event of an emergency. A party "may seek determination of an emergency matter" but only "subject to satisfaction of the following conditions." *Id.,* ¶ (b)(7). Those conditions include, among others, the requirement that counsel for the requesting party file and serve a declaration stating that the party has made a *bona fide* effort to resolve the emergency issue and has failed to do so, and that the issue constitutes an emergency in the judgment of the party and its attorney. *Id.* Mere difficulty or inconvenience in scheduling the meet-and-confer does not satisfy this requirement. "Motions for temporary restraining orders shall be filed only in circumstances where irreparable harm is likely to occur before a hearing on a motion for a preliminary injunction can be scheduled." *Id.*

The declaration of counsel filed here does not meet the required standard for establishing the existence of an emergency. Declaration of Bill Tobin, Dkt. # 2. Nor does the motion for a temporary restraining order establish that irreparable harm would occur from the proposed action of the respondent tribe, namely the proposed opening of a one-day fishery in an area over which Nisqually asserts it has primary rights.

The procedures set forth in Paragraph 25 are mandatory for invoking the continuing jurisdiction of this Court, and may not be excused or modified. Neither the original nor the amended Request for Determination meets these procedural requirements, so the Request and the subproceeding must be dismissed. If the issue has not been resolved by the parties, the Nisqually Tribe may initiate a new subproceeding, after full compliance with the meet and confer requirement, by filing an *ex parte* motion for leave to open a new subproceeding, as directed in the Supplemental Order on Paragraph 25 Procedures, Dkt. # 48.

Accordingly, it is hereby ORDERED:

(1) The Motion to Dismiss (Dkt. # 21, also Dkt. # 19836 in C70–9213) is GRANTED and the Request for Determination and Amended Request for Determination are DISMISSED;

(2) the pending motions for a preliminary injunction (Dkt. # 10, also Dkt. # 19815 in C70–9213) and for appointment of a magistrate judge (Dkt. # 52, also Dkt. # 19919 in C70–9213) are STRICKEN; and

The Clerk shall CLOSE this file.

## ORDER ON MOTIONS FOR RECONSIDERATION

### Subproceeding 09–1

### (March 14, 2012)

This matter is before the Court for consideration of a motion for reconsideration

or clarification filed by three Interested Parties in this case. Dkt. # 88. The Court directed any party who objected to the motion to file a response on or before February 24, 1012. The Quinault Indian Nation ("Quinault") and the Quileute Tribe ("Quileute") have done so. For the reasons set forth below, the motion shall be GRANTED IN PART and DENIED IN PART as set forth below.

Three Tribes, the Muckleshoot Indian Tribe, the Suquamish Indian Tribe, and the Lummi Indian Nation, have asked for clarification of the Order dated September 8, 2011, in which the Court referred to a template for this subproceeding in the prior one regarding the extent of the Suquamish Tribe's usual and accustomed fishing area, namely Cause No. C05–03. These Tribes have expressed concern over the statement that "[t]he Court there determined that the only evidence that would be considered is what was in the record that was before Judge Boldt." Dkt. # 86, p. 5. The Court hereby clarifies that this evidentiary standard applies to proceedings under Paragraph 25(a)(1) of the Permanent Injunction. The Makah Indian Tribe also invoked Paragraph 25(a)(6) of the permanent injunction in the Request for Determination. Dkt. # 1. This section empowers the Court to determine the "location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I" (referring to *United States v. Washington*, 384 F.Supp. 312). In such a proceeding it may be necessary to consider additional evidence regarding usual and accustomed fishing area. The Court's prior Order did not properly distinguish between these two standards, and inadvertently omitted Paragraph 25(a)(1) from the conclusion.

The motion for clarification (Dkt. # 88) is accordingly GRANTED IN PART. The Court now clarifies that the Makah have invoked jurisdiction under either section (a)(1) or section (a)(6) of Paragraph 25. The first sentence of the conclusion of the Court's Order is accordingly AMENDED to read, "This Court's jurisdiction has been properly invoked by the Makah under sections (1) and (6) of Paragraph 25 of the Permanent Injunction." The remainder of the sentence is STRICKEN. As the Court has stated previously, it views this subproceeding as addressing the meaning of the term "adjacent" as used by Judge Boldt in describing the Quinault and Quileute U & A's. Order on Motions to Dismiss, Dkt. # 86, p. 5. Therefore it shall proceed under Paragraph 25(a)(1), and evidence shall be limited to the record that was before Judge Boldt.

## ORDER ON MOTIONS TO MODIFY THE STATUS QUO

Subproceeding No. 91–1

(March 14, 2012)

This matter is before the Court for consideration of motions by various parties to this subproceeding to modify the *status quo* for halibut fishing. Dkt. ## 287, 357, 359, 361, 362, 365. These motions and responses thereto were filed by the Jamestown and Port Gamble S'Klallam Tribes (together, "the S'Klallam"), the Lower Elwha Klallam Tribe, the Makah Indian Tribe (joined by the Lummi Nation, the Quinault Indian Nation, the Skokomish Indian Tribe, and the Swinomish Tribal Community), the Quileute Indian Tribe, the Suquamish Indian Tribe, and the Tulalip Tribe. The Court heard oral argument on the motions at a hearing on March 7, 2012. In view of the impending opening date for halibut fishing, the Court issued a ruling from the bench that the plan that was used in 2011 shall be followed this year, with one modification. This Order shall explain that ruling.

The parties are very familiar with the history and the facts and issues presented in these motions. In the interest of expediting this ruling the Court shall only summarize the background of this dispute. In 2001, the Court issued an Order Establishing Interim Halibut Fishery Management Plan, dated March 21, 2001. Dkt. # 75. This plan represents a carefully crafted balance of the interests of Coastal Tribes against "Inside" Tribes, large-boat fishermen against small-boat fisherman, and Tribes who wish to begin fishing on the opening day of the season against Tribes who wish to defer fishing until May when the ocean conditions are safer. It was developed for the 2000 halibut fishery and was agreed to by twelve of the thirteen so-called "Halibut Tribes." The thirteenth Halibut Tribe, the Quileute, eventually consenting to it as an interim management measure. *Id.*, p. 2.

The plan comprises, in general terms, an initial 48-hour "unrestricted" fishery targeted at approximately 46% of the total allowed Tribal harvest ("TAC"); a multi-day period of restricted fishing with daily landing limits of 500 pounds, targeted at around 19% of the TAC; and a final "mop up" late-season unrestricted fishery to take the remainder, which the plan contemplates will be about 35% of the TAC. The plan initially specified that the restricted fishery would extend for thirty days, but as more and more boats have entered the fishery, the duration of the restricted fishery has become shorter and shorter. This basic plan has been followed with slight modification and varying degrees of satisfaction by individual Tribes ever since 2001, despite the designation as an "interim" plan. In February 2010, the Makah asked the Court to "clarify the *status quo*" as the fishery had been conducted under modified plans in 2004 and 2005, and some Tribes contended that was the new *status quo*. Dkt. # 209. The

S'Klallam in particular opposed the change and argued that the 2000 plan was and is the *status quo*. Noting the absence of consensus on the modified plans, the Court agreed. Dkt. ## 228, 236. The Court stated,

> In the future, any Tribe may, after providing notice to the other Tribes, request that the Court refer the matter to a settlement judge to assist the Tribes in reaching an agreement to change the *status quo*. Such request shall be filed in this subproceeding on or before September 30 for the following year's halibut fishery. Such request does not fall within the requirements of Paragraph 25 for initiation of new subproceedings, and need not be preceded by the full meet and confer procedure set forth therein.

Order on Motion to Clarify the Status Quo, Dkt. # 228, p. 2.

A year later, on February 10, 2011, the S'Klallam filed a motion to modify the *status quo*, asking in effect that the Court enforce the thirty-day period for the restricted fishery that is contemplated in the 2000 plan. Dkt. # 287. The motion was noted for March 4, 2011, shortly before the start of the 2011 halibut fishery. The Court found that it could not give meaningful consideration to the issues presented before the start of the fishery, and re-noted the motion to June 3, 2011, with oral argument to be scheduled shortly thereafter. Dkt. # 310. The earliest date that could be found to accommodate all the parties and the Court's calendar was September 12, 2011. At the hearing, the Court ruled that the matter would be referred to the Honorable Brian A. Tsuchida, United States Magistrate Judge, for settlement discussions. Dkt. # 333. In the event the parties were unable to reach consensus on modifications to the halibut fishing plan by mid-December, the parties could file joint or individual motions with

proposed plans for the fishery. The Court clearly stated that it would adopt the plan "which best balances the fishing rights of all the halibut tribes" and would do so "baseball arbitration style," that is, the Court would not pick and choose from parts of different plans or split the difference between plans, but simply adopt in whole the best-balanced plan. Transcript of September 12, 2011 Hearing, Dkt. # 337, p. 45. The Court further stated that it would not necessarily be the majority plan which would prevail, but the one which "best preserves and maximizes each Tribe's treaty rights." *Id.*

Despite diligent efforts to reach consensus in the settlement discussion, the parties were unable to do so, and five different motions to modify the *status quo* were filed. Dkt. ## 357, 359, 361, 362, 365. The proposed plans may be briefly summarized as follows:

### (1) The S'Klallam Plan

The S'Klallam, noting that the restricted fishery in 2011 lasted a mere two and a half days, proposed a plan consisting of three restricted fisheries: an opening one-day fishery with a landing limit of 900 to 1200 pounds; six to ten days of "low-limit" fishing with landing limits of 500 pounds; and a final one-day "high-limit" fishery with landing limits of 900 to 1200 pounds. Any fish remaining in the TAC would be caught by additional days of restricted fishing.

### (2) The "Five Tribes" Plan

The Makah, joined by the Swinomish, Quinault, Lummi, and Skokomish, proposes two unrestricted fisheries: one early 48–hour fishery, and a later unrestricted fishery of 24 hours or more, with 50% of the TAC apportioned to each. This proposal is a three-year plan, and incorporates a provision for 50% of the 2013 and 2014 TAC to be divided into "separate management units" ("SMU's"), allocated to the Tribes. The amount of fish in the SMU allotted to each Tribe would be determined by amounts taken in the 2012 fishery. Disputes which could not be resolved by the parties could be brought to an arbitrator, who would decide the matter.

### (3) The Tulalip Plan

The plan originally proposed by the Tulalip is a slight modification of the Five Tribes plan, eliminating the penalty and dispute resolution provision. Dkt. # 361. In their reply to the motion, the Tulalip expressed concerns over the "exclusionary" aspect of the Five Tribes plan, absent a minimum harvest provision as suggested by the Suquamish (see below). The Tulalip also agreed that the plan offered by the S'Klallam "would be fairer to the tribes who have limited capacity to prosecute a halibut fishery." Dkt. # 387, p. 2.

### (4) The Suquamish Plan

The Suquamish did not propose a plan of their own, but asked that a provision for a guaranteed minimum catch be inserted into the Five Tribes plan. That is, for the 2013 and 2014 SMU's contemplated in the Five Tribes plan, a Tribe who chooses not to fish in the competitive 2012 fishery to determine an allocation for its SMU would have a guaranteed minimum of 3.5%.

### (5) The Quileute Plan

The Quileute plan represents another modification of the Five Tribes plan. The proposed plan provides for dispute resolution by the Fisheries Advisory Board or by Magistrate Judge Tsuchida or his designee. The plan also deviates from the Five Tribes plan in that it proposes two unrestricted fisheries, with 50% of the TAC allocated to each, but eliminates the 48–

hour duration requirement. In the event the first opening is anticipated to last less than twelve hours, landing limits would be imposed to avoid exceeding the TAC.

The proposed plans contain, in addition to the restricted or unrestricted fishing provisions summarized above, numerous conditions directed to vessel identification and inspections, catch reporting, communication, paybacks, and other provisions directed to responsible and safe management of the fishery. The Court has not detailed these provisions as there appears to be little if any dispute regarding these matters.

After considering the five proposed plans, the Court determined that it could not adopt any one plan in its entirety. No plan balances the interests of all Tribes as well as the current *status quo* plan. The S'Klallam plan, by eliminating the initial unrestricted fishery that has been an essential component of the plan since its adoption in 2001, drastically alters the balance and effectively prejudices the Makah and other "large-boat" tribes. The Five Tribes plan and its iterations, on the other hand, eliminate the restricted fishery that has also been an essential component of the fishery, and effectively prejudices the S'Klallam and other "small-boat" tribes. These prejudicial effects are offset by one another in the 2001 *status quo* plan, thus creating a balance that is absent from the proposed plans.

The Five Tribes plan for "separate management units" is also problematical. The concept is appealing in theory as a sound fisheries management practice, and potentially offers to each Tribe the ability to make its own decisions about management of its allocated portion of the TAC. The Court appreciates that a considerable amount of time and effort was dedicated to developing this aspect of the proposed plan. However, the SMU's represent an allocation of fish per Tribe, and such allocation is impermissible absent consent of all Tribes. Further, the method of determining the SMU's for 2013 and 2014 by a competitive "race fishery" potentially encourages reckless or even dangerous conduct in the fishery, and raises the specter of additional disputes which would be brought to the Court. It also favors the "large-boat" Tribes over "small-boat" Tribes; the latter may be unable to find sufficient halibut in the initial 48–hour fishery to establish a fair SMU. While the Suquamish proposal for a guaranteed minimum alleviates this effect to some degree, it also represents an allocation of fish to individual Tribes, something to which all Tribes must consent.

For these reasons and others, the Court declined to adopt any of the proposed plans for the 2012 halibut fishery, and ruled that the 2011 plan, which is essentially the 2001 *status quo* plan with additional management and communication provisions, would direct the fishery this year.[1] Although some parties have criticized this plan as an impermissible allocation, that is not the case. The *status quo*

---

1. The Court deleted from the 2011 plan the provision that a weather-based delay of the initial unrestricted fishery would impose a similar delay on opening the restricted fishery. This enforced delay was not part of the 2001 plan and was objected to by the S'Klallam fishermen. The Court anticipates that this change will give the S'Klallam greater management control over the restricted fishery upon which they depend. The Court also anticipates that all Tribes will observe the catch limits allocated to the restricted fishery, even if that fishery lasts only two days as it did last year. The Court takes note of the earlier complaints by other Tribes that the S'Klallam continued to fish after all others agreed that the restricted fishery allocation had been reached. *See,* Swinomish Supplemental Response, Dkt. # 313, p. 2.

plan apportions specific percentages of the TAC to different types of fisheries. It thus represents an allocation of opportunity to fish, not an allocation of fish to individual Tribes.

The Court is mindful that this ruling leaves the underlying issues between certain Tribes unresolved. Should the parties wish to return to settlement negotiations following this year's halibut fishery, they may request a referral to Magistrate Judge Tsuchida.

The six pending motions to modify the *status quo* (Dkt. ## 287, 357, 359, 361, 362, and 365) are accordingly all DENIED.

## ORDER ON MOTION FOR CLARIFICATION

Subproceeding No. 91–1

(March 16, 2012)

This matter is before the Court for consideration of the motion for clarification filed by the Port Gamble S'Klallam and the Jamestown S'Klallam ("S'Klallam") regarding the Court's March 15, 2012 Order on the 2012 halibut fishery. Dkt. ## 397, 399. The Court deems it unnecessary to direct a response to this motion and hereby clarifies its ruling.

The Court declined to adopt any of the parties' proposed plans for the 2012 halibut fishery, and ruled that the 2011 plan, which is essentially the 2000 *status quo* plan with additional management and communication provisions, would direct the fishery this year. The Court deleted from the 2011 plan the provision that a weather-based delay of the initial unrestricted fishery would impose a similar delay on opening the restricted fishery. All other provi-

sions found at ¶¶ 2–3 [1] and 6–7 of the 2011 "Interim Management Measures" plan, found as Exhibit B to the Declaration of Russell Svec, Dkt. # 292, shall be in effect and shall be followed by all parties engaging in the 2012 halibut fishery, with the exception that disputes shall be brought to the undersigned judge instead of Magistrate Judge Tsuchida. The Court anticipates that the 2011 management measures are sufficiently clear that few if any disputes should arise, because all parties shall be bound by the provisions regarding inspections, stacking, transferring, and landing limits. The percentages that shall apply to the three fisheries, which arise from the 2000 *status quo* plan, are 46% to the initial unrestricted fishery, 19% to the restricted fishery, and 35% to the "mop-up" late unrestricted fishery. All parties shall communicate and consult in good faith as set forth in the management plan to insure that these limits are not exceeded.

The S'Klallam protest that they did not consent to the 2011 management measures, and request clarification as to whether they are nevertheless being ordered to comply with them. The Court clarifies that these management measures are indeed being imposed on all parties. The parties were previously advised that if they could not reach consensus on a plan for 2012, the Court would adopt one. The Court has jurisdiction to do so under Paragraphs 25(a)(4) and (a)(7) of the permanent injunction. The Court has found previously that the 2000 *status quo* plan does not represent an impermissible allocation of halibut. The Court further determined that the management measures adopted by many of the parties for 2011 represent reasonable measures to promote wise management of the fishery and prevent eva-

---

1. These paragraphs are adopted to the extent they provide that the 2000 *status quo* plan shall be followed. Language referring to the 2011 fishery, and to the measures being binding only on those parties who have approved them, are necessarily STRICKEN.

sion of the rules. Therefore the Court has adopted the 2011 management measures as part of the plan for the 2012 halibut fishery, to be observed by all parties.

The motion for clarification (Dkt. # 399) is accordingly GRANTED to the extent that the Order has been clarified, and the request to retain Magistrate Judge Tsuchida as the settlement judge, rather than the decider of disputes, has been deemed appropriate.

## MINUTE ORDER

### (March 23, 2012)

The following Minute Order is made by direction of the Court, the Honorable Ricardo S. Martinez, United States District Judge:

In commemoration of this truly historic case filed in our district, the Court notes that with this Minute Order, the docket has reached 20,000 entries.

## ORDER ON MOTION FOR LEAVE TO INTERVENE

### Subproceeding 09–1

### (August 9, 2012)

■ This matter is before the Court for consideration of a motion by the Hoh Tribe ("Hoh") to intervene in this subproceeding. Dkt. # 115. The Hoh assert that intervention is proper as a matter of right under Fed.R.Civ.P. 24(a), as "it is likely that any determination of Quileute ocean fishing usual and accustomed fishing grounds will also affect and define Hoh ocean fishing usual and accustomed fishing grounds." Motion to Intervene, Dkt. # 115, p. 2. The Makah Tribe and the Tulalip Tribes have each filed opposition to the motion, noting that under the practice and procedures in place for *U.S. v. Washington,* any existing party in the case, including the Hoh, is already entitled to

participate fully in each subproceeding. The Hoh reply that this level of participation is not sufficient to protect their interests, because "any decision involving Quileute will involve the same facts, history and legal principles that involve Hoh," and such decision "will impair or impede the ability of the Hoh Tribe to fully litigate this same issue in the future if the Hoh Tribe is not made a full party in this subproceeding." Hoh Tribe's Reply, Dkt. # 115, p. 2–3.

The Makah and Tulalip Tribes are correct that the Hoh are entitled to fully participate in this subproceeding without formally intervening as a responding party. Further, Paragraph 25 of the Permanent Injunction, which governs jurisdiction and procedures in the subproceedings, does not contemplate intervention of the type requested here. To the extent that factual and legal determinations in this subproceeding have implication for the scope of the usual and accustomed fishing grounds of the Hoh, that Tribe may argue their position in memoranda filed in their status as participant under Paragraph 25. On the other hand, should the Hoh wish to assert facts which would distinguish their position from that of the Quileute with respect to usual and accustomed fishing areas, they should file their own Request for Determination following the procedures set forth in Paragraph 25, including the requisite pre-filing meet and confer.

The motion to intervene (Dkt. # 115) is accordingly DENIED.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

### Subproceeding 11–2

### (October 11, 2012)

This matter is before the Court for consideration of the motion for summary

judgment filed by the Requesting Tribes, namely the Jamestown S'Klallam, Lower Elwha Klallam, and Port Gamble S'Klallam Tribes (together, "the S'Klallam"). Dkt. # 40. They request that the Court grant summary judgment on the issues presented in their Request for Determination filed November 8, 2011. Dkt. # 1. The Request for Determination asks the Court to find that the actions of the Lummi Nation in fishing in the "case area"[1] is not in conformity with Final Decision # I. The Lummi Nation ("Lummi") has opposed the motion. Oral argument was heard on September 27, 2012, and the matter has been fully considered. The Court has jurisdiction pursuant to Paragraph 25(a)(1) of the Permanent Injunction, as modified August 11, 1993. C70-9213, Dkt. # 13599. For the reasons set forth below, the motion shall be granted.

## BACKGROUND AND CASE HISTORY

The usual and accustomed fishing area of the Lummi Tribe was described by Judge Boldt in Findings of Fact ("FF") 45 and 46 in the original *U.S. v. Washington* decision.

45. Prior to the Treaty of Point Elliott, the Lummi, Semiahmoo and Samish Indians had been engaged in trade in salmon, halibut and shellfish both with other Indians and with non-Indians. (FPTO § 3–42) This trade continued after the treaty. (Ex. USA–30, p. 6) At the time of the treaty they maintained prosperous communities by virtue of their ownership of lucrative saltwater fisheries. The single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River. (Ex. USA–30, p. 11) Lummi Indians developed a highly efficient technique, known as reef netting, for taking large quantities of salmon in salt water. (Ex. USA–30, p. 11) Aboriginal Indian 'reef netting' differs from present methods and techniques described by the same term. (FPTO § 3–40) The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. (Ex. USA–30, p. 23; Exs. USA–62, USA–63; Tr. 1699, l. 2 to 1701, l. 21) When nature did not provide optimum reef conditions the Indians artificially created them. (Ex. USA–30, p. 17) Reef netting was one of the two most important economic activities engaged in by these Indians, the other being the sale of dog fish oil. These Indians also took spring, silver and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek. They trolled the waters of the San Juan Islands for various species of salmon. (FPTO § 3–42; Ex. USA–30, pp. 6–25; Ex. G–21, pp. I–19–I–21)

46. In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay. Freshwater fisheries included the river drainage systems, especially the

---

1. The case area is defined in the Request for Determination as the eastern end of the Strait of Juan de Fuca, specifically "the marine waters northeasterly of a line running from Trial Island near Victoria, British Columbia, to Point Wilson on the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait." Request for Determination, Dkt. # 1, ¶ 2.

Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay. (Exs. USA–20, p. 39; USA–30, pp. 23–26; Exs. PL–94a, b, c, d, e, t, u, v, w, x; Ex. G–26, pp. II–9 to II–13; Exs. USA–60, USA–61, USA–62, USA–63, USA–64; Tr. 1665, l. 4–11, l. 23–24).

*U.S. v. Washington,* 384 F.Supp. 312, 360 (W.D.Wash.1974) (*"Decision I "*).

I. Judge Coyle's Decision

In 1989, the S'Klallam, along with the Skokomish Tribe, filed a Request for Determination ("Request") regarding the Lummi U & A, which was opened as Subproceeding 89–2 and assigned to United States District Judge Robert Coyle. They asked for a ruling that Lummi fishing in the case area was "not in conformity with" the Findings of Fact in *Decision I,* which is one way by which a party may invoke the Court's jurisdiction under Paragraph 25 of the Permanent Injunction. The Request asserted that the Strait of Juan de Fuca, Admiralty Inlet, and the mouth of Hood Canal are all outside the Lummi U & A as it was described by Judge Boldt, and therefore, Lummi fishing in these areas is "not in conformity with" that decision.

The parties cross-moved for summary judgment. In a thorough and well-reasoned Order, dated February 13, 1990, Judge Coyle granted summary judgment to the S'Klallam, stating with respect to the case area, "There is no question in the court's mind from the evidence presented to Judge Boldt that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca." C70–9213, Dkt. # 11596, p. 13.

There are two concerns with this Order, which have led to the Lummi allegations of a lack of resolution in this matter. One is that Judge Coyle quoted extensively from a 1989 Declaration of Dr. Barbara Lane,

the anthropologist upon whose reports Judge Boldt placed great reliance when he determined the U & A's of various tribes. Her post-*Decision I* testimony, offered in an attempt to clarify Judge Boldt's meaning, was subsequently found to be improper in a different subproceeding. ("The district court erred by considering Dr. Lane's latter-day testimony as evidence of Judge Boldt's intended meaning.") *Muckleshoot Indian Tribe v. Lummi Indian Tribe,* 141 F.3d 1355, 1359–60 (9th Cir. 1998) (*"Muckleshoot I "*). However, in considering this assertion by the Lummi in their appeal of Judge Coyle's Order, the Ninth Circuit found he did not improperly rely on the 1989 declaration, and upheld the decision as to the Strait of Juan de Fuca. This is now the law of the case, and the Lummi argument that Judge Coyle's decision is flawed is unavailing.

The other concern, as the Ninth Circuit later noted, was that judgment was never entered on Judge Coyle's decision, and the Lummi subsequently filed a Cross–Request for Determination in 89–2. The Lummi requested a determination that their U & A include:

> the waters of the Strait of Juan de Fuca east from the Hoko River to the mouth of Puget Sound, the waters west of Whidbey Island, Admiralty Inlet, the waters south of Whidbey Island to the present environs of Seattle, and the waters of Hood Canal south from Admiralty Inlet to a line drawn from Termination Point due East across Hood Canal.

C70–9213, Dkt. # 11690. The Ninth Circuit later characterized this Cross–Request as an "expansion" of the Lummi U & A. *U.S. v. Washington (Lower Elwha Band of S'Klallams, et al. v. Lummi Indian Tribe),* 235 F.3d 443, 447 (9th Cir.2000) (*"Lummi "*). This "expansion" designation indicates that the Ninth Circuit did not, at

that time, view any of these areas as included in the Lummi U & A as it was determined by Judge Boldt.

## II. Judge Rothstein's Decisions

In 1993, the case was assigned to United States District Judge Barbara Rothstein. The parties cross-moved for summary judgment on the Lummi Cross–Request for Determination, and Judge Rothstein denied both motions in an Order dated February 7, 1994. Judge Rothstein found that the affidavit of anthropologist Wayne Suttles, which the Lummi presented as evidence of their fishing in the eastern area of the Strait of Juan de Fuca, constituted sufficient evidence to allow the Lummi to survive summary judgment. She stated however, "The Court will expect Dr. Suttles to clarify the boundaries of the geographic areas to which he refers together with specific documentation pertinent to each area." Order, Dkt. # 14056, p. 8. This was four years before the Ninth Circuit pronounced such latter-day declarations improper in *Muckleshoot I*.

The Ninth Circuit released the *Muckleshoot I* decision on April 17, 1998. In May of 1998, the S'Klallam moved to dismiss the Lummi Cross–Request on the basis that the issues had been decided by Judge Coyle, and that the Lummi were precluded from re-litigating them. In opposing the motion, the Lummi attached a map identifying Admiralty Inlet, the Fraser River, and Haro Strait, and argued that its U & A included the waters between Haro Strait and Admiralty Inlet. The Court ordered supplemental briefing on outstanding issues, and the Lummi then filed a cross-motion to dismiss the S'Klallam Request, or for summary judgment. The Lummi objected to consideration of Dr. Lane's 1989 Declaration, on the basis of the recent *Muckleshoot* decision. They did not re-submit the declaration of Wayne Suttles or rely on it.

On September 1, 1998, Judge Rothstein denied the Lummi motions, and granted the S'Klallam motion to dismiss. She described in her Order the issues raised in Subproceeding 89–2 as whether Lummi's U & A includes "the Strait of Juan de Fuca, Admiralty Inlet, or the mouth of Hood Canal." Dkt. # 16550, p. 2. The conclusion states, "the Court determines that Judge Boldt did not intend to include the Strait of Juan de Fuca, Admiralty Inlet, or the mouth of Hood Canal in the Lummi U & A." *Id.*, p. 18. The Clerk was directed to enter judgment in favor of the S'Klallam and Skokomish tribes, and dismiss the subproceeding. *Id.*, p. 19. The Lummi appealed.

## III. The Ninth Circuit Court of Appeals Decision

The Lummi "Statement of Issues Presented for Review" in the appeal listed three issues: (1) whether "Judge Boldt intend[ed] to include within Lummi fishing areas all of the marine waters from the San Juan Islands south to the vicinity of Seattle when he ... declared that Lummi fishing rights 'included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle'"; (2) whether Judge Coyle erred when he considered matters outside the trial record (referring to the latter-day Declaration of Barbara Lane) in interpreting the final judgment entered by Judge Boldt; and (3) whether Judge Rothstein erred "when she declined to review and revise Judge Coyle's interpretation of the judgment" in light of *Muckleshoot I*, 141 F.3d 1355. Declaration of Lauren Rasmussen, Dkt. # 20030, Exhibit A, p. 1. In the Statement of the Case, the Lummi clarified that

[t]he issue presented by this case is whether ***all*** of the marine waters between the Fraser and Seattle were in-

cluded in this judgment or only some of them. Specifically, based on the record before him, did Judge Boldt intend to exclude from the broad language of his ruling the marine waters of Admiralty Inlet and the open marine waters in the Strati of Juan de Fuca between Admiralty Inlet and Haro Straits on the western edge of the San Juan Islands?

*Id.,* p. 3.

The Ninth Circuit ruled that Judge Coyle's decision merged into the final judgment which was entered on September 2, 1998, and then proceeded to address the Lummi arguments against both Judge Coyle's and Judge Rothstein's Orders. The court started by finding that Judge Boldt's language in describing the Lummi U & A is ambiguous, "because it does not delineate the western boundary of the Lummi's usual and accustomed fishing grounds and stations." *U.S. v. Washington (Lummi),* 235 F.3d at 449. Next, the appellate court found that in resolving the ambiguity, Judge Coyle did not improperly use the 1989 Declaration of Dr. Lane. Instead, he relied on the exhibits attached to it, notably, trial exhibits USA–20 and USA–30, which were before Judge Boldt and from which he quoted extensively in *Decision I.* The court rejected the Lummi argument that Judge Boldt's language should be interpreted broadly because of Dr. Lane's statement that "it would be impossible to compile a complete inventory of any tribe's usual and accustomed fishing grounds. Such an inventory is possible only by designating entire water systems." *See* "Political and Economic Aspects of Indian–White Culture Contact in Western Washington in the Mid–19th Century (Summary Anthropological Report) Exhibit USA–20, filed in this case at Dkt. # 45, Declaration of Mary Neil, Exhibit 25. In rejecting this argument, the Ninth Circuit noted that Judge Boldt cited to specific locations listed by Dr. Lane (Point Rob-

erts, Birch Point, Cherry Point, and others) rather than general areas, so there was no basis to find that he intended to include an "entire water system" such as all the waterways in Puget Sound. The court also rejected the Lummi argument that Judge Boldt intended to encompass the Strait of Juan de Fuca in the term Puget Sound, stating that "it is clear that Judge Boldt viewed Puget Sound and the Strait of Juan de Fuca as two distinct regions, with the Strait lying to the west of the Sound." *U.S. v. Washington (Lummi),* 235 F.3d at 451–52. Thus, "had he intended to include the Strait of Juan de Fuca in the Lummi's usual and accustomed fishing grounds and stations, he would have used that specific term, as he did elsewhere in *Decision I.*" *Id.* at 452. These findings by the Ninth Circuit, which exclude the Strait of Juan de Fuca from the Lummi U & A, are now the law of the case.

With respect to Admiralty Inlet, the Ninth Circuit could find no guidance as to Judge Boldt's intent, as he did not use that term in the Lummi U & A or anywhere else in *Decision I.* The S'Klallam argued that Judge Boldt could not have intended to include Admiralty Inlet in the Lummi U & A because he did not specifically name it, but this argument failed to persuade the Ninth Circuit. In the absence of linguistic clues, the court determined that "[g]eographically, however, Admiralty Inlet was intended to be included within the 'marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle.'" *Id.* at 452. The court reasoned that the Lummi must pass through this area (Admiralty Inlet) to go from the Fraser River south to Seattle: "Admiralty Inlet consists of the waters to the west of Whidbey Island, separating that island from the Olympic Peninsula. Admiralty Inlet would likely be a passage through

which the Lummi would have traveled from the San Juan Islands in the north to the 'present environs of Seattle.'" *Id.* On the basis of this ruling, Admiralty Inlet became part of the Lummi U & A.

With respect to Judge Rothstein's decision, the Ninth Circuit ruled that she did not abuse her discretion in applying the law of the case and ruling in favor of the S'Klallam in dismissing the subproceeding. The court concluded,

> We are persuaded that Judge Boldt did not intend for either the Strait of Juan de Fuca or the mouth of the Hood Canal to be included within the Lummi's usual and accustomed grounds and stations. Based on the geography of the area, however, we conclude that Judge Boldt did intend to include Admiralty Inlet. We affirm Judge Rothstein's order of dismissal in part, and reverse in part.

*Lummi,* 235 F.3d at 453.

In 2009, the S'Klallam filed a motion for an Order to Show Cause why the Lummi Nation should not be held in contempt for fishing in the eastern portion of the Strait of Juan de Fuca, in violation of this Court's Orders and the mandate of the Ninth Circuit Court of Appeals. The motion was filed in the closed 89–02 subproceeding. *U.S. v. Washington,* Subproceeding 89–2, Dkt. # 217. The Lummi moved to dismiss the motion for contempt and the Court granted that motion. Subproceeding 89–2, Dkt. # 235. The Court agreed with the Lummi that the motion, filed in a closed subproceeding, was improper but granted the S'Klallam leave to initiate a new subproceeding to bring the issue before the Court. *Id.* The S'Klallam appeal of the dismissal was dismissed by the Ninth Circuit Court of Appeals for lack of jurisdiction. On November 11, 2011, the S'Klallam then filed a Request for Determination, opened as this subproceeding, to again bring the issue of Lummi fishing in

the case area before the Court. *U.S. v. Washington,* Subproceeding 11–02, Dkt. # 1. The S'Klallam motion for summary judgment is now ripe for consideration.

## ANALYSIS AND DISCUSSION

### I. Legal Standard

In moving for summary judgment, the S'Klallam assert that it is now the law of the case that the Strait of Juan de Fuca is not within the Lummi U & A, and that determination may not be altered or amended. The Ninth Circuit Court of Appeals clearly set forth the standards for application of the law of the case doctrine in the prior decision in this dispute:

> "The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs." Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case. For the doctrine to apply, the issue in question must have been "decided explicitly or by necessary implication in [the] previous disposition." Application of the doctrine is discretionary.

*U.S. v. Washington (S'Klallams v. Lummi),* 235 F.3d at 452 (citations omitted).

### II. Analysis

█ The S'Klallam have moved for summary judgment on the basis that it is now the law of the case that the Lummi U & A does not include the Strait of Juan de Fuca. Therefore, Lummi fishing in the case area, described as the waters of the Strait west of Whidbey Island and east of a line drawn between Trial Island and Point Wilson, is "not in conformity with" *Decision I.* The Court agrees that the issue with respect to the Strait of Juan de Fuca has been explicitly decided by this Court and affirmed by the Ninth Circuit

Court of Appeals, and is now the law of the case. Contrary to the Lummi assertion that the burden of proof lies with the S'Klallam, it is for the Lummi to demonstrate that the case area does not lie within the Strait of Juan de Fuca. That is a heavy burden in light of the fact that the Lummi specifically described this area in their failed Cross–Request for Determination. Judge Rothstein determined that the area in the Lummi Cross–Request for Determination was the same as the case area as originally defined by the S'Klallam:

> This request [the Lummi Cross–Request for Determination] sought a declaration that the Lummi U & A included the waters of the Strait of Juan de Fuca east from the Hoko River to the mouth of Puget Sound, the waters west of Whidbey Island to the present environs of Seattle, and the waters of Hood Canal.... The Lummi's request is worded differently from the Four Tribes' original request. The Four Tribes contend, however the Lummi's cross-request covers essentially the same areas the Four Tribes challenged in the initial request for determination. The Lummi have not asserted that their cross-request covers a different area from the area covered by the Four Tribes' initial request and by Judge Coyle's decision. Rather, they argue that Judge Coyle's decision is not

final and is of no precedential value. The court can discern no difference between the two requests for determination, nor have the Lummi convincingly argued that there is a difference. Thus, this order is intended to resolve both requests for determination.

C70–9213, Dkt. # 16550, p. 14. Therefore, the question with respect to waters "west of Whidbey Island" was resolved by Judge Rothstein and affirmed in that respect by the Ninth Circuit Court of Appeals.[2]

In opposing the motion for summary judgment, the Lummi advance several different arguments for their contention that the case area waters are not part of the Strait of Juan de Fuca. For one, they point to a map that was before Judge Boldt, namely Exhibit USA–62, which is a reproduction of a U.S. coastal survey map from 1853. They assert that the placement of the lettering for "Strait of Juan de Fuca" on this map would have led Judge Boldt to conclude that the eastern extent of the Strait was approximately Angeles Point. Lummi Nation's Memorandum in Opposition, Dkt. # 43, p. 18. This argument is unavailing for many reasons, not the least of which is that it is purely speculative with respect to Judge Boldt's meaning or intent.[3] While Judge Boldt did cite to USA–62 in FF 45, it was specifically in regard to the locations of Orcas Island,

---

**2.** The parties have argued at length in their briefs regarding whether the case area was actually included in the prior court rulings, pointing to statements made by one or the other in various briefs filed in the earlier proceedings. The Court notes that it is the language of the courts, not of the parties, that is determinative of the law of the case. The earlier briefs, while interesting, have not been considered and will not be addressed in this Order. It is only the court opinions, including Judge Boldt's, together with the evidence to which he pointed, that will be considered. To the extent that the Lummi have moved to strike "discuss [ions of] what the parties to this subproceeding have said to other judges over the years" that motion is granted. Memorandum in Opposition, Dkt. # 43, p. 19. The Lummi motion to strike the latter-day Declaration of Barbara Lane, together with evidence of the Board of Geographic names definition of "Strait of Juan de Fuca" was granted at the motion hearing.

**3.** By the same reasoning, Judge Boldt would have understood the western boundary of the Strait to be Klaholoh Rock, an inference which undoubtedly would be vigorously disputed by any tribe having a U & A in the Strait.

San Juan Island, Lummi Island, Fidalgo Island, Point Roberts, and Sandy Point. *U.S. v. Washington,* 384 F.Supp. at 360. Thus this map, while historically interesting, is of no import in the context of this subproceeding.

Second, the Lummi argue that their U & A includes the case area because:

[t]he Ninth Circuit expressly held that Lummi's U & A includes Admiralty Inlet, which the Ninth Circuit defined as follows:

Admiralty Inlet consists of the waters to the west of Whidbey Island, separating that island from the Olympic Peninsula.

Lummi's Memorandum in Opposition, Dkt. # 43, p. 6, quoting *Lummi,* 235 F.3d at 452. This argument mis-reads the Ninth Circuit's definition of Admiralty Inlet and impermissibly expands its scope. The correct reading of the Ninth Circuit language describes Admiralty Inlet as "(those) waters to the west of Whidbey Island (which) separate that island from the Olympic Peninsula;" in other words, only the southern portion of the waters west of Whidbey Island. The fact that the Lummi understood the "waters west of Whidbey Island" to be distinct from Admiralty Inlet is evidenced from their own Cross–Request for Determination, filed in Subproceeding 89–2, set forth above at p. 3, which names them separately and disjunctively. *See* C70–9213, Dkt. # 11690.

Next the Lummi assert that

[t]he Ninth Circuit has developed a special two-step process for determining Judge Boldt's intent with regard to a Tribe's U & A. First, Klallam must prove that a term used by Judge Boldt to describe Lummi's U & A is ambiguous or that he intended something other than the apparent meaning of the terms he used to describe Lummi's U & A. If so, then Klallam must prove there was

no evidence before Judge Boldt showing that Lummi fished the waters west of Whidbey island or traveled there en route from the Fraser River to the Seattle area.

Lummi Memorandum in Opposition, Dkt. # 43, p. 8. This line of argument misstates the burden of proof and the Court's task here. The two-step process has already been concluded by this Court in Subproceeding 89–02, and was affirmed (as to the Strait of Juan de Fuca and the mouth of Hood Canal) by the Ninth Circuit Court of Appeals. It is the law of the case that the Lummi U & A does not include the Strait of Juan de Fuca, and it now is for the Lummi to point to evidence that would create an issue of fact as to whether the case area lies outside that Strait. Specifically, they must point to evidence that would lead to the conclusion that the Ninth Circuit decision, excluding the Strait of Juan de Fuca but including Admiralty Inlet, somehow includes the case area as well.

To this end, the Lummi contend that "logic and linguistic clues from Judge Boldt and the Ninth Circuit lead inexorably to the conclusion that none of the waters between the San Juan Islands and the environs of Seattle were excluded from the Lummi's U & A." Lummi Memorandum in Opposition, Dkt. # 43, p. 22. Thus, they assert that by using a "broad, sweeping description" of the Lummi U & A, Judge Boldt "resolved the factual question of whether Lummi had fished sufficiently in the areas" to have them included in the U & A (referring to the waters west of Whidbey Island). *Id.,* p. 26. In support of this reasoning, the Lummi then point again to Dr. Lane's report:

Dr. Lane testified that Lummi fishermen were "accustomed . . . to **visit fisheries** as distant as Fraser River in the north and Puget Sound in the South,"

*USA–30 at 25,* and that **"other fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized"** by the Lummi. *USA–30 at 26 (emphasis added).*

*Id.* (emphasis and italics in original). They conclude this "logic and linguistic clues" line of argument with the assertion that "[t]he Ninth Circuit was merely using the natural pathway from the San Juan islands south to Seattle as a means of understanding the area Judge Boldt was describing," thus including the case area in the Lummi U & A along with Admiralty Inlet. *Id.*

At the oral argument, the Lummi pointed to FF 13 in *Decision I* as support for their "broad sweeping description" argument, noting that Judge Boldt stated "it would be impossible to compile a complete inventory" of any tribe's usual and accustomed fishing areas. However, when FF 13 is read in its entirety, and together with the following FF 14, they lead to the opposite conclusion from what the Lummi argue. These Findings of Fact, stated in full, read as follows:

> 13. Each of the Plaintiff tribes had usual and accustomed fishing places within the case area. Although there are extensive records and oral history from which many specific fishing locations can be pinpointed, it would be impossible to compile a complete inventory of any tribe's usual and accustomed grounds and stations. (FPTO § 3–34; Ex. USA–20, p. 21; Ex USA–52, p. 4, l. 7 to p. 5, l. 29) Among the reasons for this are the following: 1) Indian fisheries existed at all feasible places along a given drainage system. Fishing stations which were the site of weirs or permanent villages are more easily documented than riffles where fish were speared; 2) Indian fishermen shifted to those locales which seemed most productive at any given time depending upon such factors as changes in river flow, turbidity or water course; 3) some important recorded fishing sites are no longer extant because of subsequent man-made alterations in watersheds and water systems; and, 4) use of some sites has been discontinued because appropriate Indian gear for those sites has been outlawed or because competing uses and users have made utilization of the sites by Indian fishermen unfeasible. (Ex. USA–20, pp. 21–23; Ex. USA–27b, pp. 1–3) Documentation as to which Indians used specific fishing sites is incomplete. George Gibbs noted that:
>
> > 'As regards the fisheries, they are held in common, and no tribe pretends to claim from another, or from individuals, seigniorage for the right of taking. In fact, such a claim would be inconvenient to all parties, as the Indians move about, on the sound particularly, from one to another locality, according to the season.' (Ex. USA–20, p. 18; Ex. USA–27b, p. 3; Ex. G–4, p. 186)
>
> 14. Although not all tribes fished to a considerable extent in marine areas, the Lummi reef net sites in Northern Puget Sound, the Makah halibut banks, Hood Canal and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fishing grounds and stations in marine waters. Marine waters were also· used as thoroughfares for travel by Indians who trolled en route. (Ex. PL–75; Tr. 2847, l. 13 to 2850, l. 23) Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians. (Tr. 2177, l. 24 to 2180, l. 4).

*U.S. v. Washington,* 384 F.Supp. at 353.

Thus, FF 13, with its references to drainage systems, riffles, weirs, river flow,

turbidity, and so on in Reasons 1 through 3, appears to address only fishing sites along rivers. It would be pure speculation to infer that the "impossible to compile a complete inventory" statement applies as well to fishing in the marine areas where none are mentioned; indeed logic and linguistics lead to the opposite inference. Judge Boldt used terms specific to riverine areas in FF 13 when he listed reasons why it was "impossible to compile a complete inventory" of any tribe's usual fishing areas. On the other hand, marine areas, and specifically the Lummi reef net sites, are addressed in FF 14, which is also the basis for the oft-quoted principle that transit through an area does not, without more specific evidence of fishing, lead to inclusion of an area in a tribe's U & A. Thus, FF 13 fails to support the conclusion that Judge Boldt intended with his "broad sweeping description" to include the case area in the Lummi U & A, and FF 14 leads to the conclusion that the Lummi "natural pathway" argument must be rejected.

Nor does reference to Dr. Lane's language regarding Lummi's "other fisheries in the Straits and bays from the Fraser River south" (quoted from Exhibit USA–30, p. 26) aid the Lummi position. First, the case area is not a bay, and according to the Lummi argument it is not part of the Strait of Juan de Fuca either. Therefore they have not shown how the case area could be included in the "other fisheries in the Straits and bays" referenced by Dr. Lane. Second, this statement in her report is a summary conclusion, and must be read in context with the entire report, particularly the sections that were cited or quoted by Judge Boldt in FF 45 and 46. Notably, Judge Boldt did not quote Dr. Lane's "Straits and bays" conclusion in either Finding of Fact. Instead, he cited extensively and repeatedly to Dr. Lane's discussion of reefnetting, its uniqueness and importance to the Lummi, their system of individual ownership of reefnetting sites, and the location of those sites. *See* FF 45, set forth above, and citations therein to Exhibit USA–30 at pp. 11, 23.

Dr. Lane went into great detail on reefnetting by the Lummi in her report, describing the equipment and techniques, and the reasons for its success, which was attributed in part to specialized knowledge of topography and salmon behavior and migration patterns. Exhibit USA–30, p. 12. "Usually the reefnet was located in a kelp-covered reef a short distance offshore. Often it was opposite a headland that caused a backward sweep of tidal current. The fish entered with the current." Exhibit USA–30, p. 17. "The more important reefnet locations of the Semiahmoo–Lummi–Samish are noted in the section on usual and accustomed fishing sites and are plotted on the accompanying map." Exhibit USA–30, p. 11. The map shows reefnet sites at various points from Point Roberts south to the southern shore of Lopez Island. All appear to be associated with promontories and headlands, and none are located south of Lopez Island, where the case area begins. The singular importance of reefnetting to the Lummi was acknowledged by Judge Boldt in FF 45, and the complete absence of any indicated sites from the case area is significant.

The section of Dr. Lane's report which was cited extensively, and sometimes quoted, by Judge Boldt states, in its entirety,

USUAL AND ACCUSTOMED FISHING AREAS

While it is not possible to pinpoint every fishing site used by the ancestors of the present Lummi Tribe of Indians prior to the Treaty of Point Elliot, **it is feasible to indicate the general area of their fishing operations and within the general area to designate certain sites as**

important or principle fishing locations.

The pre-treaty Lummi, along with the Semiahmoo and Samish, both of whom were subsumed with the Lummi at the Treaty of Point Elliot, owned reefnet locations in the San Juan Islands, off Point Roberts, off Lummi Island, and Fidalgo Island.

The reefnetting grounds off Point Roberts were the largest in the entire area and were situated within the aboriginal territory of the Semiahmoo. They were used not only by the Semiahmoo but also by Saanich, Lummi, and other Indians.

The grounds off Village Point, Lummi Island[,] were second in size to the point Roberts grounds. At least two of the Lummi signers of the Point Elliot Treaty owned reefnet locations off Village Point.

The main Samish location was off Iceberg Point, Lopez Island[,] in the San Juans. Other Samish and Lummi locations were located off the southern shores of Lopez. The Samish also fished with reefnets off Langley Point on Fidalgo Island.

Other Lummi reefnet grounds were located off Shaw Island, Orcas Island, Waldron Island, and off Cherry Point on the mainland.

The Birch Point grounds off Birch Bay lay within the aboriginal territory of the Semiahmoo people.

In addition to using the reefnetting grounds noted above, the ancestors of the present Lummi Tribe of Indians also trolled for salmon in the contiguous salt waters of Haro and Rosario Straits and in the islands, speared them in the bays and streams of the mainland, and took them by means of weirs and traps in the rivers. There were, in addition, other important fisheries, including halibut banks, but discussion here is limited to salmon (including steelhead) fisheries.

**The traditional fishing areas discussed thus far extended from what is now the Canadian border south to Anacortes.** This description included the traditional fishing areas of the Semiahmoo and the Samish. Some of the present Lummi Tribe are descendants of the pre-treaty Semiahmoo and Samish groups. Other descendants of these pre-treaty entities have not become members of the Lummi Tribe and those descendants would, of course, legitimately make claim to some of the same usual and accustomed fishing area included here.

**In addition to the home territory discussed to this point, Lummi fishermen were accustomed, at least in historic times, and probably earlier, to visit fisheries as distant as the Fraser River in the north and Puget Sound in the south.**

In the same manner, Saanich, Clallam, Skagit and other Indians fished in waters described above as within Semiahmoo, Lummi and Samish territory. The Straits and Sound were traditional highways used in common by all Indians of the region and most saltwater fisheries traditionally were free access areas. This point is discussed at some length in the Summary Anthropological Report,[4] pages 15–19. While it is useful for certain purposes to speak of Lummi waters, or Samish territory, it is important to note that this by no means implies exclusive rights by one group. That these

4. The Summary Anthropological Report, titled "Political and Economic Aspects of Indian–White Culture Contact in Western Washington in the Mid–19th Century," was before Judge Boldt as Exhibit USA–20.

Indians travelled [sic] widely and frequently throughout the waters of the Sound and Straits is commented on by numerous early observers.

Exhibit USA–30, pp. 23–24 (emphasis added).

The Court finds several aspects of this section have significant implications for the Lummi "logic and linguistics" argument. First, Dr. Lane stated that it was feasible to indicate a general area for the fishing operations of the Lummi, and within that general area to designate important sites, but not all of them. This is contrary to the sense in which the Lummi would have the Court read the "impossible to compile a complete inventory" language in FF 13. They used this language to invite consideration of unnamed locations well outside the designated area, but this section shows that was not Dr. Lane's intent. (And as shown above, Judge Boldt's "complete inventory" remark appears to be addressed to river fishing sites, not marine areas.) Second, the "traditional fishing areas" of the Lummi were designated as extending only as far south as Anacortes, well above the case area. Judge Boldt cited specifically to this section of the report and used the specific place names in FF 45, thus indicating his reliance upon this section. Third, Dr. Lane named only two places, Fraser River in the north and Puget Sound to the south, as fisheries visited by Lummi fisherman; she did not report that they fished all the waters in between, or mention any intermediate fisheries. While Judge Boldt described the Lummi U & A

in FF 46 as including marine areas from Fraser River south to the present environs of Seattle, "and particularly Bellingham Bay," the Lummi have pointed to no facts before Judge Boldt which would support the conclusion that he intended to include all the marine waters in between. Indeed, this Court has found in a previous subproceeding that Judge Boldt's "from" and "to" language in describing a U & A does not include all the waters in between.[5] Here, the pointed reference to Bellingham Bay, far to the north of the case area, is significant. Fourth, the description of the Straits and Sound as "highways" used by all tribes reinforces the rule set forth by Judge Boldt in FF 14 that incidental trolling during travel does not "make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians." *U.S. v. Washington,* 384 F.Supp. at 353.

CONCLUSION

Based on this analysis of Dr. Lane's report and FF 45 and 46, the Court finds that neither logic nor linguistics would compel the conclusion that the waters to the west of Whidbey Island, designated as the case area, were intended by Judge Boldt to be included in the Lummi U & A. Nor were they awarded to the Lummi by the Ninth Circuit Court of Appeals as part of Admiralty Inlet, or a passage to it. The law of the case holds that the Lummi U & A does not include the Strait of Juan de Fuca or the waters west of Whidbey Island that were named in the Lummi

5. In a recent subproceeding addressing similar language by Judge Boldt in describing the Suquamish U & A ("the marine waters of Puget Sound **from** the northern tip of Vashon Island **to** the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal"), this Court found that Judge Boldt did not intend to include all of

Puget Sound, and excluded certain area to the east of Whidbey Island. Subproceeding 05–03, *affirmed, U.S. v. Washington (Upper Skagit v. Suquamish),* 590 F.3d 1020 (9th Cir.2010). This determination was made by examining the evidence that was before Judge Boldt, specifically Dr. Lane's report on Suquamish fishing areas.

Cross–Request for Determination. That issue has been finally determined and may not be re-litigated. Accordingly, the S'Klallam motion for summary judgment (Dkt. # 40) is GRANTED, and it is hereby ORDERED:

(1) The Usual and Accustomed Fishing Area (U & A) of the Lummi Nation does not include the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, an area more specifically described as the marine waters east of a line running from Trial Island near Victoria, British Columbia, to Point Wilson at the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait;

(2) The Lummi Nation is prohibited from issuing regulations or otherwise authorizing its fishers to exercise treaty fishing rights in the waters described above; and

(3) The Clerk shall enter judgment in favor of the S'Klallam, as Requesting Tribes, and shall close this subproceeding.

## ORDER ON MOTION TO QUASH AND FOR A PROTECTIVE ORDER

### Subproceeding No. 05–4

### (November 20, 2012)

This matter is before the Court for consideration of a motion for a protective order and motion to quash filed by the Tulalip Tribe ("Tulalip"). Dkt. # 208. The motion addresses a deposition subpoena issued to Dr. Barbara Lane by the Suquamish Tribe ("Suquamish"). The Court has reviewed the motion, the response and replies, and relevant case docu-

ments. For the reasons set forth below, the Court shall grant the motion.

### DISCUSSION

■■■ This subproceeding arises from a Request for Determination concerning the extent of the usual and accustomed fishing grounds ("U & A") of the Suquamish, described by the Honorable George Boldt in 1974 as follows:

> The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington*, 459 F.Supp. 1020, 1049 (1978). The Tulalip ask the Court to find that certain designated areas lie outside the Suquamish U & A as defined by Judge Boldt.

In March 2012, the parties proposed their own agreed pre-trial schedule for resolution of this matter, and the proposal was adopted by the Court, although the sequence of dates and the timing differ significantly from the Court's standard Scheduling Order. Dkt. ## 160, 161. The parties' Scheduling Order set a deadline of June 1, 2012 for Rule 26(a)(1)(c) initial disclosures; a discovery cutoff date (including depositions) of September 14, 2012; an October 26, 2012 deadline for both the filing of dispositive motions and the disclosure of experts [1] (if any) under Rule 26(a)(2)(D)(I); and a trial date of February 4, 2013. Dkt. # 161.

On October 15, 2012, the parties jointly moved to suspend the balance of the pre-trial schedule, pending a ruling on the motions for summary judgment to be filed

---

1. Under the Court's standard Scheduling Order, the date for expert witness disclosures precedes the date for filing dispositive motions by two months or more.

on or before October 26. Dkt. # 182. The joint motion stated,

> To avoid what may be unnecessary additional pretrial filings and preparation, Tulalip and Suquamish jointly request that the balance of the pretrial schedule, except for objections and motions in limine now due on October 19, 2012, and the due date for dispositive motions of October 26, 2012, be suspended until the dispositive motions are ruled on by the court.

Joint Motion for Stay of Pre–Trial Schedule, Dkt. # 182, p. 1. The proposed Order staying the schedule was adopted by the Court on October 17, 2012. Dkt. # 182. On October 25, 2012, the parties stipulated to re-set the noting date for the dispositive motions to December 7, 2012, to "avoid conflicts with the holidays." Dkt. # 192. This stipulation was also adopted by the Court, and the motions for summary judgment have accordingly been noted for December 7, 2012. Dkt. # 195, 199, 202.

Tulalip listed Dr. Barbara Lane as a person "who may have discoverable information" in the June 1, 2012 initial disclosures. Dkt. # 168. Dr. Lane, who resides in Canada, is an anthropologist and ethnohistorian whose reports were relied upon and extensively quoted by Judge Boldt in describing various Tribes' U & A's. On or about November 2, 2012, the Suquamish served a deposition subpoena and subpoena duces tecum upon Dr. Lane, asking her to appear in Seattle on November 28, 2012. Motion for Protective Order, Dkt. # 208, Attachment. The Tulalip have moved to quash the subpoena and also for a protective order barring Suquamish from engaging in further discovery in this case until further discovery is ordered by the Court. Dkt. # 208. The motion is based upon both the untimeliness of the request (discovery has closed) and the stay which is in place until the Court has resolved the summary judgment motions, as well as burden (Dr. Lane is in her eighties), distance (the subpoena compels her to travel more than 100 miles), failure to tender witness fees, and other objections. *Id.*

In response, the Suquamish assert that the "deposition of Tulalip's expert Dr. Barbara Lane is timely and necessary." Suquamish Response, Dkt. # 210, p. 3. It is timely, according to Suquamish, because "expert discovery is a separate phase of litigation that routinely takes place after the end of fact discovery." *Id.*, p. 4. It is necessary, according to Suquamish, for trial preparation. Both arguments fail. First of all, discovery has closed, so the deposition is untimely. Moreover, all pretrial activity apart from the filing of dispositive motions, objections, and motions in limine was suspended as of October 15, 2012 at the request of the parties, including Suquamish. Third, even if Suquamish is correct that expert discovery routinely takes place after the close of discovery (a proposition with which the Court does not agree), it does not appear to the Court that Dr. Lane has been identified by Tulalip as an expert. As the Court has noted in another subproceeding, in granting a motion by Suquamish to strike the designation of Dr. Lane as an expert,

> this Court has already ruled, in accordance with *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998) ("*Muckleshoot I*"), that Dr. Lane may not offer latter-day testimony regarding the evidence that was before Judge Boldt when he rendered his decision in 1974. Dkt. # 43. Although Dr. Lane's assistance was of enormous value to the Court, the record now speaks for itself, and Dr. Lane may not offer her opinion as to what she believes Judge Boldt intended.

*U.S. v. Washington*, 2006 WL 2882968 at *1 (W.D.Wash.).

Accordingly, the motion to quash the deposition subpoena is GRANTED. The motion for a protective Order is also GRANTED. The parties shall not engage in further discovery unless and until the Court re-opens discovery following entry of rulings on the pending motions for summary judgment.

## ORDER ON ELECTRONIC FILING PROCEDURES FOR C70–9213

### (November 20, 2012)

The Court hereby establishes the following revised procedures for filing documents in *United States v. Washington*, C70–9213:

(1) Beginning November 21, 2012, it shall no longer be possible for parties filing documents to "spread effects" or "spread text" from the Main Case to the Subproceedings. For motions, memoranda, declarations, Notices of Appearance, and other documents filed within an individual Subproceeding, each document shall be filed in the Main Case and separately in the relevant Subproceeding. Parties shall take care to ensure that both filings occur on the same date to avoid issues of timeliness.

(2) For documents which apply to multiple Subproceedings, the following procedures shall apply:

(a) A Notice of Unavailability of Counsel which applies to all Subproceedings need only be filed once, in the Main Case, and shall be deemed applicable to all Subproceedings.

(b) A Motion or Stipulation for Withdrawal of Counsel under Local Rule GR 2(g)(4) which applies to **all** subproceedings need only be filed once, in the main case, and shall be deemed applicable to all subproceedings. It shall be noted on the Court's calendar as a Motion or Stip-

ulation under Local Rule 7(d)(1) or 7(d)(3) as appropriate.

(c) A Motion or Stipulation for Withdrawal of Counsel under Local Rule GR 2(g)(4) which applies to **one or more, but not all** Subproceedings must be filed in the Main Case and separately in each Subproceeding to which it applies. It shall be noted on the Court's calendar separately in each Subproceeding to which it applies.

(d) Questions about other documents which need to be filed in multiple Subproceedings may be referred to Case Administrator Consuelo Ledesma at (206) 370–8455.

(3) Questions on filing may be referred to the CM/ECF Helpdesk at (206) 370–8440 or (866) 323–9293 (toll free).

(4) The Clerk is directed to revise the CM/ECF filing portal as necessary to implement these changes.

## AMENDED SUPPLEMENTAL ORDER ON PARAGRAPH 25 PROCEDURES

### (November 20, 2012)

The Court hereby AMENDS the Supplemental Order on Paragraph 25 Procedures filed November 9, 2011 (Dkt. # 19893) as follows, to reflect the November 21, 2012 changes in the Court's electronic filing procedures (CM/ECF) for *U.S.A. v. Washington:*

(1) Any party wishing to file a new Request for Determination shall, after complying with the pre-filing requirements of Paragraph 25 of the Permanent Injunction, as modified August 11, 1993, shall file an *ex parte* motion for leave to open a new subproceeding. The motion shall be filed in the Main Case of *U.S.A. v. Washington*, C70–9213, and shall be noted for consideration the same day as filed, pursuant to Local Rule CR 7. The motion shall clearly

designate who shall be the requesting and responding or affected parties, and shall contain a certification that pre-filing meet and confer requirements of Paragraph 25(b) have been met. No legal argument or other documentation is necessary. The requesting party shall also e-mail a proposed Order to the Chambers Order Box at MartinezOrders@wawd.uscourts.gov. The proposed Request for Determination shall be attached as an exhibit to the motion and filed under the same docket number, not filed as a separate docket entry.

(2) The Court shall consider the motion as soon as practicable and shall liberally grant such motions, provided the Request for Determination appears to fit within the purposes set forth at Paragraph 25(a) of the Permanent Injunction. C70–9213, Dkt. # 13599. The Order granting the motion for leave to file shall not constitute a final determination that the dispute is within the Court's jurisdiction under Paragraph 25, and such jurisdiction may still be questioned by the responding party.

(3) Upon granting the motion for leave to file a Request for Determination, the Court shall direct the Clerk to open a new subproceeding and assign the next number in sequence. Notice of the new subproceeding shall be sent electronically to all parties in C70–9213.

(4) All subsequent filings in the subproceeding shall be filed in the main case, C70–9213RSM, and filed separately in the new subproceeding. Parties shall refer to the Order on Electronic Filing Procedures, dated November 20, 2012, for further information on filing. A party who has questions regarding this procedure may call the Case Administrator, Consuelo Ledesma, at 206–370–8455 for assistance. **A document which has been filed only in C70–9213 and has not also been timely filed in the correct subproceeding may be regarded as improperly filed.**

(5) Declarations and other documents filed in support of a motion should reference the motion by docket number (from C70–9213) in the text entered on the docket sheet.

(6) Parties to *U.S.A. v. Washington* who are not named as requesting or responding parties, but who wish to participate in the subproceeding, may file a Notice of Appearance as an Interested Party, and will be entered as such on the docket by the Clerk.

(7) Corporate disclosure statements, where appropriate, shall be filed in accordance with Fed.R.Civ.P. 7.1 and shall be filed in both the main case, C70–9213, and in the subproceeding.

(8) The Court directs all parties to use care in filing documents in new and in existing subproceedings, to ensure that the documents are filed only in the appropriate subproceeding. The erroneous filling of unrelated documents in the wrong subproceedings has unnecessarily complicated the dockets of a number of subproceedings. The Court has revised the electronic filing procedures to minimize this occurrence.

(9) These procedures do not alter or amend the substantive requirements of Paragraph 25, as amended August 11, 1993, and are intended only to facilitate the process of opening new subproceedings, and maintaining existing subproceedings, using CM/ECF.

(10) The Clerk shall post a copy of this Order on the Court's webpage for Special Case Notices relating to *U.S.A. v. Washington.*

## ORDER

Subproceeding 12–1

(December 5, 2012)

This matter is before the Court for consideration of a motion by the Nisqually

Indian Tribe ("Nisqually") to wave mediation. Dkt. # 3. On September 7, 2012, the Nisqually requested leave of Court to file this Request for Determination regarding the usual and accustomed fishing area ("U & A") of the Squaxin Island Indian Tribe ("Squaxin"). Dkt. # 1. On September 17, 2012, before the Court ruled on the Nisqually request and opened the new subproceeding, the Squaxin filed and sent to the Nisqually Tribal council a demand for mediation of their dispute, pursuant to Paragraph 25(b)(2) of the Permanent Injunction in this case, as modified on August 23, 1993. *U.S. v. Washington*, C70–9213, Dkt. # 13599 ("Paragraph 25"). The Court granted the request to open a new subproceeding on September 21, 2012, but noted that the Order did not constitute a finding that "all pre-filing requirements have been met." Order, Dkt. # 5. The same day, the Nisqually filed this motion for waiver of mediation.

The pre-filing requirements of Paragraph 25 provide that in order to invoke this Court's continuing jurisdiction in C70–9213, the requesting party "shall meet and confer with all parties that may be directly affected by the request" in an attempt to negotiate a settlement. Paragraph 25(b)(1). The parties shall "continue to meet and negotiate as long as there appears to them to be a substantial possibility of settlement." *Id.* If the negotiations fail, the parties may proceed to mediation "or, absent mediation, the requesting party may file its request for determination." *Id.* However, the request for determination may not be filed until fifteen days after the conclusion of negotiations. *Id.* In the interim, "any affected party may demand mediation within 12 days after the conclusion of the unsuccessful negotiations." Paragraph 25(b)(2).

█ The Nisqually originally filed a Request for Determination regarding the Squaxin U & A on September 8, 2011.

*Nisqually v. Squaxin Island*, Subproceeding 11–01, Dkt. # 5. The Nisqually described the case area for the subproceeding as follows:

Those salt waters south and east of a line drawn from Mahnckes point on the Kitsap peninsula to the westernmost point of McNeil Island bordering on Pitt Passage, then extending from Hyde Point on McNeil Island bordering on Pitt Passage, then extending from Hyde Point on McNeil Island to Gordon Point on the mainland, and east of a line drawn from Johnson Point to Devil's Head.

*Id.*, p. 1. The Nisqually asked the Court to find that the Squaxin U & A did not include any locations within the subproceeding area. They also asserted that Judge Boldt established their primary rights in the Nisqually Reach in 1974. *Id.*, p. 5.

On September 29, 2011, the Squaxin moved to dismiss the 2011 Request for Determination for failure to comply with the pre-filing meet-and-confer requirements set forth in Paragraph 25. Subproceeding 11–01, Dkt. # 21. The motion was granted and the subproceeding was dismissed. *Id.*, Dkt. # 60. Prior to dismissal, however, the Nisqually conducted a meet-and-confer with the Squaxin and other interested tribes on October 24, 2011. Request for Determination, Subproceeding 12–01, Dkt. # 1, ¶ 4. 1. Subsequent meetings between Nisqually and Squaxin were held on November 14, 2011, and January 30, February 13, and March 26, 2012. *Id.* The Court nevertheless dismissed the Request for Determination as the meet-and-confer process must take place before the Request is filed. The Court noted that in the event the issue could not be resolved by the parties, the Nisqually could initiate a new subproceeding "after full compliance with the meet and confer requirement [of Paragraph 25]." Subproceeding 11–1, Dkt. # 60, p. 2.

On September 7, 2012, the Nisqually filed an *ex parte* motion for leave to open a new subproceeding regarding the Squaxin U & A, as required by the Court's Supplemental Order on Paragraph 25 Procedures, C70–9213, Dkt. # 19893. Ten days later, the Squaxin filed and served a demand for mediation on the Nisqually. Subproceeding 12–01, Dkt. # 2. Nisqually then filed this motion to waive mediation, asserting that the Squaxin demand for mediation is untimely, and that mediation "would lead to unnecessary expenditures of time and resources by the parties." Dkt. # 3. p. 3. The Squaxin have opposed the motion, asserting that their mediation demand is timely.

The Nisqually timeliness argument is based on a letter dated March 30, 2012, from Cynthia Iyall, Nisqually Tribal Chairman, to David Lopeman, Chairman of the Squaxin Island Indian Tribe. Declaration of Bill Tobin, Dkt. # 4, Exhibit. The letter, which was sent only to the chairman and not to counsel, stated,

> Thank you for your letter of March 27 regarding our settlement discussions and your invitation to meet again on May 23. We have considered your proposal, and while we support a negotiated resolution between our two Tribes, Nisqually continues to insist that any settlement recognize an exclusive Nisqually fishery in the waters under consideration. Our understanding from the meeting on March 26 was that Squaxin Island rejected Nisqually's first proposed point, which stated" "The Squaxin Island Tribe recognizes the exclusive area of the Nisqually Indian Tribe as defined in the 1981 court Order (map attached)." If we cannot agree on that fundamental point, we do not see how further discussions could lead to an agreement.

> If Squaxin is willing to agree to Nisqually's request for recognition of our exclusive area, or if you are willing to engage in further discussions that might lead to such an agreement, we would be happy to meet again. However, if Squaxin refuses to further entertain Nisqually's request, we regrettably must conclude that we have reached an impasse, and that our negotiations are at an end.

> If, based on Nisqually's position, Squaxin desires to continue discussions, please understand that at any future meetings we regard our Fish Commissioners, as elected tribal officials, as appropriate participants. Thank you.

*Id.*

In the view of the Nisqually, this letter of March 30, 2012, constituted a declaration that the negotiations were concluded as unsuccessful, triggering the twelve-day period during which the Squaxin could demand mediation. Paragraph 25(b)(2). Under this view, the September 17, 2012 mediation demand by the Squaxin was untimely, and the Request for Determination properly invokes this Court's continuing jurisdiction under Paragraph 25(b). The Squaxin argue in opposition that (1) the letter contemplated further negotiations and on its face was not a declaration of failure; (2) the letter was sent only to the tribal chairman and not to legal counsel or to any other tribe who participated in the negotiations; and (3) the 2012 Request for Determination is more narrowly tailored in its demands and asserts rights to a smaller geographic area, which has not been covered in the negotiations.[1]

The Court agrees with the Squaxin that the conditional nature of the language in the letter leads to the conclusion that it was an invitation to further negotiations (with conditions), rather than a final declaration of failure. Further, by sending the

---

1. The 2011 Request for Determination asserts the primary right of the Nisqually in the

Nisqually Reach. Subproceeding 11–01, Dkt. # 5. The 2012 Request for Determination

letter only to the tribal chairman and not providing a copy to legal counsel, the Nisqually deprived Squaxin's counsel of an opportunity to assess the legal effect of the letter under Paragraph 25. Finally, the Court cannot make a determination from the brief comments in the parties' memoranda as to whether the Nisqually request has actually been narrowed, but that is a question that may be determined through mediation. In summary, the Court finds that the March 30 letter was not a recognizable declaration of failure of negotiations under Paragraph 25(b)(2), and did not start the twelve-day period for demanding mediation. Accordingly, the Squaxin mediation demand was timely.

Because the Court retained jurisdiction in this case for limited and express purposes, the pre-filing requirements of Paragraph 25 are jurisdictional and must be strictly construed. Litigation is a last resort for resolution of inter-tribal fishing disputes, and the avenues of negotiation and mediation must be thoroughly explored first. As Judge Andrew Kleinfeld eloquently stated in his dissent from the amended opinion filed in the dispute between the upper Skagit Indian Tribe and the Suquamish Indian Tribe (Subproceeding 05–03),

> Continually revisiting Judge Boldt's decades-old opinions (and the limited record supporting them) in an attempt to discern what he thought the customs of multiple peoples were in the 1850's and earlier, besides being extremely burdensome and expensive, is a fundamentally futile undertaking. The truth is not knowable. "This exercise is not law, and is not a reliable way to find facts, so it is hard to see why courts are doing it

and how it could be preferable to the Indian tribes working some dispute resolution system out for themselves."

*U.S. v. Washington,* 590 F.3d 1020, 1026 (9th Cir.2010) (in dissent), quoting *U.S. v. Washington,* 573 F.3d 701, 710–11 (9th Cir.2009).

The Court declines to accept the Nisqually argument that further negotiation would be futile and would lead to unnecessary expenditures of time and resources by the parties. Accordingly, the motion to waive mediation (Dkt. # 3) is DENIED. The Request for Determination is DISMISSED, without prejudice, for failure to properly comply with Paragraph 25 procedures. The Clerk shall enter judgment of dismissal, without prejudice, and close the subproceeding.

---

substitutes the term "bay at the mouth of the Nisqually River" for "Nisqually Reach" as the area of the Nisqually primary right. Subproceeding 12–01, Dkt. # 1. The Nisqually contend they are one and the same. Judge Boldt

did not use the term "Nisqually Reach" in describing the U & A of the Nisqually. *U.S. v. Washington,* 384 F.Supp. 312, 369 (W.D.Wash.1974).